Jason Harrow
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

Charles Gerstein
(*pro hac vice*)
Emily Gerrick
(*pro hac vice forthcoming*)
GERSTEIN HARROW LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
charlie@gerstein-harrow.com
(202) 670-4809

James Crooks
(*pro hac vice*)
Michael Lieberman
(*pro hac vice*)
FAIRMARK PARTNERS, LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
jamie@fairmarklaw.com
michael@fairmarklaw.com
(619) 507-4182

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREW SAMUELS, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>LIDO DAO, a general partnership; AH CAPITAL MANAGEMENT, LLC; PARADIGM OPERATIONS LP; DRAGONFLY DIGITAL MANAGEMENT LLC; ROBOT VENTURES LP,<br><br>        Defendants. | Case No. 3:23-cv-06492<br><br>**AMENDED COMPLAINT**<br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED**<br><br>**Date: April 3, 2024**<br><br><br>**Before The Hon. Vince Chhabria** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Preliminary Statement**

1.      Defendant Lido DAO runs an "Ethereum staking" business. Staking is a process through which people earn money in exchange for verifying transactions on the Ethereum blockchain. Users are eligible to participate only if they commit or "stake" (*i.e.*, put at risk as collateral) a threshold amount of Ether (abbreviated ETH), the blockchain's native token. The more ETH users stake, and the more resources they dedicate to verifying transactions, the more money they earn. Lido's business is straightforward: It pools together its customers' assets and hires service providers (called "validators") to stake those assets. Lido keeps 5% of the proceeds of the staking process for itself, pays 5% to the validators, and sends the rest to its customers.

2.      Lido's staking business is successful: it stakes the equivalent of more than thirty billion U.S. dollars at a time. But the Silicon Valley venture capital firms (Defendants here) behind Lido were not content simply to run a fabulously lucrative business. Instead, they wanted to sell equity in that business to the public. And so Lido designed, created, marketed, and sold a crypto-asset called LDO, which is analogous to stock in the company, to the public. Unlike most technology startups, no one ever registered LDO or transactions in LDO with the SEC. As part of Lido's efforts to solicit secondary-market purchases of LDO, Lido caused LDO to be listed for trading on US-based crypto exchanges, which Lido candidly admitted the venture capital firms would want to do because "it is in their own best interests."

3.      Individuals, including Plaintiff, bought LDO tokens on those US-based crypto exchanges in securities transactions.

4.      By causing third parties in the U.S. to list LDO for secondary-market sales with the express purpose of financially benefiting Lido and its venture-capital controllers, and doing other things described below, Lido rendered itself a statutory seller of unregistered securities and is liable to Plaintiff and members of the proposed class for their losses.

1

## Parties

2      5.      Defendant Lido DAO, GP ("Lido") is a general partnership governed by

3    large holders of LDO. The DAO's governance is controlled by Defendants here and

4    their collaborators. Although Lido's headquarters is unknown, its founders and

5    Defendants' key collaborators are Kasper Rasmussen, who is Danish and lives in

6    Copenhagen; Vasily Shapovalov, who is Russian and lives in Cyprus; Konstantin

7    Lomashuk, who is Russian and lives in the Territory of Cocos (Keeling) Islands, an

8    external territory of Australia; and Jordan Fish, who is British and whose

9    whereabouts are unknown. The individuals are not Defendants here.

10     6.      Defendant    Paradigm    Operations    LP    is    an    investment    firm

11   headquartered in San Francisco. On information and belief, it and its agents engaged

12   in the conduct alleged here while in the United States. Through its agents, including

13   Arjun Balaji and Georgios Konstantopolous, Paradigm has publicly participated in

14   the Lido general partnership. And the Lido DAO has publicly identified Paradigm as

15   one of the key "strategic partners."

16     7.      Defendant AH Capital Management, LLC, doing business as Andreesen

17   Horowitz, is a venture-capital and investment firm headquartered in Palo Alto,

18   California. On information and belief, it and its agents engaged in the conduct alleged

19   here while in the United States. Through its agents, including Porter Smith,

20   Andreesen Horowitz has publicly participated in the Lido general partnership. The

21   Lido DAO has publicly identified Andreesen Horowitz as a member of "the Lido

22   family," creating a graphic to note the link between the Lido DAO and Andreesen

23   Horowitz. And the Lido DAO expressed gratitude for Andreesen Horowitz

24   participating in the Lido DAO governance and staking with Lido.

25     8.      Defendant Dragonfly Digital Management, LLC, is a venture-capital

26   and investment firm headquartered in San Francisco and Beijing. On information

27   and belief, it and its agents engaged in the conduct alleged here while in the United

28

States. Through its agents, Dragonfly has publicly participated in the Lido general partnership. And the Lido DAO has publicly identified Dragonfly as one of the key "strategic partners."

9.     Defendant Robot Ventures LP is an entity used to manage the investments of Robert Leshner and Tarun Chitra, who are also founders and partners of Robot Ventures. Its headquarters is San Francisco, where Leshner lives and works. On information and belief, Robot Ventures and its agents engaged in the conduct alleged here while in the United States. Both Chitra and Leshner have participated in the Lido general partnership. And the Lido DAO has publicly identified Robot Ventures as one of the key "strategic partners."

10.     Plaintiff Andrew Samuels lives in Solano County, California. He purchased approximately 132 LDO tokens in April and May 2023 on Gemini, a US-based cryptocurrency exchange. He sold those tokens for a loss in June 2023.

## Jurisdiction and Venue

11.     This Court has subject-matter jurisdiction over this Action under 28 U.S.C. § 1331 because the Action arises under the laws of the United States.

12.     This Court may exercise general personal jurisdiction over Paradigm, Andreesen Horowitz, Dragonfly, and Robot Ventures (collectively "Partner Defendants") because they are headquartered in California.

13.     This Court may exercise specific personal jurisdiction over Lido because it purposefully targeted its solicitation activities at the United States and California, specifically by listing and promoting its illegal securities for trading on California-based exchanges and other U.S. exchanges and to California persons, including Plaintiff, and other U.S. persons, with the purpose of inducing secondary-market purchases of those securities for its own gain. Lido also has U.S.-based employees and contractors, and has entered into business relationships with multiple U.S.-based entities, including Partner Defendants, Coinbase, Compound, MetaMask, and many

more, from which the subject matter of this action arises.

14.     Venue lies in this District because a substantial portion of the acts leading to this Action were performed in this District and because the Partner Defendants are headquartered in or residents of this District and because all Defendants transact business in this District.

