```
 1                              Pages 1 - 54

 2                     UNITED STATES DISTRICT COURT

 3                    NORTHERN DISTRICT OF CALIFORNIA

 4   Before The Honorable Vince G. Chhabria, Judge

 5   ANDREW SAMUELS,                 )
                                     )
 6             Plaintiff,            )
                                     )
 7     VS.                           )      NO. 3:23-CV-06492-VC
                                     )
 8   LIDO DAO, et al.,               )
                                     )
 9             Defendants.           )
     _____)
10
                                     San Francisco, California
11                                   Thursday, June 27, 2024

12                      TRANSCRIPT OF PROCEEDINGS

13   APPEARANCES:

14   For Plaintiff:
                              GERSTEIN HARROW, LLP
15                            1001 G Street, Northwest, Ste 400e
                              Washington, DC 20001
16                       BY:  CHARLES L. GERSTEIN
                              ATTORNEY AT LAW
17
                              FAIRMARK PARTNERS, LLP
18                            1001 G Street, Northwest, Suite 400 East
                              Washington, DC 20001
19                       BY:  MICHAEL D. LIEBERMAN
                              ATTORNEY AT LAW
20
     For Defendants:
21                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
                              One Manhattan West
22                            New York, NY 10001
                         BY:  ALEXANDER C. DRYLEWSKI
23                            ATTORNEY AT LAW

24   (Appearances Continued on Page 2.)

25   REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
```

```
1    APPEARANCES (CONT.'D):

2    For Defendants:
                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
3                      300 South Grand Avenue, Suite 3400
                       Los Angeles, CA 90071
4               BY:    ZACHARY M. FAIGEN
                       ATTORNEY AT LAW
5
                       LATHAM & WATKINS, LLP
6                      555 Eleventh Street Northwest, Suite 1000
                       Washington, DC 20004
7               BY:    SUSAN E. ENGEL
                       ATTORNEY AT LAW
8
                       LATHAM & WATKINS, LLP
9                      1271 Avenue of the Americas
                       New York, NY 10020
10              BY:    PETER TROMBLY
                       ATTORNEY AT LAW
11
                       MORRISON COHEN, LLP
12                     909 Third Ave
                       New York, NY 10022
13              BY:    JASON P. GOTTLIEB
                       MICHAEL A. MIX
14                     ATTORNEYS AT LAW

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Thursday - June 27, 2024**                              **10:36 a.m.** |
| 2 |                          **P R O C E E D I N G S** |
| 3 |                              ---o0o--- |
| 4 |         **THE COURTROOM DEPUTY:**  Now calling civil case |
| 5 | 23-6492, Samuels versus Lido DAO, et al.  Will counsel please |
| 6 | come forward and state your appearances for the record starting |
| 7 | with the plaintiff. |
| 8 |         **MR. GERSTEIN:**  Good morning, Your Honor.  I'm Charlie |
| 9 | Gerstein for the plaintiff.  I'm joined by Michael Lieberman. |
| 10 |         **THE COURT:**  Good morning. |
| 11 |         **MR. DRYLEWSKI:**  Good morning, Your Honor.  I'm Alex |
| 12 | Drylewski.  I'm joined by my colleague, Zachary Faigen.  We |
| 13 | represent Paradigm Operations, LP. |
| 14 |         **THE COURT:**  Hi. |
| 15 |         **MS. ENGEL:**  Good morning, Your Honor.  Susan Engel, |
| 16 | Latham & Watkins.  I represent AH Capital Management, and I'm |
| 17 | joined by my colleague, Peter Trombly. |
| 18 |         **THE COURT:**  Ms. Engel, when did you go to Latham?  I |
| 19 | guess, I mean, I must have known that, but I forgot. |
| 20 |         **MR. DRYLEWSKI:**  Six years ago. |
| 21 |         **THE COURT:**  Seriously? |
| 22 |         **MS. ENGEL:**  Yep.  Which Peter actually just reminded |
| 23 | me of, because I apparently gave a presentation when he was a |
| 24 | summer associate in 2018.  I would have told you I joined in |
| 25 | 2019 until that conversation. |

1          **THE COURT:**  I must have known that.  I guess I just

2    forgot.  Anyway, hi.  Good to see you.

3          **MS. ENGEL:**  Nice to see you.

4          **MR. GOTTLIEB:**  Good morning, Your Honor.  Jason

5    Gottlieb from Morrison Cohen, LLP, on behalf of Dragonfly

6    Digital Management, LLC, and Robot Ventures, LLP.  I'm joined

7    by my colleague, Michael Mix.

8          **THE COURT:**  Hi.

9      Okay.  Let me start with the plaintiffs.  And let me say

10   at the outset, I feel like I'm only just beginning to develop

11   the understanding that I need to rule on this case, so it will

12   probably take me a bit longer than it normally would, and part

13   of that is because of the service stuff.  So I wanted to start

14   by talking about the service stuff.

15         **MR. LIEBERMAN:**  Good morning, Your Honor.  Michael

16   Lieberman for the plaintiff.

17         **THE COURT:**  Hi.

18     Okay.  So on the service stuff, normally -- I mean, I've

19   been here 10 years now, and I guess this is the first time I've

20   had a situation where a plaintiff asks the clerk to enter

21   default; the clerk said no.  Is that what happened in this

22   case?  Or you didn't even bother asking the clerk to enter a

23   default?

24         **MR. LIEBERMAN:**  That's right.  We filed a motion with

25   the Court first, because there's kind of an embedded

1  alternative service motion in there which does require consent

2  of the Court.

3              **THE COURT:**  Right.  So you didn't even -- you didn't

4  even ask the clerk to enter default.  You just came straight to

5  us and said, we want you to issue a ruling that -- specifying

6  that the defendant, Lido DAO, has been served and order the

7  clerk to enter default against them.  I've never seen that

8  before.

9        I mean, usually what happens, or I think always what has

10 happened in my case is the plaintiff goes to the clerk's

11 office, seeks entry of default.  If the clerk's office says no,

12 then the plaintiff comes to me and asks for approval of

13 alternative service, and I grant approval, and then the

14 defendant is given "X" number of days to respond, and if they

15 don't respond within "X" number of days, then the plaintiff

16 goes back to the clerk's office and gets entry of a default.

17       It seems somewhat procedurally irregular to be doing it

18 the way you're doing it, and I wonder why I shouldn't just

19 grant your motion for an alternative service and then give the

20 Lido DAO 14 days to file a response to the complaint.

21             **MR. LIEBERMAN:**  Yeah, we're absolutely okay with

22 that.  The issue of who actually enters the default is kind

23 of -- we're indifferent to that.  And really the reason we

24 filed it the way we did is because we have this sort of

25 alternative service motion, and we kind of anticipated that we

1   started with the clerk, we'd end up here anyway.  We're all

2   here together for this motion to dismiss, and so it would be

3   more efficient to get it all done at once.  But totally agree

4   that makes sense to authorize alternative service, find that,

5   you know, either the service was effective when it was done

6   back in February or effective the date of the Court's order,

7   and then 21 days later we can file a new motion with the clerk

8   for entry of default.

9          THE COURT:  The other weird thing about your motion

10  is that you've got the motion for alternative service, but your

11  first-line argument is, we've served them.  Right?  And we've

12  served them because they're a general partnership, and we did

13  these things to serve the general partnership, and it's

14  basically just if you serve any member of the general

15  partnership, you've served the general partnership.  Right?

16         MR. LIEBERMAN:  Right.

17         THE COURT:  But the question of whether it's a

18  general partnership is a merits question that I need to

19  adjudicate, and the -- and Lido DAO is not here to participate

20  in that discussion.  So you're asking me to adjudicate a merits

21  question against Lido DAO, when Lido DAO is not here to

22  participate in the discussion for the purpose of establishing

23  that you've served the Lido DAO.  That doesn't seem

24  procedurally right to me.

25         MR. LIEBERMAN:  Yeah.  So I think I mostly agree with

1    that.  I think I'd make one edit if I could, which is that in

2    our view, you know, the Court doesn't have to resolve kind of

3    finally the ultimate merits question of who's a partner or

4    whether a certain party is a partner.  I think at the service

5    stage, the Court can rely on the allegations in saying that

6    it's been plausibly alleged.  If the Court reaches that

7    determination --

8              THE COURT:  Right.  But that's an issue also in

9    dispute.

10             MR. LIEBERMAN:  Sure.

11             THE COURT:  Whether it's been plausibly alleged that

12   the Lido DAO is a general partnership is a -- is an issue

13   that's in dispute.  And, again, you know, some of the alleged

14   general partners are here to weigh in on that, but the Lido

15   DAO, the alleged general partnership is not.  So just I don't

16   know how I could resolve that.  It seems much cleaner to just

17   grant your motion for alternative service and give the Lido DAO

18   14 days to respond, and if they -- are these DAOs showing up in

19   any of these cases?

20             MR. LIEBERMAN:  I don't know -- the cases I'm aware

21   of, I don't believe DAO has actually shown up to defend itself.

22   But I haven't checked every single case, but that's my

23   understanding.

24             THE COURT:  Okay.  And if they don't show up, fine.

25   Right?  And if they do show up, then that's the other thing,

1   right, is that you're -- you know, by virtue of these motions

2   to dismiss being teed up now, without having resolved the

3   service issue as to the Lido DAO, I'm being asked to decide

4   this general partnership question that affects a party that

5   might show up and might want an opportunity to be heard.  I

6   don't know if it will or not.  Right?  But that's -- I think

7   the other -- the other sort of wrinkle to the service issue is

8   that we need to give them a chance to respond, and before I

9   rule on the questions that are presented by these motions to

10  dismiss, we want to make sure the Lido DAO has a chance to

11  weigh in and file its own motion to dismiss.  Right?

12      I mean, isn't that procedurally the fairest way to do it?

13          MR. LIEBERMAN:  Yeah, I think we're in total

14  agreement.  That's the cleanest and easiest way to handle

15  things going forward is to authorize alternative service, give

16  the DAO a chance to show up, and if it wants to present

17  argument, it can do that.

18          THE COURT:  Okay.  So what I'm going to do is I'll

19  grant the motion for alternative service, and I'll issue a

20  written order today so that, you know, you have a written

21  order, and I'll require the Lido DAO to respond to the second

22  amended complaint within 14 days.  And assuming it's a motion

23  to dismiss, we'll schedule a hearing date on Lido DAO's motion

24  to dismiss.  That may be useful for me, because as I've said,

25  I'm sort of at the beginning stages of understanding all of