## The Ethereum Blockchain

15.     In 2009, someone calling themselves Satoshi Nakamoto created Bitcoin. Bitcoin is a virtual currency—it serves as a store of value, a unit of account, and a means of exchange—but it is not issued by any government and lacks legal-tender status in every nation except El Salvador, which declared Bitcoin legal tender in 2021.

16.     Bitcoin is created and maintained on a digital ledger called a "blockchain." To maintain a blockchain, a distributed network of computers uses a cryptographic function called a "hash" to validate a series of transactions (a "block") and connect it (in a way that is practically immutable) to all prior series of transactions (hence "chain").

17.     The hash function used to validate blocks can vary in its computational intensity—that is to say, it can require more or less computing power to solve the hash function. The Bitcoin blockchain, then, operates by (a) awarding people Bitcoin in exchange for validating new blocks using a hash function, and (b) allowing the difficulty of the hash function to vary in response to the number of people attempting to validate new blocks such that it always takes approximately ten minutes for someone to successfully validate a new block. Although the network predictably generates a new block in approximately ten minutes, the hash function can be solved (for practical purposes) only by trial and error, which means that the person who is awarded Bitcoin for mining each block is determined pseudo-randomly: People compete to solve the hash function first, and the winner is rewarded Bitcoin. Because

the hash functions' computational intensity requires the expenditure of a real resource to verify transactions, the network as a whole is robust to an attack by a malicious actor in proportion to the amount of resources required to solve the hash function—to verify fraudulent transactions, a malicious actor would need to expend more resources than all of the honest transactors, and so if the honest transactors are expending lots of resources their network is robust. This is the process called "proof of work" and the people competing to solve the hash functions are called "miners."

18.     In 2015, Vitalik Buterin and others working with him created Ethereum. Ethereum's native currency is called "Ether," and abbreviated ETH. At its founding, Ethereum was a proof-of-work blockchain just like Bitcoin, except Ethereum could more easily allow each block to record transactions other than simple transfers. Indeed, in Buterin's vision, Ethereum is a "virtual machine"—using proof-of-work to maintain the distributed ledger, Ethereum is theoretically capable of running any program that a computer could run. (This property is called "Turing completeness," after cryptographer Alan Turing.)

19.     Because Ethereum was Turing complete, it allowed for the creation of innovative new collective computing activities. For example, Ethereum users could create programs called "smart contracts," which, as their name suggests, automatically execute transactions when certain conditions are triggered. These smart contracts can together create "protocols," which are the rough equivalent of software on a personal computer. Some protocols allow for machine-executed borrowing, lending, and asset exchanges. And together these protocols created something called "DeFi," or "decentralized finance," which uses blockchains ostensibly to remove third parties, like traditional banking institutions and regulators, from financial transactions.

20.     In the place of those traditional institutions, DeFi entrepreneurs created "DAOs" (pronounced "dows"), or "decentralized autonomous organizations." In a

DAO, there is no formal corporate structure, no explicit liability protection, and no formalized distinction between, say, managers and directors. Instead, holders of specific tokens—such as the LDO token at issue here—have governance rights that allow them to suggest actions that the associated DAO will take. Those suggestions are then voted on and implemented if the required number of tokenholders support the actions. Actions include many of those typically done by corporate officers, boards, or employees, such as spending treasury funds to hire people; changing organizational goals and policies; and even distributing treasury assets to tokenholders, like how corporations can authorize distributions to owners. Holders of governance tokens thus may participate in the governance of a protocol and have a potential claim on its profits.

21.   As Ethereum became more popular, the number of miners on the network increased, and so too did the computational intensity of the operations they needed to solve to earn Ether rewards. And so too, then, did the resources they needed to burn—in most cases quite literally. By early 2022, Ethereum alone was burning more energy in a year than Switzerland, a wealthy country of more than 8 million people that gets quite cold in the winter.

22.   To mitigate Ethereum's impact on climate change, Buterin and others decided to transition from the proof-of-work model to something called "proof of stake." The proof-of-stake process works like this: Each new block added to the chain is "validated" by a pseudo-randomly selected person who has "staked" Ether; staking Ether subjects it to forfeiture (called "slashing") if the person acts dishonestly or incompetently; and people are selected for validation in proportion to the size of their stake and rewarded with larger stakes accordingly. Because Ether rewards are paid out proportionally to the share of total staked Ether that each validator has staked, the proof-of-stake process creates an essentially fixed rate of return in exchange for an investment.

23.     To effect the transition between proof-of-work and proof-of-stake, Buterin and others started a new chain, called the Beacon chain, to run alongside the old Ethereum chain for a while until a day called "the Merge," when the two chains' transaction histories would be reconciled and future transactions would be conducted on the Beacon. Initially, though, the Beacon had a few limitations—staked assets could not initially be withdrawn, and the threshold for putting up a stake (and thus for earning the rewards associated with it) was quite high.

## The Ethereum Merge Creates a Business Opportunity

24.     As the merge approached, from 2020 to 2022, many in the crypto economy realized that the impending proof-of-stake process created a business opportunity: Many people would want to cash in on the Ether rewards generated by the new network, but the process would be illiquid (because staked Ether could not immediately be withdrawn), capital intensive (because the initial threshold for a stake cost around $50,000 dollars), and technologically complicated (because running the validating software is reasonably challenging for average computer users). A company that could pool investors' assets and stake them in exchange for a fee could thus meet a clearly anticipated market demand.

25.     In response, Coinbase and Kraken, two large U.S.-based crypto asset exchanges, began offering programs called "staking as a service." Under these programs, Coinbase and Kraken took possession of users' assets, staked them, and paid the effectively fixed proceeds to the users less a fee.

26.     This is illegal to do in the United States without registering with the SEC: Staking as a service involves the investment of money in a common enterprise with the expectation of profits relying on the efforts of others, and it is thus an investment contract required to be registered as a security. Unsurprisingly, then, the SEC brought enforcement actions against Coinbase and Kraken for illegally selling securities to the public. *See, e.g.*, *SEC v. Coinbase Inc.*, No. 23-cv-4738, 2024 WL

1304037 at *33 (S.D.N.Y. March 27, 2024) ("The Court finds that the SEC has sufficiently alleged that Coinbase offers and sells the Staking Program as an investment contract … [in violation of] Securities Act Sections 5(a) and 5(c).").

## The Lido DAO Is Formed to Capitalize on Ethereum Staking

27. In 2020, Lomashuk, Shapolov, and Fish created Lido, which they described as a "decentralized" Ethereum staking service.