```
1   this stuff.  And we may have the hearing, or I may determine by
2   the time this hearing is over and by the time I've read all the
3   cases that I haven't yet read and all the papers that are filed
4   by Lido DAO, if any, that we don't need a further hearing, and
5   I'll just decide it on the papers.  But at least the Lido DAO
6   will have had an opportunity to be heard.
7             MR. LIEBERMAN:  That makes sense to us.
8             THE COURT:  Okay.  And I'll -- what I will order you
9   to do is serve the Lido DAO in the same way that you -- serve
10  the Lido DAO with my order and the second amended complaint in
11  the same way that you served, that you alternatively served the
12  initial complaint.  I said second amended complaint, but I
13  think it's the first amended complaint.  Yeah, okay.
14            MR. LIEBERMAN:  Okay.
15            THE COURT:  Does that make sense?
16            MR. LIEBERMAN:  That does.  Thank you, Your Honor.
17            THE COURT:  Okay.  So that's the -- that takes care
18  of the issue of service.  And then maybe let's talk about the
19  general partnership issue and the offering for sale issue.
20            MR. LIEBERMAN:  I'll cede the floor.
21            MR. GERSTEIN:  Good morning, Your Honor.  I'm
22  prepared to answer any questions you have on that subject.
23            THE COURT:  So just to be totally clear, your
24  argument, or at least what I understood your argument to be in
25  the amended complaint, first amended complaint, is that you are
```

```
 1   a member of the general partnership by virtue of holding a

 2   token.

 3            MR. GERSTEIN:  So our argument in the amended

 4   complaint at paragraph 5, and I want to lay this out very

 5   clearly, our theory of general partnership is that anyone who

 6   jointly carries on a business for profit is a general partner.

 7   The jury in this case will be instructed on what those terms

 8   exactly mean, but basically they mean meaningful participation

 9   in the business.  And we know that from the cases --

10            THE COURT:  Which paragraph did you ...

11            MR. GERSTEIN:  That was in paragraph 5 of the

12   complaint.  It says, governed by the large holders of LDO.

13        The reason we think the large --

14            THE COURT:  Wait, wait, wait.  Hold on.

15            MR. GERSTEIN:  I'm sorry, Your Honor.

16            THE COURT:  Okay.  But elsewhere in the complaint you

17   talk about how, if you -- if you are a token holder, you're a

18   participant in the governance of the partnership.  Right?