28. To facilitate the creation of Lido, Lomashuk, Shapolov, and Fish incorporated some legal entities in the British Virgin Islands. These BVI entities operate a website by which users could access information about Lido and, eventually, transfer money to Lido, but the entities (as they vigorously repeat in their legal documentation) do not control Lido.

29. Lido's plan was materially identical to Coinbase's and Kraken's illegal staking services. The only difference is that Lido was set up as a DAO, with the explicit goal of avoiding regulatory scrutiny for its fundamentally illegal business. As one Lido DAO member put it, there was an understanding that Lido could avoid "the potential of SEC enforcement action" because "[t]he Lido DAO is a fully-decentralized organization with no legal entities."

30. To use Lido to stake Ether, users navigate to a website operated by the Caymans entity and send their Ether to a smart contract controlled by Lido. That contract pools all the Ether together and issues tokens, called stETH (for "staked ETH"), in return for each deposit. The Lido DAO then votes to select people to serve as the actual, technological validators. This is one of the—if not the only—key business decisions that Lido makes.

31. Once approved, the validators stake the pooled Ether, listing an address to which to send ETH rewards that is in fact controlled by the DAO. (This way the validators can't just run off with the money.) Then Lido uses an "oracle" (an external computer program) to check how much ETH the validators have earned from staking

1   users' ETH and periodically distributes 5% to the validators for having done the work

2   of validating, keeps 5% for itself, and gives the remaining 90% to the users

3   themselves. Users can then do whatever they please with stETH—borrowing and

4   lending, investing, et cet.—and all the while earn a fixed rate of return (promised by

5   Lido) on the ETH. (As of April 1, the rate of return was approximately 3.2%.)

6       32.   To establish the Lido DAO, the founders generated a billion LDO tokens.

7   Sixty-four percent of those initial tokens were given to the founders and initial

8   investors. According to a news article, "that giant stash is locked for a year and then

9   will be parceled out (vested) over the following year." The remaining 36% were put in

10  Lido's "treasury," to be distributed as the holders of the other 64% see fit.

11      33.   As explained above, these LDO tokens represent ownership of the Lido

12  business and allow tokenholders to vote on governance proposals.

13      34.   Tarun Chitra, founder and partner at Defendant Robot Ventures, has

14  praised Lido as being among the rare projects to "securitize something prelaunch."

15      35.   The revenue generated by Lido's 5% fee on all staking done through its

16  protocols is retained in Lido's treasury and is used to pay for operating costs of the

17  business, with the understanding that eventually tokenholders will vote to distribute

18  the profits amongst themselves. As Defendant Andreesen Horowitz put it, after

19  "focus[ing] on growth and product technical development," they plan to explore "token

20  buyback mechanisms" and other ways to distribute the profits.

21      36.   As a member of the Lido DAO's "Treasury Committee" explained:

22         You can think of tokens as equity in a startup. If you have
    them, you own the company and are incentivized to make
23         it grow in the long term because you will either get cash-
    flows (e.g., dividends) or an exit (e.g., IPO, acquisition). . . .
24         With crypto in particular, token price also helps bring
    attention to the project (similar to funding rounds do for
25         startups) which can create a community around it (many
    times ends up looking like a Ponzi). In a nutshell, my POV:
26         Should we worry about $LDO in the short term? Probably
    not, this is a startup (long term game) [.] Should Lido
27

28

provide an economic reward to LDO holders? Definitely, one day but it's not necessarily a short term priority. We need to grow a lot and make lots of money first.

**The Lido DAO Is Formed with Partner Defendants as General Partners**

37.     The Lido founders and its institutional investors actively work together to run the Lido DAO as a business for profit. Unlike other technology startups, they have not incorporated the Lido DAO anywhere nor sought any form of limited-liability protection for the Lido DAO.

38.     Shortly after Lido was formed, it distributed LDO tokens to venture capitalists to fund its operations. In April 2021, Lido sold 10% of its then-outstanding supply to Paradigm and another 3% to a collection of other venture capitalists. About a year later, Andreesen Horowitz invested $70 million in Lido and received an undisclosed amount of LDO. And shortly thereafter Lido sold another $25 million in LDO to Dragonfly. These sales were generally subject to vesting schedules pursuant to which the companies were not permitted to sell their tokens for certain periods of time.

39.     Each of the Partner Defendants are institutional investors that were chosen to invest due to the deep knowledge and expertise they could bring to the venture.

40.     A blog post from a company called Mint Ventures explained Paradigm's deep involvement in Lido from its inception: "Georgios Konstantopoulos, Hasu and Arjun Balaji from Paradigm conducted in-depth research on Lido Finance and contributed to Paradigm's investment, and they also influenced and even guided the development route of Lido Finance on the key decentralization issue of Lido Finance. In combination with the voting rights represented by the large number of LDOs held by Paradigm and the huge impact on Lido, these three members of Paradigm can also be counted as team members of Lido Finance to some extent."

41.     Paradigm was sought after as an investor and "team member" because of its expertise in running crypto businesses on a day-to-day basis. "Paradigm's support for DeFi projects and in-house expertise (including smart contract developers and security experts)," Lido wrote, "positions it as a premiere [*sic*] participant in the DeFi ecosystem uniquely positioned to lend its expertise to LidoDAO governance and serve as a liaison to other DeFi project teams who can help further decentralize LidoDAO's community....Paradigm has strived to partner with its portfolio investments by providing valuable input on product and technical strategy. The team actively contributes to protocol research (examples include Flashbots, Yield Protocol, Uniswap V3, Optimism), writing code, and, in some cases, auditing codebases."

42.     This hands-on approach to its investments is typical for Paradigm. As its website explains, Paradigm "take[s] a deeply hands-on approach to help projects reach their full potential, from the technical (mechanism design, smart contract security, engineering) to the operational (recruiting, regulatory strategy)."

43.     Andreesen Horowitz, when announcing its $70 million investment in Lido, explained that "[w]e actively contribute to the networks and communities in our portfolio. . . . We will contribute, as both a staker and governance participant, to help ensure a fair, transparent, and credible staking ecosystem."

44.     Again, this type of hands-on involvement in its crypto investments is expected of Andreesen Horowitz. Andreesen Horowitz's crypto fund advertises that it supports the businesses it invests in with its "research organization," "[e]ngineering and security teams," "[l]egal and regulatory teams," "[g]o-to-market expertise," "[r]ecruiting services," "[e]ducational content," and a "Crypto Startup School."