19            MR. GERSTEIN:  You have the capacity to vote.  Right?

20        So imagine a circumstance in which -- let's just take a

21   hypothetical to explain what I mean here.  Let's imagine a

22   circumstance in which there's a DAO where four people hold

23   60 percent of the tokens and 50,000 people hold the remaining

24   40 percent.  It may be the case -- and again, this is a factual

25   question.  It may be the case that those four people are the
```

1    only general partnership partners in that business, because

2    they're the only people with a meaningful capacity to run a

3    business together.  That's a factual question.  We cite cases

4    explaining why that's a factual question.

5          Here we have plausibly alleged that the four defendants

6    here and others are jointly operating a very large and very

7    successful business for an exceptional profit that they

8    explicitly say they plan to distribute to themselves.  So

9    again, I think we were clear on our position --

10          THE COURT:  And then what was that last phrase you

11    used?  That they plan to distribute themselves?  What did you

12    just say?

13          MR. GERSTEIN:  Yes, that they plan to distribute to

14    themselves.

15          THE COURT:  They plan to distribute what to

16    themselves?

17          MR. GERSTEIN:  The profits of the business.  And that

18    is -- let me just get the correct complaint there.  Paragraph

19    35, Andreessen Horowitz saying that they will explore token

20    buyback mechanisms.  A member of the treasury committee of Lido

21    DAO saying, think of tokens as equity in the startup.  Make

22    lots of money and then provide an economic reward to LDO token

23    holders.

24          THE COURT:  Right.  So the profit sharing is for

25    everybody who holds a token.  Right?

1          MR. GERSTEIN:  That's correct.

2          THE COURT:  Not just -- not just the defendants in

3   this case, but everybody.  Anybody who holds a token is

4   involved in the profit sharing and would therefore be

5   considered a member of this general partnership, I assume.  And

6   that was my takeaway from your complaint, but if I'm

7   misunderstanding it ...

8          MR. GERSTEIN:  Well, so that -- what we explain is in

9   response to this motion to dismiss, that there have been three

10  effective approaches to determining --

11         THE COURT:  Well, but before we get to your response

12  to the motion to dismiss, I'm trying to under -- I mean, what I

13  have to decipher is the complaint.  Right?  And I have to

14  figure out, what is the complaint alleging about this general

15  partnership.  What -- you know, how is it that these -- you

16  know, that these particular defendants are general partners in

17  these -- in this alleged general partnership.

18      And it seems to me that what you said is the Lido -- and

19  again, correct me if I'm misunderstanding it, but that the Lido

20  DAO is a general partnership, and the reason it's a general

21  partnership is it's a compilation of all the people who hold

22  tokens, and that they are jointly engaged in the governance of

23  the partnership or the association, and they're all engaged in

24  profit sharing, and so that's why the Lido DAO is a general

25  partnership.  Right?

1    Have I misunderstood the allegations in your complaint?

2         MR. GERSTEIN:  No, I think that's correct, Your

3    Honor.  And I think that's also consistent --

4         THE COURT:  Okay.  So let's stick with that.

5    So that's your complaint, right?

6    And in your opposition, you say that there are some other

7    ways you can think of the DAO general partnership, but in the

8    complaint, again, that was my takeaway, right, that Lido DAO is

9    a general partnership because all these token holders are

10   general partners.

11        MR. GERSTEIN:  So let me just clarify one thing here.

12   The complaint straightforwardly alleges that -- claims against

13   four general partners.  Right?  We've sued only four people,

14   four entities.  And so on the face of the complaint we

15   allege --

16        THE COURT:  So you sued the -- you sued three of the

17   general partners, not for anything they particularly did, but

18   because -- or four of the -- you've sued these four general

19   partners because of what the general partnership did.

20        MR. GERSTEIN:  Correct.

21        THE COURT:  And so you need to establish that it is a

22   general partnership.

23        MR. GERSTEIN:  That's correct.

24        THE COURT:  Right?  Not just that these four

25   defendants are members of the partnership.  Right?  I mean,

1   you --

2           **MR. GERSTEIN:**  Yes.

3           **THE COURT:**  Because they say it's not a partnership.

4   It's not a general partnership.

5           **MR. GERSTEIN:**  Correct.

6           **THE COURT:**  And it seems like the reasons you've

7   given for it being a general partnership are that everyone who

8   holds -- has a token is involved in the governance of the

9   entity, and they all vote on it, and they have the power to

10  decide hiring and firing and initiatives that the organization

11  might take, and therefore it's a general partnership.

12          **MR. GERSTEIN:**  Yes, that's correct.

13          **THE COURT:**  Okay.  So the -- and then, and so the

14  consequence of that theory of partnership is that anybody who

15  buys a token, single, any random person who buys a single token

16  on Coinbase is a general partner, is jointly and severally

17  liable for all of the activities of the partnership?

18          **MR. GERSTEIN:**  So I don't think that.  And we do

19  plead this in the complaint, that people who buy on Coinbase do

20  not have the capacity to vote.  I --

21          **THE COURT:**  Okay.  Well, I understand that nuance,

22  but let's put that nuance aside for the moment and say that any

23  random person who buys a token that gives them the capacity to

24  vote, right, is a general partner and therefore jointly and

25  severally liable for the activities of the association?

1          **MR. GERSTEIN:**  So again, so I want to make two

2     distinctions here.  That is certainly a -- applying the *Sarcuni*

3     case to the facts of this complaint, that would be the

4     conclusion.  Right?

5          **THE COURT:**  That's the Southern District of

6     California case?

7          **MR. GERSTEIN:**  Correct, Southern District of

8     California.

9     But that court addressed the motion to dismiss just as

10    this Court is, and Judge Orrick, addressing a similarly

11    materially identical case against the compound DAO, deferred

12    the question of the exact membership I think in part for this

13    reason.  But how would Judge Burns instruct the jury in that

14    case about why someone who holds one token is jointly carrying

15    on a business for profit?  We don't know.  That case settled.

16    It did not progress further.

17    Again, in paragraph 5 we do say that the partnership is

18    governed by large holders of LDO for this reason, to address

19    the hypothetical I was talking about with Your Honor.  And that

20    we don't know the answer to and discovery will reveal --

21         **THE COURT:**  I understand what you're saying, but I

22    have to decide whether you've adequately alleged that the Lido

23    DAO is a general partnership.  Right?  I -- because that's what

24    you --

25         **MR. GERSTEIN:**  Correct.

1          **THE COURT:**  That's the basis on which you are seeking

2    to hold these four defendants liable.

3          **MR. GERSTEIN:**  Correct.

4          **THE COURT:**  So it -- so I have to un' -- if you are

5    asking me to hold that you've adequately alleged that the Lido

6    DAO is a general partnership, I have to understand, right, what

7    it is you are alleging about this general partnership.

8          Can we be -- can we sort of step back and be candid for a

9    moment?

10          **MR. GERSTEIN:**  Sure.

11          **THE COURT:**  It seems like you're running away from

12    your complaint.

13          **MR. GERSTEIN:**  Uh-huh.

14          **THE COURT:**  It seems like in your complaint your

15    pitch was the Lido DAO is a general partnership because all of

16    these token holders get to vote and they get to participate in

17    decisions about who to hire and what initiatives to take.  And

18    that now you may be considering the consequences of that

19    characterization of the partnership, and you're running away

20    from it a little bit.

21          Am I misunderstanding what's happening here?

22          **MR. GERSTEIN:**  No.  I think what we were trying to do

23    in our opposition is be as candid with the Court as possible

24    about the developments in the case law regarding this subject.

25    If the Court's conclusion is --

1          **THE COURT:**  Hold on a second.

2      Can I ask you, all you're doing is like front row of a law

3  school class, and you're like nodding your head vigorously at

4  the professor whenever he opens his mouth.  It's very

5  distracting.

6      Thank you.

7          **MR. GERSTEIN:**  Okay.  So what we were trying to do in

8  our opposition is be as candid with the Court about the

9  development of the case law in this area, and to be clear that

10  we win on this motion regardless of those theories.

11      My best theory of what a general partnership is, looking

12  at California law and looking at these allegations, is that it

13  isn't always necessarily everyone who holds a token.  Right?

14  That is my personal belief in the case.  I'm not running away

15  from the allegation that that is, in fact, what the *Sarcuni*

16  court held and applied to these facts.  That would be the

17  status of the general partner, and I think this Court should

18  rule in our favor if that is the case.

19      But looking through the cases cited by defendants and by

20  us, California law looks to whether people quite simply are

21  jointly carrying on a business for profit, and it's unclear to

22  me whether every single token holder would always be in that

23  category.  But to my knowledge, and with full candor, I do not

24  believe we're running away from the theory of that complaint.

25  That is why in paragraph 4 we say it's governed by large

1   holders of LDO.

2          **THE COURT:**  Right.  You can't just say it's governed

3   by large holders.  You can't just say it's governed by large

4   holders of the token.  Right?  I mean, you have to -- if you --

5   if you are saying that only certain token holders are general

6   partners, then you have to articulate what it is that they are

7   doing that makes them general partners, as distinction from

8   the, you know, random token holder.  Right?

9          **MR. GERSTEIN:**  Sure.

10         **THE COURT:**  And so, you know, the question is whether

11  you have done enough of that in the complaint, or you've just

12  done it like you tried to do it in your opposition brief.

13         **MR. GERSTEIN:**  Let me cite a few facts --

14         **THE COURT:**  Okay.

15         **MR. GERSTEIN:**  -- that might help the Court on that.

16      These are paragraphs 40, 43, 45 and 46.

17         **THE COURT:**  Okay.  Hold on.  Let me go there.

18      And you have to do it as to each of the defendants.

19  Right?  Not just --

20         **MR. GERSTEIN:**  That's correct, Your Honor.

21         **THE COURT:**  Okay.  So, sorry.  You said you were

22  starting with 43?

23         **MR. GERSTEIN:**  Starting with 40.

24      So some other entities described Paradigm as, quote,

25  guiding the development route of Lido, quote, in noting that

1   their, quote, voting rights represented by the large numbers of

2   LDOs held, give them a, quote, huge impact.

3          Practice 43, Andreessen Horowitz saying itself, quote, we

4   will contribute as a governance participant, closed quote.

5          Lido's chief marketing officer describing Robot and

6   Dragonfly as being chosen specifically for their expertise in

7   the matter.

8          And paragraph 43, Dragonfly actively voting to sell itself

9   tokens, describing itself as active supporters and, quote

10  participants.

11         We don't make that allegation as to anyone else except

12  perhaps the founders themselves, who, again, to be clear, if I

13  predict what the case submitted to the jury would conclude, I

14  would think the founders are partners, as well.  Right?  We

15  never said that the defendants here are the only partners, we

16  just can't find the founders, right, and we would love to have

17  sued them.  We just don't know where they are.

18         And so, again, I think those four allegations alone are

19  adequate to suggest that these people are jointly carrying on a

20  business for profit, and --

21             THE COURT:  Right.  But in the -- you know, with a

22  typical, with a normal partnership, with a normal general

23  partnership -- let's say -- I know that it's just sort of

24  dangerous to analogize to lawyers.  Right?  But we're all

25  tempted to do it.  I know that the lawyers are all like limited

1  liability partnerships and all that.  But let's say, you know,

2  my five friends and I get together and we start a law firm, and

3  it's a general partnership, and, you know, we each -- you know,

4  we can each vote on governance stuff, but, you know, three --

5  my three friends have a, you know, greater share in the

6  partnership, and they have more management responsibility.

7  That doesn't make me any less of a general partner.  Right?  So

8  I -- like the amount.  If everybody has -- if everybody has a

9  say in governance and everybody is involved in the profit

10  sharing, right, but some people are more involved than others

11  and some people have a greater stake than others, that doesn't

12  make the others not general partners.  Right?

13          **MR. GERSTEIN:**  It might.

14      So, Your Honor, we are imagining a circumstance with no

15  written partnership agreement, I assume?

16          **THE COURT:**  Yeah, sure.

17          **MR. GERSTEIN:**  Because I do think that would make a

18  difference, right?  But in the absence of a written partnership

19  agreement, which is what we have here, I think if you could

20  show that the third partner barely contributed, was never

21  consulted on any decisions, didn't have any active

22  participation in the operation of the firm, that that person

23  wouldn't be a general partner.  And I think we see that in the

24  *Holmes versus Lerner* case.

25          **THE COURT:**  Okay.  I'm not sure I've read that case