45.     Dragonfly and Robot Ventures were similarly chosen, according to Lido's Chief Marketing Officer, "for a number of reasons, specifically their expertise in the successful development of distributed protocols." Lido's Chief Marketing Officer wrote that "[w]e are confident in their ability to add similar expertise to the Lido

1    DAO."

2        46.    In July 2022, Partner Defendant Dragonfly used its LDO tokens to vote

3    to sell itself even more at a discount to the market price, further cementing its role

4    as a general partner in Lido. Dragonfly wrote on a public Lido forum: "Dragonfly has

5    been an active supporter of Lido since we participated in the first treasury

6    diversification round….However, due to the constrained allocation for funds outside

7    of Paradigm, our support has been limited to strategy calls and specific requests from

8    core Lido contributors. That said, we're long-term investors and are looking forward

9    to being more active in governance….We have never sold any of our purchased LDO

10   from the previous round (despite unlocks), and do not intend to sell LDO purchased

11   from this treasury sale at any point over the next few years."

12       47.    Dragonfly also explained that it had made this move after being invited

13   to do so by the Lido team, writing, "After conversation with the Lido team, at their

14   suggestion, the Liquid team [at Dragonfly] used their existing LDO to vote on the

15   proposal out of the address 0x641c."

16                    **Defendants Sell LDO To the Public**

17       48.    The Lido founders and its institutional investors like Partner

18   Defendants were not content to simply run Lido's (fundamentally illegal without

19   registration) business for a profit; they also wanted to be able to earn money on their

20   investments through a potential "exit" opportunity. To do that, the companies needed

21   a liquid secondary market into which to sell their tokens. And so Lido and the Partner

22   Defendants began the process of listing LDO tokens on crypto-asset exchanges. Yet,

23   unlike most technology startups who engage in a robust regulatory process prior to

24   selling or listing stock, Lido and the Partner Defendants chose not to.

25       49.    In February 2022, an LDO holder submitted a proposal to gauge the

26   "community's" sentiment about listing LDO on centralized crypto-asset exchanges

27   (sometimes "CEXs"). A centralized crypto-asset exchange is essentially identical to a

28

stock exchange except users trade crypto assets rather than stock and no one registers assets with the SEC or submits any mandatory disclosures to investors. Because trading crypto assets directly on the blockchain requires some technological sophistication, the vast majority of individual investors—including Plaintiff here—use centralized exchanges to invest.

50.     The user submitting the proposal wrote: "A strategy that many projects, DAOs and protocols have employed to aid with listings and liquidity on CEXes is that of hiring or partnering with a market maker. A recent example of this is Index Coop partnering with Wintermute. Crypto-native market makers such as GSR, Wintermute and others tend to have good connections and pull with CEXes and can accelerate (or initiate) CEX listings and the subsequent liquidity provision for LDO markets after listings."

51.     A Lido representative named Hasu, who also works for Paradigm, put Lido's response straightforwardly, responding that "Later this year, LDO owned by well-connected venture firms…is going to unlock due to the vesting schedule. Wouldn't it be natural to assume that they will help get LDO listed on CEXs because it is in their own best interest to do so? I see a decent chance that we can get the same outcome for free just by waiting."

52.     In further response, a Lido representative named Jacob Blish wrote that "Centralized exchange listings and market making are 2 such activities that walk a thin edge from a legal standpoint. It matters how it is done. I am looking at how we can work with exchanges and would love any insight you might have on the matter."

53.     Blish was hired and paid by the Lido DAO starting in mid-2021 to be "Business Development Lead for Lido DAO," and one of his key roles was to get LDO listed on exchanges. This included working directly with exchanges to list LDO, encouraging the public to "ask [exchanges]" "to list LDO[.]" And the few times exchanges reached out to Lido with an interest in listing LDO, Blish responded

asking representatives for two exchanges to send him private messages to his account "jbeezy."

54.    Once Blish and other members of the Lido DAO caused exchanges including Gemini, Kraken, and Cypto.com to list LDO, Blish, Rasmussen, and other Lido DAO employees promoted the availability of LDO for purchase on those and other exchanges in many public posts on Discord, including the following:





1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



25    55.    Blish had previously explained that "Listing is a complicated process

26 and we have to be careful of the legal implications so that Lido is not seen as

27 manipulating pricing in any way. Therefore a marketing budget or paying for a listing

28

AMENDED COMPLAINT

is not something Lido can do without risk of exposure….” But, Blish made clear, “We are working with a number of exchanges on listing both LDO and st-assets but it will take time. We also need to coordinate with market makers who will be able to provide the necessary liquidity on said exchanges.”

56.   The Lido DAO created a form to allow exchanges to send and receive information from Lido about listing LDO. Members of the Lido DAO team directed exchanges to fill out the form when an exchange interested in listing LDO reached out.

57.   By November 2022, LDO was listed for trading on Coinbase, a California-based crypto exchange.[1] Coinbase's website advertises it as a means by which “asset issuers” can “list, launch, and grow.” On that page, Coinbase tells issuers that it will “[h]elp new customers learn about your asset…to help you reach and grow an audience.”

58.   To list LDO on Coinbase, Lido completed a “Listing Application” which required detailed information about LDO and then worked with the Coinbase “Listings Team” to identify and overcome roadblocks to the listing.

59.   Lido's Chief Marketing Officer Kasper Rasmussen promoted Lido's work to be listed on Coinbase stating publicly the day before trading began, “LDO is coming to Coinbase [Beach emoji] Deposits/withdrawals are live, with trading to go live at 9AM PT on 17 November.” Rasmussen often uses the username “kethfinex.”

60.   In February 2022, LDO was listed for trading on Gemini, a New York-based crypto exchange.[2] Gemini's publicly described approval process required it to conduct thorough due diligence on Lido (as with all digital assets it lists), including communicating with Lido regarding the reasons for the creation of the assets,

---

[1] Coinbase is owned and operated by Coinbase, Inc. and Coinbase Global, Inc., which are Delaware corporations headquartered in New York.
[2] Gemini is operated by Gemini Trust Company, LLC, which is a New York trust company headquartered in New York.

diligence on the issuer, diligence on the protocol linked to the asset (including the level of the protocol's decentralization, the protocol's cybersecurity procedures, the protocol's illicit finance procedures, the potential legal risks to the protocol, etc.), diligence related to the entities holding a high concentration of the asset, and *ongoing* diligence on the same issues after the token is issued. On information and belief, to cause LDO to be listed pursuant to this process, Lido DAO actively collaborated with Gemini.