```
 1   yet.  Which one is that?
 2           MR. GERSTEIN:  So this is a case in which two people
 3   decide to start a nail polish business.
 4           THE COURT:  Yeah, I haven't read that one.
 5           MR. GERSTEIN:  Okay.  So we can talk about that later
 6   if more helpful.
 7           THE COURT:  Go ahead.  Tell me a little bit.
 8           MR. GERSTEIN:  Yeah.  Generally speaking, I just, I
 9   don't -- I think in Your Honor's hypothetical, it isn't at
10   least not to me obvious that in all circumstances that person
11   would be a general partner.
12       And again, and I think this is a helpful way to think
13   about it at this stage, in a case in which there was a question
14   as to the liability of that partnership, the jury would be
15   instructed to ask whether each person was an active participant
16   in that business, whether they were jointly carrying on the
17   business for profit.  If I were to allege of that firm that
18   that fourth partner was in fact doing that, and that is the
19   allegations were based on concrete facts, and as I just read
20   for Your Honor I think ours are quite concrete here, I would
21   have alleged the existence of a general partnership and that
22   those four people are general partners.  I don't believe in
23   that circumstance I would have an obligation to identify every
24   other general partner.  In fact, those four people might know a
25   great deal more about who their partners are than any plaintiff
```

1  would.

2       And the purpose of joint and several liability is that if

3  you can find one of them, you can get relief.  Right?  They are

4  meant to be able to seek contribution from each other, which

5  all the defendants here can do now.

6       So the short answer to Your Honor's hypothetical is, no,

7  not necessarily.

8            **THE COURT:**  I guess that in a way you're discussing

9  the hypo, you are presuming that a general partnership exists,

10  and you're just trying to figure out who is in the general

11  partnership.

12       Here we have a threshold question of whether a general

13  partnership exists at all.  And to answer that question, we

14  need to know, we want to know as much as we can about the

15  general partnership, what the organization looks like and who's

16  in the general partnership.  And it seems like right now you're

17  not -- maybe you've committed in your complaint, but you're no

18  longer committing to the idea that all of the token holders are

19  general partners.

20            **MR. GERSTEIN:**  Committing -- yeah, I guess it's hard

21  to know whether we commit to that or not, because it's not

22  presented on this motion.  Right?  And, but I think that to

23  allege the existence of a general partnership, one must show

24  that there are two or more people jointly carrying on a

25  business for profit.  And here let's just focus for a moment on

1    our allegations that this is a business for profit.  I think

2    that we have clearly alleged.

3         In paragraph 45 we allege that they have a chief marketing

4    officer.

5         Paragraph 53 we allege that they have someone they call --

6         **THE COURT:**  I don't think you have to worry about

7    that part.  I get that part.

8         **MR. GERSTEIN:**  Well, so I think if that's the case,

9    then I think it is -- if we have adequately alleged that there

10   exists a business that is being run by more than one person for

11   a profit, then the only remaining question is:  Have we alleged

12   that the defendants are participating?  Are they jointly

13   carrying on that business, as the California Corporations Code

14   puts it.

15        So Your Honor's hypothetical, then, I think it is fair for

16   us to say we are assuming the existence of a general

17   partnership, because we've alleged a business that's being run

18   for profit, it's never been incorporated, and it currently does

19   $30 billion of business with a bunch of corporate officers

20   running like what appears to be an ordinary, if illegal,

21   business.  And so from our perspective the reason I think it

22   might appear that we're sort of running away from these

23   allegations is they're just not presented at this stage.  We

24   don't need to know exactly who.

25        **THE COURT:**  Okay.  Could I ask, I don't know if