61.     A Lido team member (who works under the pseudonyms "cc" and "cryptodenier") repeatedly informed the public that they could purchase LDO on Gemini. Even before trading began on Gemini, Lido's Chief Marketing Officer Kasper Rasmussen promoted the listing, announcing, "LDO is coming to Gemini! Stay tuned for news on the start of trading[.]" And the official Lido DAO X (formerly Twitter) account promoted the announcement of the listing on Gemini.

62.     In May 2022, Lido's Chief Marketing Officer announced that LDO had been listed on Kraken,[3] a California-based crypto exchange, and Crypto.com,[4] a Singapore-based exchange accessible to U.S. users. To list LDO on Kraken, Lido (like all token issuers) had to submit a "new coin listing request" or otherwise engage with Kraken's listing team to provide information and respond to questions about the token.

63.     Likewise,  to list LDO on Crypto.com, Lido (like all token issuers) had to submit one of the required "applications for digital assets to be listed" and engage with the Crypto.com team who reach out after the token is "shortlisted." A Lido team member (who works under a pseudonym) repeatedly informed the public that they

---

[3] Kraken's exchange is operated by Payward Ventures, Inc., which is a Delaware corporation headquartered in California. Payward Ventures, Inc.'s parent corporation is Payward, Inc., which is a Delaware corporation headquartered in California.

[4] Crypto.com is operated by Foris DAX, Inc., a Singaporean corporation. Crypto.com holds money-transmitter licenses in all U.S. states and has registered with FINCEN as a money-services business.

could purchase LDO on Kraken and Crypto.com.

64. Lido's Chief Marketing Officer has also promoted LDO's listing on several other exchanges. In March 2021, he announced that "LDO/ETH market is live on DeversiFi"; in June 2022, he announced that "LDO is coming to Huobi Global [beach emoji] Deposits are live, with USDT trading to follow in the coming hours"; and in July 2022 he announced that "On July 08 Lido DAO (LDO) got listed on KuCoin."

65. For those who purchase LDO on centralized exchanges including Gemini, Coinbase, Crypto.com, and others, it is not possible to use their tokens to vote on governance proposals because the exchanges maintain custody of users' crypto assets.

66. Since LDO's listing on these exchanges, the token has become one of the most traded DAO tokens on the market. As of December 15, 2023, LDO had the third-highest market capitalization out of any DAO project token and a 24-hour trade volume of over $76 million.

67. Lido has publicly touted increases in the price of LDO by, for example, announcing from its official X account that "LDO price is $1.04 today, up +53% over the past week," "LDO price is $1.63 today, up +57% over the past week," and that "During the last week we have seen the highest LDO trading volumes since Jan. 2021."

68. Lido has publicly touted its listing on crypto exchanges from its official X account, including by announcing that "LDO is live on @krakenfx [beach emoji]," that "Lido's LDO token is live on @DeversiFi," that LDO was "listed on KuCoin," and that LDO was "listed on FTX."

69. Lido regularly encourages members of the general public to participate in Lido governance, which can be done only by owning LDO tokens. Lido's website encourages the public to obtain LDO, stating that "[h]olding LDO gives DAO

members a vote in the future of Lido, allowing each DAO member to have a personal say in the community" and that "[t]he more LDO there is on a user's balance, the greater voting power the voter gets." By purchasing LDO tokens, Lido promises, tokenholders can have "a say in the direction and growth of the Lido DAO." Lido regularly touts upcoming votes on its website, on its official X account, and in other formats accessible to the general public.

70.     Lido's website currently states: "LDO is available on a variety of exchanges such as Uniswap, SushiSwap, 1inch, DeversiFi, Binance, Coinbase, and OKX."

## Lido's Day-to-Day Operations

71.     Lido swiftly proved to be fabulously successful. As of April 2024, Lido customers are staking more than *thirty billion dollars*' worth of Ethereum with Lido. And Lido has acquired significant influence over the Ethereum network—it currently controls more than a third of all staked Ethereum, giving it significant control over the network.

72.     A venture this large of course requires significant ongoing managerial and promotional efforts to develop and maintain the success of the endeavor.

73.     Lido has over 70 employees. Many of these employees are software developers who maintain and improve the Lido website and staking protocols.

74.     Lido's Chief Marketing Officer, Kasper Rasmussen, has been leading Lido's marketing, communications, branding, and promotion activities since Lido was founded in 2020. He has publicly promoted trading LDO on multiple occasions, encouraging the general public to "[t]rade LDO against USD and EUR," i.e., against the U.S. dollar and Euro, and urging people to purchase LDO and thereby join the Lido DAO "in just a few easy clicks using 20+ fiat currencies."

75.     Partner Defendants and Lido employees frequently suggest governance proposals and communicate with each other about those proposals.

76.     As described above, Partner Defendants all made public statements about their intentions to be involved in the development and operations of the Lido DAO. This involvement includes discussing and voting on governance proposals to alter and improve the Lido staking protocol, distribution of LDO tokens, hire contractors, and more. Because the Lido founders and a handful of early institutional investors like Partner Defendants control the majority of LDO tokens, their decisions are controlling and the public expects their continued financial interest in the project to incentivize their ongoing work to promote the business.

77.     For example, as discussed above, in July 2022 Partner Defendant Dragonfly used its LDO tokens to vote to sell itself even more at a discount to the market price.

78.     The process began with a proposal to "diversify" the treasury by selling LDO to, among others, Dragonfly. Dragonfly employee Ashwin Ramachandran wrote of the proposal: "The primary purpose of the proposal is to ensure that the LidoDAO has adequate runaway in the case of continued market volatility. The LidoDAO currently has ~75 full-time contributors with annualized operating costs totaling $16-18MM. In our view, it's critical for the LidoDAO to have ample stablecoin[5] reserves to meet its payroll obligations over the next 18–24 months." The official proposal noted that "Dragonfly has been a premiere [sic] participant in the DeFi ecosystem uniquely positioned to lend its expertise to LidoDAO governance and serve as a liaison to other DeFi project teams who can help further decentralize LidoDAO's community."

79.     Eventually the proposal passed. The "community"—i.e., tokenholders who were not institutional investors like Partner Defendants—was, to say the least,

---

[5] A stablecoin is a crypto asset that is designed to maintain the value of a fiat currency, such as the dollar or Euro. For example, the token "USDC" or "U.S. Dollar Coin" is "tethered" such that one USDC will always be equal to one U.S. dollar.