```
1   you've -- you know, I don't know if this is a question you've
2   thought much about, but if one were to conclude that it's a
3   general partnership and every token holder who can vote is a
4   partner, does that mean that any defendant in any one of these
5   cases could file a cross-complaint against every token holder
6   seeking to hold, no matter how random and small and, you know,
7   their holdings are, and, you know, no matter what they knew,
8   you could -- could the defendants file a cross complaint
9   against every single token holder alleging that they're jointly
10  and severally liable for the conduct that's being alleged
11  against them?
12        MR. GERSTEIN:  Not only could they, but Jason and I
13  believe Alexander did in two other cases we've had with them.
14  I don't think those -- any --
15        THE COURT:  They filed a cross complaint against
16  every single token holder?
17        MR. GERSTEIN:  I don't know about every one.  They
18  filed them against our named plaintiffs.  I don't know if they
19  found anyone else.  Not in our case they didn't.  They may have
20  sought contribution from somebody else, but --
21        THE COURT:  It's totally understandable why you would
22  file a cross complaint against the named plaintiffs if you
23  could find them.
24        MR. GERSTEIN:  Yeah.  And if they're before the
25  Court, yeah.  No, and they did in fact do that.
```

1    And again, like --

2         THE COURT:  What happens if -- what happens if I'm

3    some random person who's buying crypto and I buy one of these

4    tokens, and then all of a sudden I get hauled into court

5    seeking to hold me responsible for the conduct of the Lido DAO

6    for selling unregistered securities.

7         MR. GERSTEIN:  I think, well, so you would be able,

8    in my view, to contest that allegation as a factorial matter.

9    Again, in my view, not in the *Sarcuni* court's view.  The

10   *Sarcuni* court's view, if it applied to this case, what happened

11   there is that random token holder should seek relief from the

12   other defendants just as a general partner in any general

13   partnership.

14        THE COURT:  And how would they seek relief from the

15   other defendants?

16        MR. GERSTEIN:  They could sue for contribution.  They

17   could file their own cause claim.

18        THE COURT:  Would they say, like, you didn't

19   adequately disclose to you that I might be a general partner if

20   I buy a token, and so I'm not, I shouldn't be jointly and

21   severally liable?

22        MR. GERSTEIN:  Well, I don't know whether that would

23   be the case.  I mean to say, just as in any partnership, they

24   would distribute the liability among themselves how they see

25   fit.  Right?

1    **THE COURT:**  Then you have these random token holder's

2    been dragged into this massive litigation.  Right?

3    **MR. GERSTEIN:**  And I think to the extent that is

4    counterintuitive to the Court, it seems like a bad result,

5    there's a very easy answer to that, right, which is you

6    shouldn't set up large illegal businesses without corporate

7    protection.  Right?  That's not a good idea.

8    And I think one of the headings in our opposition is the

9    fact that it's not a good idea isn't a defense, right, the fact

10   that this has created an unusual state of affairs.  That was

11   something that these defendants fully knew they were doing.  In

12   fact, they said it out loud.  And the reason they did it is

13   also quite clear.  It's because they're running a business that

14   they don't have authorization to run; it's illegal.

15   **THE COURT:**  Is there any indication that, you know,

16   somebody who buys one of these tokens on the exchange is

17   informed of the possibility that they could be held -- that by

18   virtue of having a token that gives you the right to vote, you

19   could be held jointly and severally liable for the activities

20   of the Lido DAO?

21   **MR. GERSTEIN:**  Well, so all the exchange holders

22   don't have the right to vote.  I don't know anything about the

23   exchange's disclosures.  We don't have a case against them.  I

24   have not personally read them.

25   **THE COURT:**  For any token holder who has the right to

1    vote, is there any indication that it was disclosed to them

2    that they might be held jointly and severally liable for the

3    activities of the Lido DAO?

4         **MR. GERSTEIN:**  I am aware of no such indication.  I'd

5    be surprised if there were.

6         **THE COURT:**  I mean, wouldn't that be a huge problem

7    for the people who were involved in the creation and marketing

8    of this token, if they didn't disclose to purchasers that they

9    could potentially be hauled into court as a general partner?

10        **MR. GERSTEIN:**  If you're suggesting that we amend our

11   complaint to add such a claim, that doesn't sound like a bad

12   idea.  Right?  Like it -- of course.  And, in fact, we know

13   that at least one of these defendants' lawyers and one of the

14   defendants themselves foresaw that prospect.  They said it,

15   again, out loud.  We cited several times in our brief.  Yes, it

16   is indeed a problem.

17        **THE COURT:**  And probably underscores why these, you

18   know, ought to be registered as securities.  Right?  Because if

19   you're purchasing a token like this and it may give rise to

20   liability as a general partner, you should know that and you

21   should be able to find that information.

22        **MR. GERSTEIN:**  Yes.  And they had no such disclosure

23   of any kind.  Right?  They have no disclosure protection.

24        Again, defendants don't presently contest, they keep

25   telling us they're going to eventually contest this, but for

1  this motion, no one appears to raise the question whether these

2  are alleged to be security interests, which of course in our

3  view they clearly are.

4  But I think did Your Honor also have a question about

5  solicitation, or do you want to talk to the ...

6  **THE COURT:**  Yeah, I had -- I guess I think the only

7  question I had about that, I mean, I don't think there's any

8  question that you've adequately alleged that the Lido DAO was

9  engaged in solicitation.  Right?  And we're not asking whether

10  the defendants were engaged in solicitation, we're asking

11  whether the Lido DAO was engaged in solicitation, given the way

12  that you've teed up the case.

13  **MR. GERSTEIN:**  Correct.

14  **THE COURT:**  I guess the one -- you know, and again,

15  with the caveat that this is all -- you know, I'm still at the

16  early stages.

17  I guess the one argument that I saw in their briefs

18  relating to this issue that gave me pause was the one from

19  Andreessen Horowitz about -- I'm pulling up the statutes now.

20  **MR. GERSTEIN:**  I'll do the same.

21  **THE COURT:**  About Section 12(a)(1) and (2).  Right?

22  And so (a)(2), which this case is not about, says, you

23  know, that you're liable if you offer or sell a security

24  through interstate commerce by means of a prospectus or oral

25  communication.  And that has -- as I understand it, but I

1   haven't read the case law yet, I've only kinda stared at the

2   statutes for a little bit, but as I understand it, that has

3   been interpreted as applying only to public offerings.

4           **MR. GERSTEIN:**  That's the *Gustafson* Supreme Court,

5   yes.

6           **THE COURT:**  Yes.

7           **MR. GERSTEIN:**  12(a)(2).

8           **THE COURT:**  And then (a)(1) refers to Section 5,

9   right?

10          **MR. GERSTEIN:**  Uh-huh.

11          **THE COURT:**  So I'm pulling up Section 5 now.

12      And then Section 5 says it's unlawful to sell a registered

13  security through the use or medium of any prospectus or

14  otherwise.  So prospectus or oral statement, prospectus or

15  otherwise.

16      And as I understand it, your argument is that that

17  language difference signifies that when you're talking about

18  (a)(2), Section 12(a)(2), you're only talking about public

19  offerings, but when you're talking about Section 12(a)(1),

20  you're talking about offerings on the secondary market also.

21          **MR. GERSTEIN:**  That's correct, yes.

22          **THE COURT:**  And that, like just as a pure matter of

23  the text, without understanding -- I don't understand the

24  context yet, and I haven't read -- there are a couple district

25  court cases that agree with you, I understand.

1        MR. GERSTEIN:  Yes.

2        THE COURT:  But I haven't read them yet.  But just as

3    a matter of text, that seems like you're placing quite a bit of

4    weight on the word "otherwise".  So can I -- and I don't think

5    that was addressed from your briefs, so can you address that?

6        MR. GERSTEIN:  Yes.  And the reason it wasn't

7    addressed in our brief, but just to be clear, is that we relied

8    on the district courts' explanation of this.  Which, I think

9    they do a better job than we would have done here.  But the

10   district court's conclusion -- I'm looking now the *Owen versus*

11   *Elastos Foundation* case, which cites the -- is cited by the

12   *Zakinov versus Ripple* case, and the -- yes, imposes a good deal

13   of weight on the word "otherwise," but putting no weight on the

14   word "otherwise" would be contrary to the text of the statute.

15       At the same time --

16       THE COURT:  Although, we have Section 12(a).  Right?

17   And we have two provisions, and one of them, the Supreme Court

18   has issued this big ruling about how it only applies to public

19   offerings, and the other section is right before it and the

20   language is kind of similar.  And I just, what reason do we

21   have to believe that that language reaches so much more

22   broadly; the language of (a)(1) reads so much more broadly than

23   the language of (a)(2)?

24       MR. GERSTEIN:  So I think in the securities context,

25   oral statement when next to prospectus is a term of art is the

1    reasoning here.  Right?  And otherwise means through other

2    sales.

3         And again, looking at the *Gustafson* opinion itself, there

4    were four dissenters, and the dissent begins with Judge Thomas

5    saying -- Justice Thomas, excuse me -- that you wouldn't know

6    the text of the statute was involved in this opinion until you

7    went and made it at least three quarters of the way through the

8    opinion, I think.  And, you know, he was joined by Justices

9    Scalia, Ginsburg any Breyer.  I think today that probably would

10   have come out differently because of the text of the statute

11   itself.

12        So if we're looking squarely at the text of the statute,

13   the fact that the Supreme Court has not interpreted 12(a)(1) --

14   this is, by the way, not in the *Owen* case.  This is just my own

15   reading of the case.  *Owen* I think just dismantles the argument

16   piece by piece a little more effectively, and it might be more

17   efficient for the Court just to consult that.  But I think as a

18   matter of simply relying too much on the word "otherwise," the