**AMENDED COMPLAINT**

displeased. Nonetheless, because ordinary investors have no hope of stopping governance proposals from Partner Defendants, the deal went through with minor adjustments.

80.     Similarly, in July 2022, a proposal to self-limit Lido's share of the staking market was rejected by a margin of 99.81% to 0.19% despite over 40% of wallets that voted supporting the proposal.

81.     Lido DAO also purports to have a general counsel. In the summer of 2022, a Lido holder proposed "to engage Eric Hill aka @rotorless as Head of Legal and General Counsel for Lido." The vote passed by a margin of 64,252,044 to 571. Lido DAO pays Hill $250,000 per year in stablecoins and equity in the form of LDO options.

82.     Plaintiff's counsel attempted to reach Lido to serve the initial summons and Complaint by, among other ways, emailing Mr. Hill, messaging him via X to @rotorless, and posting the summons and Complaint on a public Lido forum. To this point, Plaintiff's counsel has gotten no response from Mr. Hill or anyone purporting to act on Lido DAO's behalf. Plaintiff's counsel has also served Lido DAO in other ways, and Lido DAO has thus far not responded to the Complaint and not communicated with the Court or Plaintiff's counsel.

**Transactions in LDO Tokens Are Securities**

83.     Gary Gensler, the Chair of the SEC, recently stated that, other than Bitcoin, all crypto "tokens are securities because there's a group in the middle [between the tokens and investors] and the public is anticipating profits based on that group."

84.     Gensler recently stated, with respect to crypto tokens that are not registered as securities, that "the path forward is well-trodden.... We have tens of thousands of [non-crypto] registrants that properly in good faith comply, they register, they make the proper disclosures. It's time for this group to do so. The

1    runway is getting awfully short, and we're here to try to protect the investing public."

2        85.    Gensler recently stated: "There's nothing incompatible [between] crypto

3    and our securities laws. Our securities laws were brought about to protect the

4    investing public against fraud and schemes and manipulation. And it was through

5    this idea of full, fair, and truthful disclosure, registering with the SEC when you're

6    raising money from the public and the public's anticipating a profit."

7        86.    The securities laws define the term "security" to include any

8    "investment contract."

9        87.    Under the Supreme Court's decision in *SEC v. WJ Howey Co.*, 328 U.S.

10   293 (1946), an "investment contract" is an investment of money in a common

11   enterprise with a reasonable expectation of profits to be derived from the

12   entrepreneurial or managerial efforts of others.

13       88.    The SEC's Strategic Hub for Innovation and Financial Technology has

14   published the Framework for 'Investment Contract' Analysis of Digital Assets ("SEC

15   Framework"), which provides guidance for assessing whether transactions in crypto

16   tokens are  securities under federal law.

17       89.    The SEC Framework states that the first prong of the *Howey* test—an

18   investment of money—"is typically satisfied in an offer and sale of a digital asset

19   because the digital asset is purchased or otherwise acquired in exchange for value,

20   whether in the form of real (or fiat) currency, another digital asset, or other type of

21   consideration."

22       90.    Investors in LDO use various forms of money, including various forms

23   of crypto assets, to make their investments. Many investors, including Plaintiff,

24   obtained their LDO tokens on the secondary market in exchange for cash or various

25   cryptocurrencies or other digital assets.

26       91.    The SEC Framework states that a 'common enterprise' typically exists"

27   with respect to "digital assets."

28

92.     LDO is no exception. Investors who purchase LDO tokens are investing in a common enterprise—the Lido business—and the value of their LDO tokens are interwoven with and dependent upon the success of the DAO and the protocol, as well as the efforts of those who control the DAO and the protocol.

93.     Partner Defendants each own or control a substantial share of Lido, such that they share a common financial interest in the Lido token with Plaintiff and the members of the class. As Lido stated publicly, of the 1 billion LDO tokens initially minted, 15% were allocated to Lido's founders, 20% were allocated to Lido developers, and 22.18% were allocated to investors, including Partner Defendants.

94.     With respect to the element of "reasonable expectation of profits," the SEC Framework states that "[a] purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

95.     Investors in LDO, including Plaintiff and Defendants, make their investment with a reasonable expectation of profit. The information that Lido has publicly disseminated has led LDO holders to reasonably view LDO as an investment and expect to profit from Lido's efforts to grow Lido's staking business and the associated ecosystem, which in turn would increase the demand for and value of LDO.

96.     Lido has stated publicly that it would use the proceeds from its sales of LDO, as well as its own LDO holdings, to fund the development, operations, and marketing efforts of Lido's business (which in turn would increase demand for and the value of LDO). For example, in connection with the sale to Paradigm of 100 million LDO, Lido stated publicly that the sale would "help guide development, facilitate vertical integration of stETH in Ethereum's DeFi ecosystem and bolster Lido's position as the market-leading solution for staking tokens." Similarly, in connection with the sale to entities including Robot Ventures of 30 million LDO, Lido stated that the sale would "solidify Lido's position as the leading liquid staking

1   solution in the DeFi space, allowing us to grow further through collaboration with a

2   group of strategic partners." Similarly, the official proposal for the sale of LDO tokens

3   to Dragonfly, described above, stated that the sale of LDO tokens would "ensure Lido

4   and its core contributors are able to continue the important work needed for the

5   protocol in the long term and to flourish as an autonomous, self-governing collective."

6       97.    Lido's website explains that it will use its Treasury Fund to "develop

7   and upgrade the Lido protocol to solidify our position as the leading liquid staking

8   solution," including by "paying full-time and occasional contributors of Lido, and

9   paying for future protocol development in the forms of audits, developers/coders,

10   oracles, future node operators/validators, gas fees for contract deployments, etc." and

11   on "social marketing campaigns … to spread awareness for the protocol and to teach

12   those uninformed about Lido's goals and future prospects."

13       98.    Lido undertook, and continues to undertake, extensive promotional

14   efforts to increase participation in its staking service (and thus demand for and value

15   of LDO), including with:

16           a.    A May 2023 post on Lido's website promoted the launch of Lido

17              V2, which it described as "the most important upgrade to the

18              Lido protocol to date," promising "a host of exciting new

19              features." The post further stated that Lido "remain[ed]

20              committed to providing a secure and reliable protocol for

21              staking ETH, and we're excited to continue building on this

22              foundation in the months and years to come."