19   two statutes are written differently, and they cover different

20   things.  At the same time, it would make a very odd holding, if

21   not contradict *Pinter versus Dahl* to interpret it this way.

22        In *Pinter versus Dahl*, the Supreme Court creates solicitor

23   liability for people who don't pass title, as here.  And if the

24   Court were to interpret *Pinter versus Dahl*, it would be the

25   first court in the country to do so, 12(a)(1) as defendants

1  suggest, it would make an almost irreconcilable holding out of

2  *Pinter*.

3            **THE COURT:**  Okay.  Can I ask you one last question?

4       This didn't come up in the briefs, but of course we have

5  an obligation to explore whether a plaintiff -- whether we have

6  jurisdiction.  Right?  So on the question of why your client

7  has standing, the injury that you allege is that you bought

8  tokens and lost money on them.  So is that the injury, lost

9  money?

10           **MR. GERSTEIN:**  That's correct, yes.

11           **THE COURT:**  Okay.  So that's the injury.

12      Then you -- and then there is, of course, three prongs to

13  the stand analysis.  There's injury and, you know, causation;

14  whether the injury is fairly traceable to the conduct of the

15  defendant that's being complained of; and then redressability.

16  Right?  Seems pretty easy to -- it's redressable.  Right?

17  You -- I could issue a ruling that says the defendants have to

18  give the plaintiff back the money that he lost.  Right?

19           **MR. GERSTEIN:**  Uh-huh.

20           **THE COURT:**  But what about causation?  What about

21  whether the injury is fairly traceable to the conduct that

22  you're alleging in the complaint.  Right?  Because the claim is

23  that they've violated the law by selling an unregistered

24  security.  Right?  Does the -- is the fact that it was

25  unregistered, is that what caused your client to lose money?

1          **MR. GERSTEIN:**  Maybe.  But I don't think we need that

2   to be the case.

3          **THE COURT:**  Okay.

4          **MR. GERSTEIN:**  The fact that they solicited his

5   purchase is what caused him to lose money, and the Ninth

6   Circuit has been clear that reliance is not an element in

7   solicitation cases.

8          **THE COURT:**  But I'm talking about Article III

9   standing.

10          **MR. GERSTEIN:**  And I feel like those questions are

11   somewhat related, because the question that we're asking is,

12   what did Lido DAO do that caused plaintiff harm.  And the thing

13   that the complaint straightforwardly alleges is that the harm

14   was that he lost the money, and he was among the population of

15   people solicited to purchase these had these shares.  And the

16   way to see that is that --

17          **THE COURT:**  But had he not been solicited to purchase

18   the shares, he wouldn't have lost money?

19          **MR. GERSTEIN:**  Yeah, of course.  Yeah.

20       And the reason he was solicited is they caused them to be

21   listed.  They created a secondary market of the sale of these

22   things on Gemini by cooperating with Gemini, communicating with

23   Gemini to get Gemini to list these shares.  Our client uses

24   Gemini, purchased them on Gemini, lost money, is suing them for

25   that money back under a statute that gives him a right of

recision against any statutory seller.  And as Your Honor has just concluded or just said, it's clear that we've alleged that Lido DAO was engaged in solicitation.

So that's the straightforward on standing.

**THE COURT:**  Okay.  All right.  The defendants want to address any of this stuff?

**MR. GERSTEIN:**  Thank you, Your Honor.

**MR. DRYLEWSKI:**  Yes, Your Honor.

**THE COURT:**  I'm mostly interested in hearing about the general partnership business.

**MR. DRYLEWSKI:**  Absolutely, Your Honor.  May it please the Court.  I'm Alex Drylewski for Paradigm.

So I'll start where Your Honor did, which is:  What is the partnership that's being alleged here.  And Your Honor put your finger on the issue.  This is a merits question, but it's also a pleading question.

So the plaintiff here has asserted a claim against the quote-unquote Lido DAO.  And the Lido DAO is all of the LDO token holders out there in the world at any given time.  Now, they allege that these tokens change hands millions of times a day.

But what we just heard from plaintiff's counsel, and this is also in their papers, is that the partnership that they're alleging is not necessarily every token holder.  It's some subset of token holders that doesn't include the plaintiff and

1    doesn't include the absent class members that they're seeking

2    to represent here.

3         So the simple question --

4              **THE COURT:**  Is there a reason you keep looking over

5    at your opposing counsel and gesturing at him as you're

6    talking?

7              **MR. DRYLEWSKI:**  I suppose because I'm referencing

8    counsel, but I'll direct it to Your Honor.

9              **THE COURT:**  Okay.

10             **MR. DRYLEWSKI:**  So the fundamental question that

11   deserves answering, we think, is what is the partnership.  And

12   we don't mean what are the names and the addresses of every

13   partner, who's in, who's out.  But generally speaking, which

14   qualities and characteristics make one a partnership in this

15   partnership, and which do not.  This is a fundamental matter of

16   pleading.

17        And it becomes very important when you --

18             **THE COURT:**  I think what they would -- what their

19   response would be, well, we don't know the full contours of the

20   partnership, but what we know is that it's a partnership, and

21   at a minimum these defendants, and proper the founders, are

22   part of the partnership because of the extensive role that they

23   have played in launching this operation.

24             **MR. DRYLEWSKI:**  So the reason why that doesn't get

25   them there, Your Honor, is when you consider what the elements

1    of a partnership are under California law.  And the one I

2    really want to focus on the most is the one that is discussed

3    in the trio of appellate California cases that we cite in our

4    briefs.  That's *Rivlin*, R-i-v-l-i-n, *Deeney*, D-e-e-n-e-y, and

5    *Solomont*, S-o-l-o-m-o-n-t.

6        And what those cases focused on is what's called the

7    mutual selection test, or sometimes called delectus personae.

8    And what it says, it's grounded in California statute, Section

9    16401 of the California Corporations Code, it says, for the

10   existence of a partnership, any person who's admitted into the

11   partnership needs to be consented to and approved by every

12   other partner.  And that's a critical element, and courts

13   strictly construe it, because as Your Honor knows, partners can

14   create joint and several liability for one another.  They owe

15   one another fiduciary duties.  These are significant

16   consequences.

17       **THE COURT:**  But how does that square with the

18   provision in the -- that other section of the Corporations Code

19   that says you don't even have to know if you're a partnership?

20       **MR. DRYLEWSKI:**  Right.  So that's Section 16202, Your

21   Honor.  And that is just saying you have to have two or more

22   people who are associated in a business and co-own that

23   business together.  What the case law says is what that means

24   is you don't have to call something a partnership.  You don't

25   have to say, okay, now, we're partners.  Your conduct and your

1   running or co-owning a business together can be enough to imply

2   a partnership as a matter of law.

3        But that is different than the more specific and different

4   provision in 16401, which says, then, for a partner to be

5   admitted into the partnership, you must have the consent and

6   approval of every other partner.  And the California cases we

7   cite, which we respectfully submit are binding here on

8   California law, strictly construe that.

9        Take *Rivlin*, for example.  There were nine parties there

10  that were approached by the defendants, asked to sign

11  certificates of limited partnership.  They did so, and the

12  court of appeal in California said that is not a partnership,

13  because there is no evidence that any of these supposed

14  partners knew of each other or consented and approved to each

15  of their admission into this partnership.  And by its nature,

16  what the Court said, is because of that element, partnerships

17  by their nature are relationships of close personal confidence,

18  and they are closed select groups.

19        **THE COURT:**  Right.  But at a minimum be, it seems

20  like your description applies to the allegations that they've

21  made about the four defendants in this case.

22        **MR. DRYLEWSKI:**  So "no" as to them and "no" as to any

23  broader group, and I'll take them in turn.

24        First as to the defendants themselves, in *Rivlin* what

25  happened, there was a closed group.  They all signed this

1    limited partnership agreement at different times, and the Court

2    said there is no evidence, there is nothing that shows that

3    they came together as a group and made a decision, we're going

4    to co-own a business together.

5         Here what's alleged in this amended complaint is that each

6    of these four investor defendants bought LDO tokens at

7    dramatically different times; one a year apart.  So Paradigm

8    bought in April of 2021, then A16z and Dragonfly a year later.

9    Robot they don't even plead when it was bought.  And they

10   certainly don't plead any communications or consent or approval

11   among the four.

12        Now, more broadly, if you extend it out, it gets worse for

13   plaintiff, because --

14        **THE COURT:**  Well, but I mean, I think you've

15   mischaracterized the allegations in their complaint.  I mean,

16   they have alleged that these -- that these different defendants

17   were basically brought into the business --

18        **MR. DRYLEWSKI:**  Uh-huh.

19        **THE COURT:**  -- to play a major role in the business

20   because of their expertise.

21        **MR. DRYLEWSKI:**  Yeah, that's analogous to the

22   defendant in *Rivlin*, and *Solomont* holds the same.  I would

23   direct Your Honor to that decision.

24        The defendants certainly intended to sell tokens to each

25   of these four investor defendants.  That's pled.  What's not

1    pled is that any of these investor defendants approved and

2    consented to any of the other investor defendants being

3    admitted into a partnership.  That's the critical piece that's

4    missing.

5         And in *Revlin* --

6              **THE COURT:**  If you're not going to think about it as

7    the situation where anybody who buys a token automatically

8    becomes a member of the partnership.

9              **MR. DRYLEWSKI:**  Exactly right, Your Honor.

10        And, now, if you do look at it that way it gets even

11   worse, because what *Rivlin* said, quote:  Partnership