23           b.    Statements on the Lido website that tout its staking service as

24              "the leading Ethereum staking pool letting you benefit from

25              efficient liquidity and pool security" and describing a "growing

26              Lido ecosystem that "lets you to put your staked ETH to use

27              across Curve, Yearn, Sushi, 1inch and more to compound

28

rewards."

c. A March 2022 post on Andreesen Horowitz's website, written by Daren Matsuoka and Porter Smith, promoting Lido as "an effective, decentralized staking platform [that] offers one of the easiest ways to stake ETH and other PoS assets today." The post further complimented "the Lido community's unwavering commitment" and stated that Lido "solves the competitive incentives between staking and seeking yield in DeFi."

d. Regular announcements promoting partnerships or collaborations with other crypto companies, including providing press statements to various crypto websites and publications. For example, when a media outlet covered a governance proposal made by Lido's head of DeFi Partnerships & Business Development, Lido's Chief Marketing Officer provided a comment for the story to explain how the proposed incentives would work.

e. Monthly Reports touting "noteworthy metrics, new collaborations, and ongoing developments that highlight the overall performance and progress of the Lido middleware solution." For example, the November 2023 monthly report stated that "Lido [Total Value Locked] surpassed $20b for the first time since April 2022," that "the Lido protocol achieved a significant milestone as the number of first-time ETH stakers surpassed the 200,000 mark," and that "stETH, including wstETH, observed a notable surge in DeFi ecosystems, growing 10.34% to 3.52m stETH."

99.    Lido frequently promotes its investments in the Lido "ecosystem," which refers to the projects and applications that use, support, or otherwise incorporate the LDO token or stTokens. The Lido website has a separate "Lido Ecosystem" page that lists 106 of "the hottest projects on Lido" and encourages users to "[e]xplore apps and services within Lido ecosystem to get more benefits with your staked tokens." Lido also operates a "Lido Ecosystem Grants Organization," which "strive[s] to fund individuals, projects and initiatives which benefit both Lido and/or the surrounding space while maintaining efficiency and accountability for big developments." Through this program, Lido uses its treasury to invest in improvements to the Lido ecosystem, including "critical improvements to Lido that have a significant impact on its growth, security, operations, etc."

100.    Lido's website touts that "Lido protocol has been audited by the industry-leaders in blockchain security."

101.    The LDO token represents a claim in the DAO's business, which earns significant revenue through the five percent fee that Lido retains on funds staked through its protocol, which goes directly to the Lido treasury, which is controlled by the Lido DAO, which is controlled by the Partner Defendants and their collaborators.

102.    The price of the LDO token fluctuates in accordance with the business prospects of Lido's staking service.

103.    After reports that the SEC was planning to shut down the staking services of two of Lido's competitors, Coinbase and Kraken, the price of LDO surged. As one outlet reported, "LDO…surged around 11% in the immediate aftermath of the comments, and is up around 8.4% in the past 24 hours." The "surge" in LDO prices was attributed to the fact that SEC enforcement action against Lido's competitors would "be a boon for Lido, allowing it to capture the market" of its competitors.

104.    Similarly, the price of LDO tokens jumped by 35% in a single week after reports that upgrades to the Ethereum blockchain would eliminate some of the risks

associated with staking. As one outlet reported, "LDO's price surge has been attributed to Ethereum developers' recently setting the date for the blockchain's upcoming Shanghai hard fork," which "prompted many investors to look into ETH-related products and services, such as Lido."

105.   Lido's website contains a page titled "A guide to LDO – Lido's governance token."  Under the heading "How does the Lido LDO token accrue value?", the website states: "The Lido DAO accrues value through staking rewards with the DAO receiving 5% of all staking rewards in real-time." Lido thus pitches the LDO token as a yield-bearing investment whose value will grow in line with the Lido staking service.

106.   There is a robust secondary market for LDO, which is traded on multiple major crypto exchanges. This secondary market allows LDO tokenholders to sell their LDO tokens and realize gains if the price of LDO increases.

107.   LDO is designed in a way that allows investors to hold the token without participating in governance, facilitating investors' use of LDO solely as an investment asset. The vast majority of tokenholders do not participate in governance.

108.   The functionality of the token as a governance mechanism is illusory for regular investors like Plaintiff. Because 64 percent of the tokens are dedicated to the founders and early investors like Partner Defendants, ordinary investors like Plaintiff are unable to exert any meaningful influence on governance issues.

109.   The widespread availability of LDO on the secondary market allows members of the general public to purchase LDO as investors even if they do not use, and do not plan to ever use, the Lido protocol to stake assets, and even if they do not fully understand the business model.

110.   Investors reasonably expect that the efforts of the Partner Defendants and other insiders will result in appreciation of the LDO token and that they will therefore be able to earn a return on their investment.

111.    Some or all of the Partner Defendants have promoted LDO in terms that indicate it is an investment and that the value of the investment will increase with the success of the Lido DAO and the Lido protocol.

112.    The SEC Framework explains that the "reliance on the efforts of others" prong focuses on two key issues: "Does the purchaser reasonably expect to rely on the efforts of [a promoter]?" And are those efforts "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," as opposed to efforts that are more ministerial in nature?

113.    As detailed more fully above, the success of the DAO, and the profits that Plaintiff reasonably expected to derive from investing in LDO, are dependent on essential technical, entrepreneurial, and managerial efforts of the Partner Defendants and their agents and employees.

114.    The value of LDO is derived from or influenced by the value, operability, and success of the Lido staking protocol.

115.    As explained more fully above, Partner Defendants play a lead role in the ongoing development and promotion of the Lido staking protocols and of the LDO token, and they advertise their role publicly. In addition, Lido has dozens of employees, including software engineers, data analysts, product designers, and a Chief Marketing Officer who has been leading marketing and promotion efforts for Lido since November 2020.

116.    Plaintiff and members of the proposed class objectively expect the Lido founders, Partner Defendants, and Lido employees to provide significant managerial efforts, to develop and improve the protocol, to make governance proposals for the improvement of the protocol, to promote the DAO in public forums, and to ensure that LDO is listed on public exchanges. The Lido founders, Partner Defendants, and Lido employees have made multiple modifications, upgrades, and improvements to Lido's protocols and security features since its launch, and investors reasonably expect them

to continue to do so. No major changes can realistically be made to the protocol or the business model without the approval of the founders and Partner Defendants.

### Class Action Allegations

117.   Plaintiff proposes to move and certify the following class: All people who purchased or obtained LDO on or after December 16, 2022. Excluded from the class are Defendants; corporate officers, members of the boards of directors, and senior executives of Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

118.   The proposed class meets Federal Rule of Civil Procedure 23's requirements, called respectively numerosity, commonality, typicality, adequacy, predominance, and superiority.