12   memberships are never, never indiscriminately offered at random

13   to the public at large.

14        Here what we have is LDO tokens are available for anyone

15   to buy, in any quantity, at any time, and they can do it

16   anonymously.  So what this means if you take that as the theory

17   of partnership, is you have people out there in the world who,

18   as I'm speaking this sentence, can unilaterally and secretly

19   enter into this partnership and give rise to joint and several

20   liability and fiduciary duties that no one consented to;

21   certainly not my client or the other investor defendants.

22        And so without that clarity as to what the partnership is,

23   plaintiff couldn't possibly plead that mutual selection

24   element.  If you can't describe the partnership, you can't

25   adequately plead it, and we think it should be dismissed on

1   that basis.

2        So, Your Honor, plaintiff's counsel pointed to *Sarcuni*.

3   It's that case out of the Southern District of California.

4   There's a few reasons why that case is distinguishable.

5        First of all, unlike here, the theory in *Sarcuni* was that

6   the entire DAO, all of the token holders were the partnership.

7   And the reason why that happened there and isn't happening

8   here, I would suggest, is because in *Sarcuni* you didn't need to

9   be a token holder to make a claim.  The claim was not a

10  securities claim, that the tokens were securities or anything

11  like that.

12          **THE COURT:**  The hack.  Right?

13          **MR. DRYLEWSKI:**  It's the users -- yes -- on the

14  protocol suffered harm from a hack by a third party.  So the

15  plaintiff there didn't need to allege that he was a token

16  holder or that any members of the class were token holders.

17       Here we have a very different situation, and you can see I

18  think plaintiff struggling with how to walk this line, because

19  in order to allege this securities violation, this plaintiff

20  needs to claim that he was sold the tokens, but then he also

21  needs to at the same time exclude himself from the partnership

22  of all token holders.  So a different theory in *Sarcuni*.

23       This argument that I'm making, too, about 16401, the

24  mutual selection test, also was not addressed in *Sarcuni* by

25  Judge Burns because it wasn't raised.  So Judge Burns never had

1    occasion to rule on it.

2         And third, even if plaintiff got over those two obstacles,

3    we would respectfully submit *Sarcuni* is contrary to binding

4    California law.  Again, if you look at *Rivlin*, *Deeney* and

5    *Solomont*.

6              THE COURT:  Okay.

7              MR. DRYLEWSKI:  They are -- and I'll just make one

8    last point on those three cases.

9         *Deeney* is a case that, Your Honor, if you read it, was

10   about whether labor unions can be partnerships.  And the Court

11   said there are a lot of similarities between labor unions and

12   partnerships, but what's missing from a labor union is you can

13   have thousands of members in a labor union, and although they

14   all know that they're joining, they all know that they're part

15   of this labor union, that mutual selection requirement is not

16   met.  It's not there, because no member of the labor union --

17             THE COURT:  So a labor union is an unincorporated

18   association?

19             MR. DRYLEWSKI:  I don't know if it is.  That's a

20   separate provision of the California --

21             THE COURT:  One of the questions I forgot to ask the

22   plaintiffs is why there was -- I believe in one of the other

23   cases the allegation was that the DAO was an unincorporated

24   association, and now the allegation is that it's a general

25   partnership, and I didn't understand the difference between

1    those two or the significance of any difference between those

2    two for purposes of the case.

3         **MR. DRYLEWSKI:**  Yeah, I can't speak to plaintiff's

4    decisions on its theory of the case.  I can tell you that they

5    are different things under California law.  They are in

6    different provisions of the California --

7         **THE COURT:**  Right; but what is the consequence?

8    Why -- what ...

9         **MR. DRYLEWSKI:**  The mutual selection test, what's

10   embodied in 16401, Subsection I, that applies to general

11   partnerships.  There is not a similar provision for

12   unincorporated associations.

13        **THE COURT:**  Is there a difference from the standpoint

14   of liability of the unincorporated association's members?

15        **MR. DRYLEWSKI:**  I don't want to give you a

16   representation and be wrong on it.  I don't believe so.  I

17   think that the allegation in the *Ooki DAO* case that Your Honor

18   is referencing is that any members of the unincorporated

19   association are jointly and severally liable.  Even if

20   plaintiff were to plead that theory, though, Your Honor, it

21   suffers from the same fatal defect.  What is the incorporated

22   association?

23        **THE COURT:**  I understand.  Let me just get clarity

24   from you on one final point as it relates to this partnership

25   question.

1          So the consequence of your argument is that:

2          A, your clients cannot be sued for the activities of the

3     DAO.  I mean, if they were engaged in some activities in

4     concert with the DAO that were illegal they could be sued for

5     that, but they can't be sued for the activities of the DAO.

6          The other consequence is that the DAO also cannot be sued

7     for these activities?

8          **MR. DRYLEWSKI:**  That's exactly right, Your Honor.  In

9     order to plead a claim against the DAO as a juridical entity

10    capable of being sued, they have to plead the existence of a

11    partnership.  That's their theory.

12         **THE COURT:**  And so who can be sued for what seems

13    like an obvious violation of the law, offering to sell these

14    unregistered securities?

15         **MR. DRYLEWSKI:**  I'll only say that when you read the

16    complaint, this plaintiff pleads that Lido had founders that

17    created it.  They created entities that operate its website.

18    They claim that Lido has a business director, a marketing

19    director, a general counsel and over 70 employees.  None of

20    those parties are sued here.  Instead --

21         **THE COURT:**  And if -- and if they could adequately

22    allege that your clients were sufficiently involved in sort of

23    the operation of the DAO and the offering of the sale of

24    securities, then they could sue your clients directly for

25    violating the securities laws.

1    **MR. DRYLEWSKI:**  Precisely what they disavow here, but

2    you're right, Your Honor.

3             **THE COURT:**  Okay.  All right.  Thanks.

4             **MR. DRYLEWSKI:**  Would you like me to just mention

5    solicitation?  I can address that very briefly.

6             **THE COURT:**  Sure, very briefly.

7             **MR. DRYLEWSKI:**  Thank you very much.

8        There's one issue that it wasn't expressly talked about in

9    your colloquy with my friend from the other side, but it

10   touches upon the standing issue.  And here, *Pinter* lays out two

11   ways that you can be a statutory seller:  One, you pass title

12   of the security to the purchaser, that's not alleged here; or

13   second, you successfully solicit the sale.  That is the theory

14   that plaintiffs are going on here.  The problem with that is

15   plaintiffs do not plead anywhere that they saw any of the

16   solicitations at issue or were even aware of them.

17       And so --

18            **THE COURT:**  But it seems like you're arguing --

19   you're basically arguing against that Ninth Circuit case.  I

20   mean, that's an argument you can take to the en banc court or

21   the Supreme Court.  But what is it, *Pino*?  Is that what it's

22   called?

23            **MR. DRYLEWSKI:**  It's called *Pino versus Cardone*, Your

24   Honor.  We don't think so.

25       So *Pino versus Cardone* was about primarily whether or not

1  generalized solicitations, statements on social media can

2  constitute solicitations under *Pinter*.  And the question was:

3  Does it have to be directed to a particular plaintiff.  And the

4  Ninth Circuit said no, and we don't contest that ruling.

5       At the very end, *Pino* has a discussion that reliance is

6  not an element of a Section 12 claim.  Again, we don't disagree

7  with that either.  We're saying something different.  We're

8  saying put reliance aside.  In order to have been solicited

9  definitionally, you have to have seen the soliciting statement.

10 You have to at least have been cognizant of it.  Otherwise, you

11 weren't solicited.

12      If I take a post and I put it on a bulletin board, and

13 let's just assume it's a solicitation saying buy this thing,

14 the people that walk by and see it, they were solicited, you

15 could say.  But it makes no sense to say someone who never saw

16 that post was solicited --

17          **THE COURT:**  But did the plaintiffs in *Pino* allege

18 that they saw the posts?

19          **MR. DRYLEWSKI:**  They allege that they saw the

20 breakout summit, wealth summit, a seminar.  So there was at

21 least one solicitation there that in the opinion it's clear

22 that they were solicited.  It's unclear from the opinion

23 whether they saw social media posts or not, but they -- you at

24 least have one solicitation that you know they were solicited

25 by the defendants, because they --

1      **THE COURT:**  But that's not -- but the opinion in *Pino*

2  was not just that that breakout seminar, or whatever you

3  called, it was a solicitation.  Right?  It was that the social

4  media -- it was that the defendants were liable for the social

5  media posts as solicitations.  Right?

6      **MR. DRYLEWSKI:**  At most what *Pino* stands for, we

7  think, is if you've been solicited by any of a number of

8  statements, then that supplies the relationship between a buyer

9  and seller --

10     **THE COURT:**  I understand your argument.

11     **MR. DRYLEWSKI:**  And this goes to the text of Section

12  12, though, Your Honor.  What it says is if you violate Section

13  12(a)(1), you are liable to the purchaser for the security that

14  that person purchased from you.  And Justice Blackmun in *Pinter*

15  said that contemplates, that focuses on a relationship between

16  the defendant and the plaintiff.  But here we have no

17  relationship.  Right?  And that gets to a standing issue.  If

18  they are not even aware, they have no inkling that these

19  soliciting statements were ever even made, where is the

20  conduct, the harm that's fairly traceable to the conduct of the

21  defendants?  There is none, because they're not even aware that

22  the solicitation occurred.

23     My bulletin board example applies with equal force to

24  digital posts, like on Twitter or on social media.  If they've

25  never seen it there can't be standing, because there is no

1    causation even at the most basic level.