119.   Plaintiff has already been appointed Lead Plaintiff in this Action by this Court.

*Numerosity*

120.   The class is so large that joinder of all parties would be impracticable.

121.   There are approximately 890 million LDO tokens in circulating supply. While many of those tokens are held by the Partner Defendants, thousands of other investors hold LDO tokens, and they trade millions of tokens each day.

122.   The class likely contains thousands of members and therefore satisfies the numerosity requirement.

*Commonality*

123.   There are questions of law and fact common to members of the class, including, without limitation: whether transactions in LDO are securities; whether Defendants' offerings, sales, and solicitations, of LDO transactions violate the registration provisions of the Securities Act; whether Defendants sold or solicited transactions in LDO; and whether Defendants are liable to the class members for

rescissory damages.

*Typicality*

124.   The Plaintiff received LDO tokens for value, even though Defendants did not register transactions in LDO tokens as a security. The claims of the named Plaintiff are, therefore, typical of—indeed identical to—the claims of all the unnamed class members.

*Adequacy*

125.   As explained above, the named Plaintiff's claims are identical to the claims of other class members, and there are no known conflicts of interest with any other class member.

126.   The named Plaintiff will adequately protect the interests of absent class members.

127.   Plaintiff proposes Gerstein Harrow, LLP, and Fairmark Partners, LLP, as class counsel.

128.   Both firms have extensive experience in class-action litigation, and indeed have been appointed as class counsel in *Houghton v. Compound DAO*, 22-CV-7781, now pending before this Court. They have also already been appointed Lead Counsel in this case.

129.   Class counsel will fairly and adequately represent the interests of the class.

*Predominance and Superiority*

130.   The questions of fact and law common to the class predominate in this Action over any questions affecting only individual members of the class.

131.   The classes in this case will be easily managed and ascertained.  LDO transactions are recorded on the Ethereum blockchain or in the blockchains or transaction logs used by the secondary-market exchanges on which LDO is bought and sold.  Accordingly, although Defendants may not know the legal identities of all

1   LDO investors, those investors can be communicated with (to ensure the provision of

2   notice), the amounts of money the investors spent on LDO tokens is easily

3   ascertainable, and the investors can easily be made whole through the accounts

4   associated with the transactions.

5                                   **Claim for Relief**

6   ***Count One: Unregistered Offer and Sale of Securities in Violation of***

7   ***Sections 5 and 12(a)(1) of the Securities Act of 1933 (Against All***

8   ***Defendants)***

9          132.   Plaintiff incorporates all prior paragraphs by reference.

10         133.   15 U.S.C. § 77*l*(a)(1) provides that "any person who . . . offers or sells a

11   security in violation of section 77e of this title . . . shall be liable, subject to subsection

12   (b), to the person purchasing such security from him."

13         134.   15 U.S.C. § 77e(a) (Section 5(a) of the '33 Act) states: "Unless a

14   registration statement is in effect as to a security, it shall be unlawful for any person,

15   directly or indirectly (1) to make use of any means or instruments of transportation

16   or communication in interstate commerce or of the mails to sell such security through

17   the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried

18   through the mails or in interstate commerce, by any means or instruments of

19   transportation, any such security for the purpose of sale or for delivery after sale."

20         135.   15 U.S.C. § 77e(c) (Section 5(c) of the '33 Act) states: "It shall be unlawful

21   for any person, directly or indirectly, to make use of any means or instruments of

22   transportation or communication in interstate commerce or of the mails to offer to

23   sell or offer to buy through the use or medium of any prospectus or otherwise any

24   security, unless a registration statement has been filed as to such security, or while

25   the registration statement is the subject of a refusal order or stop order or (prior to

26   the effective date of the registration statement) any public proceeding or examination

27   under section 77h of this title."

28

136.   From the time of their first offer or sale, LDO tokens were offered and sold, and continue to be offered and sold today, as an investment contract and thus a security within the meaning of Section 2(a)(1) of the '33 Act, 15 U.S.C. § 77b(a)(1).

137.   During the Class Period, Defendants sold LDO tokens to Plaintiff and the Class members.

138.   Defendants sold LDO tokens both by transferring title to LDO tokens directly to class members and/or by soliciting the purchase of LDO tokens by Plaintiff and the class members with a self-interested financial motive.

139.   Defendants therefore directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

140.   No registration statements have been filed with the SEC or have been in effect with respect to the offering of LDO tokens.

141.   Accordingly, Defendants violated Section 5 of the '33 Act, 15 U.S.C. §§ 77e(a), 77e(c), and are liable under Section 12(a)(1), 15 U.S.C. § 77l(a)(1).

142.   As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and members of the class have suffered damages in connection with their respective purchases of LDO.

## **Prayer for Relief**

Plaintiff respectfully requests that the Court:

- Certify the proposed class, the named Plaintiff as class representative, and the undersigned counsel as class counsel, and allow Plaintiff and the class to have trial by jury;

- Enter judgment against all Defendants, jointly and severally, and in favor of Plaintiff and the class, awarding rescission or rescissory damages as defined by relevant law;

1
2
- Award reasonable attorneys' fees, costs, expenses, prejudgment and postjudgment interest, to the extent allowable by law;

3
4
5
- Award equitable, injunctive, and declaratory relief, including but not limited to declaring that LDO is a security and that Defendants joined a general partnership that sold LDO without registration, and enjoining Defendants from continuing to sell LDO without registration;

6
7
- Award any other relief deemed just and proper.

8

9
Respectfully submitted,

10
*/s/ Jason Harrow*

11
Jason Harrow

12
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800

13
Los Angeles, CA 90025

14
jason@gerstein-harrow.com
(323) 744-5293

15

16
Charles Gerstein
(*pro hac vice*)

17
Emily Gerrick
(*pro hac vice* application forthcoming)

18
GERSTEIN HARROW LLP

19
1001 G Street NW, Suite 400E
Washington, DC 20001

20
charlie@gerstein-harrow.com
(202) 670-4809

21

22
James Crooks
(*pro hac vice*)

23
Michael Lieberman
(*pro hac vice*)

24
FAIRMARK PARTNERS LLP
1001 G Street NW, Suite 400E

25
Washington, DC 20001

26
jamie@fairmarklaw.com
michael@fairmarklaw.com
(619) 507-4182

27

28

**AMENDED COMPLAINT**

*Attorneys for Plaintiff and the Proposed Class*

**AMENDED COMPLAINT**