2        And so we would respectfully submit that, Your Honor, that

3    is grounds for dismissal of the solicitation claim, too.

4        **THE COURT:**  Okay.  Anybody else have any burning

5    desire to say anything?

6        **MR. DRYLEWSKI:**  Thank you, Your Honor.

7        **MS. ENGEL:**  Your Honor, can I respond on the public

8    offering point?

9        **THE COURT:**  Sure.

10       **MS. ENGEL:**  Thank you.  I may need my glasses.

11       Plaintiff's counsel said that if Your Honor were to

12   interpret 12(a)(1) as applying only to the public distribution

13   of securities, that would be irreconcilable with *Pinter*.

14       **THE COURT:**  Yeah.

15       **MS. ENGEL:**  I'm not sure why, because *Pinter* was an

16   unregistered public offering of securities.  So it didn't reach

17   the question, but certainly your decision finding as much would

18   be compatible.

19       This district court a few years after *Gustafson* squarely

20   held --

21       **THE COURT:**  This district court, meaning me?

22       **MS. ENGEL:**  This district court, meaning Judge

23   Patel --

24       **THE COURT:**  Okay.

25       **MS. ENGEL:**  -- in the *Kanos* (phonetic) decision.

1          **THE COURT:**  Okay.

2          **MS. ENGEL:**  Northern District of California, sorry.

3      But squarely held that Section 12(a)(1), applying

4  *Gustafson*, applies only to purchases in a public offering.

5      *Pino* was also a public offering.  It was an unregistered,

6  crowd-funded public offering.

7      If I can briefly walk through what *Gustafson* said.  I

8  think it makes clear, a read of that decision, whether we like

9  it or not, that 12(a)(1) must be interpreted in the same way as

10  12(a)(2).

11      So *Gustafson* involved a private transaction, and the

12  question before the Court was whether the prospectus term in

13  Section 12(a)(2) limited its reach to a public offering.  And

14  Justice Kennedy, writing for the majority, said that the

15  prospectus term is a term of art.  It means documents related

16  to public offerings by an issuer or its controlling

17  shareholder.

18      So the plaintiff says even when there is a prospectus term

19  incorporated into 12(a)(1), it's totally different because of

20  the otherwise language.

21      A couple points.  Justice Breyer, writing for the majority

22  in the *Begay* case, interpreting an otherwise clause said,

23  "otherwise" must be interpreted by the company it keeps.  When

24  it follows a more specific term, it means something similar to

25  that specific term, but different in a certain way.

1          **THE COURT:**  We've had a number of similar cases in

2    the last couple terms.

3          **MS. ENGEL:**  Sure.

4          It also comes up in the context of fee requests under the

5    Equal Access to Justice Act.  An adversary proceeding is

6    defined as one in which the United States represents its

7    position through counsel or otherwise.  So *Begay* has been

8    applied in that context, too, to say "or otherwise" means some

9    sort of advocacy similar to what a counsel would do in court,

10   right?  A written brief advocating a position is sufficient.

11         Plaintiff's reading would take the word "otherwise" and

12   read the entire clause out of Section 5 through 12(a)(1), and

13   it would read 12(a)(1) to cover any offers or sales, no matter

14   whether they were through the medium of a prospectus or

15   otherwise.  It renders that whole -- plaintiff's interpretation

16   renders the prospectus or otherwise clause complete surplusage.

17         So why, why would Congress have written "or otherwise"?

18   The whole point of Section 12(a)(1) and Section 5 was to

19   enforce the registration requirements.  A defendant otherwise

20   can get up and say, hey, I didn't file a prospectus, you can't

21   come after me.  And so the "or otherwise" terms says if you

22   distribute securities to the public through something like a

23   prospectus, you fall within the reach of Section 12(a)(1).

24         **THE COURT:**  Uh-huh.

25         **MS. ENGEL:**  And plaintiff points to two decisions

1    that have addressed this argument.  One was Judge Hamilton in

2    the *Ripple* case.  And I will say the argument was reraised on

3    summary judgment.  The Court didn't reach it, because it

4    granted summary judgment on the federal securities claims

5    recently for *Ripple*.

6         The *Kanos* decision from the Northern District was not

7    cited in the briefing on this point.  Judge Hamilton did rely

8    on the "otherwise" language but did not consider tools of

9    construction that require "otherwise" under Supreme Court

10   precedent to be limited.

11        The *Elastos* decision I think erroneously says that

12   Section 5 is limited or can reach beyond public distributions,

13   and I don't think that's correct.  The cases that Judge Wood in

14   that case cited to the proposition don't stand for that

15   proposition.  And Judge Wood also pointed to the fact that

16   Section 4 provides exemptions to Section 5.

17        And the *Gustafson* majority rejected a similar argument.

18   There, the dissent said, well, if Section 12(a)(2) were meant

19   to exclude private sales, the Congress could have referenced

20   the exemption from private sales that exists in Section 4.  It

21   could have been referenced in Section 12(a)(2).  And Justice

22   Kennedy basically said that puts the cart before the horse.

23   The question is in the first instance, to grant a private cause

24   of action you have to allege that you purchased in a public

25   offering.  Plaintiff purchased here, I believe it was April-May

1  of 2023.

2        THE COURT:  I think I understand your argument.  It's

3  just that it's a little abstract to me because I haven't read

4  the cases yet.  But I understand the basic statutory

5  constructions argument and the, you know, the issue of placing,

6  you know, so much weight on the word "otherwise".  So that's

7  something I needed to spend some more time looking at.

8      What would the consequence be?  If you prevailed on this

9  argument would all the defendants be gone, or would we need to

10  sort out, like, who was involved in the public offering versus

11  who was only involved in ...

12        MS. ENGEL:  I think plaintiff's allegations have

13  meant that none of the four BC defendants were involved at all

14  at the time the LDO token was launched.

15        THE COURT:  Okay.

16        MS. ENGEL:  And plaintiffs also don't allege -- they

17  wouldn't have, you could describe it as a matter of statutory

18  standing.  They can't allege that they purchased public

19  distribution securities.

20        THE COURT:  Right, right.

21        MS. ENGEL:  Which would be from an issuer or its

22  controlling shareholders.

23        THE COURT:  Got it.

24        MS. ENGEL:  Just one last point.

25      I would note that it wasn't disputed in *Gustafson* that

1    Section 12(a)(1) only applied to public offerings.  Justice

2    Ginsburg makes that point in her dissent.  So the idea that

3    12(a)(2) would apply to public offerings, but 12(a)(1) would

4    not, is a novel one.

5            **THE COURT:**  In other words, they relied partly on the

6    assumption that (a)(1) was only applied to public offerings to

7    conclude that (a)(2) only applied to public offerings?

8            **MS. ENGEL:**  The majority didn't rely on it.  Justice

9    Ginsburg just says that it's not in dispute.

10           **THE COURT:**  Okay.

11           **MS. ENGEL:**  I think the thrust of the decision is the

12   Securities Act generally speaking only applies to public

13   offerings.

14           **THE COURT:**  Okay.  All right.

15           **MS. ENGEL:**  Thank you, Your Honor.

16           **THE COURT:**  Thanks.  All right.

17           **MR. DRYLEWSKI:**  Your Honor, just, I'm sorry, could I

18   have 10 seconds on the service issue?

19           **THE COURT:**  No, sorry.  You can have five minutes if

20   there's anything you want to respond to.  You don't have to

21   take it.

22           **MR. GERSTEIN:**  I do not intend to take five minutes.

23           **THE COURT:**  Okay.

24           **MR. GERSTEIN:**  Briefly, if helpful to Your Honor, I

25   think I can of course answer any questions Your Honor has in

1   five minutes or otherwise.

2        Briefly on the *Rivlin* case, because it seems to be

3   exceptionally important here, I think the Securities Act claims

4   are briefed and they're in the cases, and so we won't respond

5   to that now unless you have any questions specifically for me.

6        **THE COURT:**  Okay.

7        **MR. GERSTEIN:**  But the important thing to understand

8   I think about the *Rivlin* line of cases is that *Rivlin* was

9   distinguishing between genuine general partnerships and what it

10  called sham genuine -- general partnerships.  Right?

11       What the defendants in *Rivlin* were doing is they were

12  selling what they called partnership interests that were

13  actually securities under California law, and the Court was

14  attempting to apply a test that would forbid defendants from

15  doing that kind of sham, right, by saying, aha, you're my

16  partner, so you can't be -- I can't be liable to you for

17  selling you equity in this business.  The parallels here are

18  sort of unmistakable.  What they weren't saying, because it

19  wasn't presented there, is whether you can ever create a very

20  large general partnership where everyone doesn't know each

21  other.

22       So imagine a circumstance in which Microsoft Corporation

23  calls the State of Delaware and says, please revoke our limited

24  liability.  We don't want limited liability anymore.  Delete

25  our corporate registration, but everything else about the

1  charter stays the same.  I think the defendants' point is now

2  no one's liable for anything that Microsoft does.  They can do

3  anything they want.  I don't understand at all why the founders

4  are in some different position here, assuming that they

5  personally didn't do anything illegal, but the entity itself

6  did.  Right?  The point here is that if Your Honor accepts

7  their position, they can run a $30 billion business in

8  violation of U.S. law, sell equity to U.S. people and get away

9  with it without any consequence, so far as I can tell.  I can't

10  figure out what any other alternative would be.  But again,

11  whatever it is, it is not an interpretation of *Rivlin* that

12  would lead there court there.  If helpful, of course, we can

13  submit further briefing on any of the issues that have come up.

14         **THE COURT:**  So I've tried -- I'll read the cases that

15  I haven't read.  If I need further briefing, I'll let you know.

16         (Proceedings concluded at 11:41 a.m.)

17                    **CERTIFICATE OF REPORTER**

18         I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20  DATE:  Sunday, July 7, 2024

21

22

23  _____

24  Stephen W. Franklin, RMR, CRR, CPE
    Official Reporter, U.S. District Court

25