1   Jason Harrow
    (Cal. Bar No. 308560)
2   GERSTEIN HARROW LLP
    12100 Wilshire Blvd. Ste. 800
3   Los Angeles, CA 90025
    jason@gerstein-harrow.com
4   (323) 744-5293

5

6

7   Charles Gerstein
    (*pro hac vice*)
8   Emily Gerrick
    (*pro hac vice forthcoming*)
9   GERSTEIN HARROW LLP
    1001 G Street NW, Suite 400E
10  Washington, DC 20001
    charlie@gerstein-harrow.com
11  (202) 670-4809

James Crooks
(*pro hac vice*)
Michael Lieberman
(*pro hac vice*)
FAIRMARK PARTNERS, LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
jamie@fairmarklaw.com
michael@fairmarklaw.com
(619) 507-4182

12

13              UNITED STATES DISTRICT COURT
14        FOR THE NORTHERN DISTRICT OF CALIFORNIA
                  SAN FRANCISCO DIVISION
15

16   ANDREW SAMUELS, on behalf of himself    Case No. 3:23-cv-06492
     and all others similarly situated,
17                                            **PLAINTIFF'S RESPONSE TO**
                     Plaintiff,               **DOLPHIN CL, LLC'S MOTION TO**
18                                            **DISMISS AS TO LIDO DAO**
              vs.
19                                            **CLASS ACTION**
     LIDO DAO, a general partnership; AH
20   CAPITAL MANAGEMENT, LLC;                 **JURY TRIAL DEMANDED**
     PARADIGM OPERATIONS LP;
21   DRAGONFLY DIGITAL MANAGEMENT            **Date: September 5, 2024**
     LLC; ROBOT VENTURES LP,                  **Time: 10:00 AM**
22                                            **Courtroom 4**
                     Defendants.              **Before the Hon. Vince Chhabria**
23

24

25

26

27

28

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................2

ARGUMENT ..............................................................................................................4

I.      LIDO DAO IS AN ENTITY CAPABLE OF BEING SUED. ...........................4

      A.      Lido DAO Is An Association of Two or More People Jointly Operating...............5

      B.      Lido DAO is a Business ...................................................9

      C.      Lido DAO is a For-Profit Business ........................................10

II.      THIS COURT HAS PERSONAL JURISDICTION OVER LIDO DAO. .........................10

III.      PLAINTIFF STATED A CLAIM AGAINST LIDO DAO. ...............................12

CONCLUSION ...........................................................................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*CFTC v. Ooki DAO*, No. 22-cv-05416, 2022 WL 17822445 (N.D. Cal. Dec. 20, 2022) ..............1

*CFTC v. Ooki DAO*, No. 22-cv-05416, 2023 WL 5321527 (N.D. Cal. June 8, 2023) ................11

*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066 (9th Cir. 2011) ...................................12

*Disability Rts. Montana, Inc. v. Batista*, 930 F.3d 1090 (9th Cir. 2019) ........................................4

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101 (9th Cir. 2020)................................................................................................................................12

*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995) ....................................................................14

*Houghton v. Leshner*, 2023 WL 6826814 (N.D. Cal. Sep. 20, 2023) ............................................6

*Marx v. General Revenue Corp.*, 568 U.S. 371 (2013) ................................................................14

*Masa Fukuda v. Nethercott*, No. 13-cv-917, 2016 U.S. Dist. LEXIS 92462 (D. Utah July 15, 2016)........................................................................................................................................14

*Owen v. Elastos Found.*, No. 19-cv-5462, 2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) .......14, 15

*Rivlin v. Levine*, 195 Cal. App. 2d 13 (1961) ...............................................................................7

*Sarcuni v. bZx DAO*, 664 F. Supp. 3d 1100, 1115 (S.D. Cal. 2023)..........................................5, 6

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004) ............................10, 12

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ..........................................................................14

*SEC v. Phan*, 500 F.3d 895 (9th Cir. 2007)............................................................................13, 14

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010) ...................................13, 15

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ...................................................................13, 15

*SEC v. Ross*, 504 F.3d 1130 (9th Cir. 2007)................................................................................11

*Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309 (9th Cir. 1985)................................................11

*Webster v. San Joaquin Fruit & Vegetable Growers' Protective Ass'n*, 32 Cal. App. 264 (1916)...........................................................................................................7

*Zakinov v. Ripple Labs, Inc.*, No. 18-cv-06753, 2020 WL 922815 (N.D. Cal. Feb. 26, 2020).....15

**Statutes**

15 U.S.C. § 77d(a)(2) ..............................................................................................................13, 14

15 U.S.C. § 77e(a)(1) ....................................................................................................................15

15 U.S.C. § 77v(a) ........................................................................................................................11

Cal. Corp. Code § 16202(a) .................................................................................................6, 9, 10

**Other Authorities**

1 Louis Loss *et al.*, *Securities Regulation* 591 (4th ed. 2006)........................................................14

Stephen D. Palley, *How to Sue a Decentralized Autonomous Organization*, COINDESK, March 20, 2016, https://perma.cc/ZZ5A-J9G4 ..............................................................................................8

Thomas L. Hazen, *Law Sec. Reg.* § 4.2 (May 2024 update) ..........................................................14

**PLAINTIFF'S RESPONSE TO DOLPHIN CL, LLC'S MOTION TO DISMISS AS TO LIDO DAO**

1

## PRELIMINARY STATEMENT

2

After this Court granted Plaintiff's Motion for Alternative Service on Lido DAO, *see* ECF

3

75, Lido DAO's tokenholders voted to appoint a newly created entity called "Dolphin CL, LLC"

4

to appear "with respect to Lido DAO." *See* Dolphin CL, LLC's Motion to Dismiss ("Mot."), ECF

5

82 at 1 & n.2.[1] That entity has now filed a motion to dismiss "as to Lido DAO." *Id.* at 15. The

6

Motion should be denied.

7

Dolphin's primary argument for dismissal is that Lido DAO is mere "software" that is

8

incapable of being sued. This characterization of Lido DAO contradicts the plausible allegations

9

of the Complaint and so must be rejected. As the "O" in the acronym "DAO" reveals—the "O"

10

stands for "organization"—the Complaint plausibly alleges that Lido DAO is an *organization*

11

composed of holders of the LDO token at issue here. *See, e.g.*, Amended Complaint ("AC"), ECF

12

54, at ¶ 20. Those tokenholders are not "software," as Dolphin asserts in direct contradiction to the

13

Complaint's allegations. Instead, they are humans and business entities who use those tokens to

14

jointly operate the Lido software and accompanying business—a business that controls more than

15

$30 billion of staked Ether. *See, e.g.*, AC ¶¶ 24–47. Lido DAO is the crypto equivalent of the

16

company "Microsoft"—the one with tens of thousands of employees and investors—not Microsoft

17

Excel, a piece of software that the company produces. Lido DAO's argument to the contrary

18

ignores its own sources and flies in the face of the one decision to have directly addressed the

19

issue. *See CFTC v. Ooki DAO*, No. 22-cv-05416, 2022 WL 17822445, at *4 (N.D. Cal. Dec. 20,

20

2022) (rejecting argument "that Ooki DAO cannot be sued at all, and therefore cannot be served

21

at all, because it is not an entity that can be sued").

22

Dolphin's other arguments fare no better, as they largely recapitulate arguments already

23

made and addressed in prior briefing. First, Dolphin argues that Lido DAO is not plausibly alleged

24

to be a general partnership, but as explained before and again below, Lido DAO unquestionably is

25

a business run jointly by two or more people for a profit, which makes it a general partnership.

26

Dolphin's contrary arguments are based on mischaracterizations of fact and misapplications of

27

28

---

[1] Dolphin's Motion includes two sets of pages numbered 1, 2, and 3. Unless otherwise noted, this brief's citations refer to the second set of pages so numbered.

1

law. Second, there is personal jurisdiction over Lido DAO because it purposefully targeted its solicitation activities at the United States, including by getting the LDO token listed on several U.S.-based crypto exchanges for sale to U.S. persons, including Plaintiff. Those U.S. contacts plainly suffice in light of the Securities Act's nationwide service-of-process provision. Finally, Dolphin incorporates—but adds no substance to—a handful of other arguments made by the other defendants. Those arguments remain meritless. Dolphin's Motion should be denied.

## **FACTUAL BACKGROUND**

The facts in this matter are clearly pleaded in the Amended Complaint, and nothing in Dolphin's request for judicial notice (which Plaintiff does not oppose) contradicts those facts: Lido DAO runs a large, lucrative, and illegal business that sold securities to the American public without registration.

In 2020, three people created Lido DAO by generating one billion LDO tokens. *See* AC ¶ 32. Lido DAO's founders also incorporated business entities abroad to run Lido DAO's website—called a "front-end interface" in crypto parlance—but *not* for the purpose of conducting Lido DAO's staking business. AC ¶ 28 (explaining that the website's legal disclosures explicitly say that these entities do not control Lido DAO and do not operate its business); *see also* Dolphin CL, LLC's Request for Judicial Notice ("RJN"), ECF 83 at 4:24 (citing Lido front-end website, at the bottom of which is a link to terms of service, which read "[t]he Interface maintainers do not own, operate or control the blockchain systems, wallets or devices, validator nodes, or the Middleware [defined as "the publicly available Lido Smart Contract Systems"]").

Lido DAO makes decisions about how to operate its Ethereum staking business by binding votes of those holding LDO tokens. AC ¶ 33; RJN at 4:24 (citing website describing Lido governance process). As initially distributed, Silicon Valley venture capitalists and Lido's founders controlled 64% of the tokens, giving them full control of the business. AC ¶ 32; *see generally* RJN (citing nothing to contest this proposition). The insiders controlling Lido DAO use that control to run a business where users have, so far, staked more than $30 billion of Ether and where Lido DAO charges a 5% fee that is kept in the DAO treasury. AC ¶¶ 30, 31, 35; *see also* RJN at 4:20–21 (citing a Lido DAO blog post explaining, in a graphic, that users stake Ether

through LDO and Lido DAO keeps a 5% fee in its treasury). Defendant AH Capital Management and a member of Lido DAO's Treasury Committee have both admitted—in public statements that Dolphin does not and cannot dispute (*see generally* RJN (citing nothing to the contrary))—that the plan is to distribute the spoils of this business to LDO tokenholders. AC ¶¶ 35, 36.

Lido DAO and its Silicon Valley backers were not content to run a large and lucrative business—they wanted to sell something like equity in that business to the public. *See id.* According to Dolphin's brief, LDO tokens were initially "distributed widely to users of Lido (*i.e.*, persons who staked ETH in Lido) through a free public software-based distribution known as an 'airdrop.'" Mot. at 5:4–5. In support of this supposedly "wide" distribution, Dolphin cites a Lido DAO governance proposal distributing just 0.5% of LDO to actual users. RJN at 4:25–26. According to Dolphin's brief, "secondary markets [then] developed for trading LDO tokens and users may buy and sell them in such markets." Mot. at 5:7–8. Dolphin offers no citation for the proposition that these secondary markets developed all on their own. What actually happened— and what this Court must take as true for purposes of this Motion—is that Lido DAO worked with centralized U.S.-based exchanges to *create* secondary markets for LDO tokens. AC ¶¶ 48-70; *see generally* RJN (citing noting to contradict this). Why did Lido DAO do that? Hasu, who works for Lido DAO *and* Defendant Paradigm, explained: "Later this year, LDO owned by well-connected venture firms … is going to unlock due to the vesting schedule. Wouldn't it be natural to assume that they will help get LDO listed on [centralized exchanges] because it is in their own best interest to do so?" AC ¶ 51; *see generally* RJN (citing nothing to contradict this); *see also* Paradigm, *Hasu*, https://www.paradigm.xyz/team/hasu (last accessed Aug. 2, 2024) (listing Hasu on Paradigm's website). Once LDO tokens were indeed listed on many exchanges, *e.g.*, AC ¶ 54, Lido DAO solicited the public to buy them for its own gain, *see generally id.* ¶¶ 48–70.

Plaintiff Andrew Samuels bought LDO tokens on Gemini, a centralized exchange, and sold them for a loss. *Id.* ¶ 10. He brought this suit on his own behalf and on behalf of other purchasers against Lido DAO and its Partners, was appointed lead plaintiff without opposition, ECF 42, and effected service on Lido DAO through alternative means with this Court's approval, ECF 75. In response, Lido DAO did not appear. Instead, Lido DAO's tokenholders came together and voted

1    to "appoint and fund Dolphin CL, LLC, a Delaware limited liability company ("Dolphin") to

2    engage legal counsel (currently expected to be Brown Rudnick, led by partner Stephen Palley) and

3    make a limited appearance as 'Lido DAO.'" RJN at 4:12–14 (citing governance vote of Lido DAO

4    appointing and funding Dolphin). Of the 52 million LDO tokens voted in snapshot polling, the 13

5    million voted by Paradigm's Hasu represent the largest single share. *Id.* The vote was unanimous.

6    *Id.* Dolphin, it seems, did not exactly follow Lido DAO's instructions—although Lido DAO voted

7    to appoint a representative to appear "as 'Lido DAO,'" Dolphin seems to have appeared as itself

8    "on behalf of Lido DAO," RJN at 4:2–3, or "with respect to 'Lido DAO,'" Mot. at 1:3–4. It is

9    unclear whether Dolphin purports to have the authority to bind Lido DAO and who has authority

10   to make litigation decisions for Dolphin and instruct its counsel. Still, because Dolphin's

11   arguments are meritless, Plaintiff responds to them here while reserving his position that Lido

12   DAO still has not appeared in this case.[2]

13                               **ARGUMENT**[3]

14   **I.**    **LIDO DAO IS AN ENTITY CAPABLE OF BEING SUED.**

15         Even if the Court considers the Dolphin's arguments for why Lido DAO should be

16   dismissed, the Motion should be denied. Lido DAO is, as its name suggests, a DAO, which stands

17   for "Decentralized Autonomous Organization." AC ¶ 20. A DAO takes actions, like hiring people,

18   spending money, and distributing profits, through votes of its governance tokens. *Id.* Those votes

19   aren't suggestions; they determine the actions that the DAO *will* take by altering the code of its

20

21             —————————————

22      [2] While Plaintiff defers for now the question whether Lido DAO has validly appeared through Dolphin, the very fact that Lido DAO tokenholders voted to appoint Dolphin to appear on

23   its behalf defeats Dolphin's argument that Lido DAO is not any kind of partnership or entity. Dolphin was not appointed by a sentient "domain name" or "software system," but by LDO

24   tokenholders, who cast 52 million votes to approve a proposal that Lido DAO "appoint and fund Dolphin … to engage legal counsel … and … make all necessary or desirable legal arguments to

25   cause the case to be dismissed against Lido DAO." RJN 4:12–14 (citing governance-vote website). Dolphin itself notes that this vote was "open to all LDO token holders" but disavows it as an action

26   of any Lido DAO partnership "because this vote did not in fact obtain the votes, or even come to the attention of, all LDO token holders." Mot. 1 & 1 n.1. Left out of this analysis is any authority

27   for the non-sensical proposition that an entity may act only through an action in which every single partner, shareholder, or member affirmatively votes for or against an action.

28      [3] Dolphin's motion is governed by the well-established motion-to-dismiss standard. *E.g.*, *Disability Rts. Montana, Inc. v. Batista*, 930 F.3d 1090, 1096 (9th Cir. 2019).

underlying business, *id.*, which in Lido DAO's case consists mostly of selecting validators for its $30+ billion Ethereum staking business and managing the fees that business charges, *id.* ¶ 30. Lido DAO's founders—thinking, or at least hoping, that they could "avoid the potential of [an] SEC enforcement action"—chose a DAO, instead of a corporation or LLC, to create a business "with no legal entities." *Id.* ¶ 29. That is, they hoped they could set up a software system to collect votes and implement joint decisions to do tens of billions of dollars of illegal business, and then, when called to account, create an LLC to say "Lido DAO is software," Mot. at 3:3, and, by that magical incantation, avoid liability for what this Court said "seems like an obvious violation of the law[:] offering to sell . . . unregistered securities," Transcript of June 27, 2024 Proceedings ("Trans."), ECF 78 at 43:13–14. This plan fails. Lido DAO is a business, run jointly by two or more people, for a profit. Lido DAO therefore is, as Plaintiff previously explained and as courts considering similar questions have held, a general partnership. *See Sarcuni v. bZx DAO*, 664 F. Supp. 3d 1100, 1115 (S.D. Cal. 2023) (reaching that conclusion for Ooki DAO). Dolphin's attempt to pull this plan off relies on nothing more than contradicting the Complaint's well-pleaded allegations with verifiably false factual statements and unsupported legal arguments.

## A.      Lido DAO Is An Association of Two or More People Jointly Operating

The first element of a general partnership under California law, which Dolphin concedes governs this action, Mot. at 8:15, is the association of two or more people working together, *id.* (citing Cal. Corp. Code § 16202(a)). Lido DAO consists of two or more people jointly working together: Lido DAO operates a software protocol through which users stake Ether on the Ethereum blockchain and collect the rewards from that activity, and that software protocol is *governed* by votes of LDO holders. *E.g.*, AC ¶ 30. As Lido's website currently states: "Lido is managed by the Lido DAO. The DAO members govern Lido." Lido DAO, https://docs.lido.fi/lido-dao/ (last accessed Aug. 2, 2024).

To argue otherwise, Dolphin first contends that "the facts here are different" from *Sarcuni* because "the AC pleads that only a narrow subset of LDO token holders constitute the general partnership and, moreover, it is not their ownership of LDO tokens which makes them members of the general partnership." Mot. at 8:24–26. For this reason, Dolphin contends, "unlike in *Sarcuni*,

1   Lido DAO's alleged business is not 'DAO governance.'" *Id.* at 9:2. But that is no different from

2   *Sarcuni*. In *Sarcuni*, the DAO's alleged business was to operate "a protocol for tokenized margin

3   trading and lending" of crypto assets, not "DAO governance," whatever Dolphin means by that.

4   664 F. Supp. 3d at 1109. Here, the DAO's business is a massive, fee-generating Ethereum staking

5   operation. *E.g.*, AC ¶ 1. DAO governance is not a business—it is a way human beings *conduct*

6   business, in this case with the stated intention of avoiding accountability for violating the law, AC

7   ¶ 29. This case is identical to *Sarcuni* on the facts.

8           Next, while Dolphin is correct that Plaintiff has not pleaded a roster of every general partner

9   in Lido DAO, Mot. at 8:24–25, that is not a reason to dismiss the case and permit Lido DAO to

10  carry on with its "obvious violation of the law." Trans. at 43:13. Neither Dolphin nor any other

11  defendant has provided any authority for the proposition that plaintiffs suing general partnerships

12  must identify in the Complaint every partner in the enterprise. Instead, a partnership under

13  California law is the association of two or more people to jointly operate a business for profit. Cal.

14  Corp. Code § 16202(a). Plaintiff here has alleged that Lido DAO is governed by at least two people

15  who work together to govern the Lido Ethereum staking protocol and that this joint governance is

16  effected by votes of LDO tokens. AC ¶ 30. As explained in prior briefing and at the hearing on the

17  other Defendants' motions to dismiss, this Court need not determine whether anyone other than

18  the Partner Defendants is plausibly alleged to be a general partner to conclude that Lido DAO is a

19  general partnership and deny all pending motions to dismiss. *E.g.*, Trans. at 19:21–23:24

20  (discussion between Court and Plaintiff's counsel on general partnerships whose membership is

21  uncertain). As alleged in the Amended Complaint, Lido DAO is jointly operated by "large" holders

22  of LDO voting those tokens to cause the DAO to make business decisions. Plaintiff's legal theory

23  is that Lido DAO's partners are those that have the capacity to meaningfully participate in Lido

24  DAO's business. Pltf.'s Resp. to Mot. to Dismiss, ECF 64 at 20 (explaining *Houghton v. Leshner*'s

25  conclusion that liability for a DAO's illegal actions is "more appropriately tested on a full

26  evidentiary record at summary judgment or trial"); *see Houghton*, 2023 WL 6826814 (N.D. Cal.

27  Sep. 20, 2023)). The *Sarcuni* court concluded that this is true of every holder of a governance

28

1    token. *Id.* at 19:22–28. Plaintiff doesn't think this is necessarily so, *see, e.g.*, Trans. at 20:13, but

2    either way Dolphin's motion must be denied.

3         The mere fact that Lido DAO's partnership interests are freely tradeable (*see* Mot. at 10:9–

4    26) is also of no moment. In support of this argument, the Partner Defendants conjured something

5    they call the "mutual selection test" from *Rivlin v. Levine*, in which the Court of Appeal said that

6    "in all general partnerships, and also in *bona fide* limited partnerships, there is the right to *delectus*

7    *personam*, the right to determine membership." 195 Cal. App. 2d 13, 21 (1961). But *Rivlin* wasn't

8    distinguishing general partnerships from non-entities that can do anything they want without

9    creating any legal consequences for anyone. Rather, it was distinguishing *bona fide* partnerships

10   (shares of which could be sold privately without registration under then-existing California law)

11   from "*sham partnerships*, either general or limited, which masquerade[] as such to exploit

12   investors" by pretending to involve people as partners who are, in fact, securities-violation victims,

13   and which are not exempt from state registration requirements. *Id.* at 22 (emphasis added). Plaintiff

14   couldn't have described Lido DAO any better himself: Small holders of LDO are sold illegal

15   securities that occasionally masquerade as "coordination" devices to "decentralize the Ethereum

16   blockchain"—or whatever other palaver Lido DAO resorts to when it needs to evade

17   accountability, having initially sold LDO tokens as a way to "make lots of money . . . for LDO

18   holders," AC ¶ 36—but the business is *actually* governed by *large* holders of LDO, jointly

19   operating a business for profit.

20        Regardless, if this Court becomes the first to conclude as to a DAO that literal, person-by-

21   person, individualized selection of partners—rather than consent to admit partners who buy

22   enough tokens by agreeing to a governance structure in which this is possible—is a *sine qua non*

23   of a general partnership, Plaintiff would respectfully request leave to amend the complaint to allege

24   that Lido DAO is an unincorporated association in the alternative. *See* Trans. at 42:9–12

25   (Paradigm's counsel conceding that "mutual selection test" does not apply to unincorporated

26   associations); *Webster v. San Joaquin Fruit & Vegetable Growers' Protective Ass'n*, 32 Cal. App.

27   264, 265 (1916) ("An unincorporated association organized for business or profit is in legal effect

28   a mere partnership so far as the liability of its members to third persons is concerned.").

Faced with these straightforward conclusions, Dolphin would have this Court rely on verifiably false factual statements rather than the allegations in the Complaint. Dolphin contends, concededly contrary to the Amended Complaint, that "Lido DAO . . . is a smart contract system that polls LDO users on their views about potential Lido parameter changes[,] … similar to an agency doing surveys on the street and asking consumers about their preference for a product." Mot. at 4:26–5:2. In support of this "fact," Dolphin cites Lido's explanation of its voting process, which explains that, in the ordinary course, LDO tokenholders have a non-binding "discussion" before voting. *Id.* But Dolphin neglects to mention that the very same explanation goes on to say that votes are then conducted "on-chain" and "execut[ed]" whenever "quorum … has been reached" and "more than 50% of the tokens used to vote were for the 'Yes' option." Indeed, Dolphin itself immediately contradicts its argument that LDO holders are really just chatting instead of working together by saying, in the next sentence, that recipients of free LDO tokens have "*the power to determine* parameter settings." Mot. at 5:6 (emphasis added); *see also* Mot. at 11 (acknowledging that the parameters of the Lido protocol are "set by the Lido DAO"). Without conceding that Dolphin may contradict the Amended Complaint's facts with its own alternative facts at this stage, Dolphin has not even done so here—its own source confirms the inaccuracy of its statements. Indeed, Dolphin should know that its statements are false, as its own counsel previously acknowledged: "[F]or a DAO to operate in a world in which legal relationships are formalized by contracts, and enforced by courts, I don't see how a DAO can act unless it is either a corporation or it has no corporate form and it is simply an extension of its human members." Stephen D. Palley, *How to Sue a Decentralized Autonomous Organization*, COINDESK, March 20, 2016, https://perma.cc/ZZ5A-J9G4/. Exactly.

Dolphin's remaining arguments are legally irrelevant. *First*, Dolphin contends that "[a]nyone can deploy copies of . . . the source code to Lido . . . to Ethereum or any similar blockchain system, and each such deployment would constitute an instance of Lido similar to the one alleged in the complaint." Mot. at 4:16–18. This is a non sequitur. Even if in theory anyone could create their own version of the DAO and its business, Plaintiff is suing the actual people who actually operate the "deployment" of Lido DAO that currently manages a $30 billion

Ethereum staking business and sells unregistered securities to the public. The fact that some other group of people, in some other universe, or in the future of this one, could do the same illegal things, is irrelevant. Nor does it matter whether "Lido DAO did such deployment." Mot. at 4:20. As the Complaint makes clear, liability in this case does not flow from merely creating software; it flows to this specific DAO for its "obvious violation of the law," Trans. at 43:13, and thence to its partners under California law.

*Second*, Dolphin contends that "LDO holders' interests are often adverse to one another and Lido's staking users." But this is true of every partnership and does not change the legal analysis. In a law firm, for example, every nickel paid to one partner is one that doesn't go to another. And in every business, economic surplus that goes to the business doesn't go to its customers. Whatever Partners' "understandings of what Lido and Lido DAO mean to them," Mot. at 7:10, they appear able to coordinate to run a profitable business quite well, ¶¶ AC 35, 79, 80 (explaining major governance proposal to "self limit" the percentage of the Ethereum blockchain staked through Lido failing 99.81% to 0.19% despite more than 40% of users supporting it because "ordinary investors have no hope of stopping governance proposals from Partner Defendants," whose interest is *admittedly* to "focus on growth" rather than limitation and then to explore "token buyback mechanisms" to distribute the spoils of that growth).

## B. Lido DAO is a Business

Having established that Lido DAO is jointly operated by two or more people, Plaintiff must next plead that it is a business. Cal. Corp. Code § 16202(a). He has done so. *See, e.g.*, Trans. at 23:6–7 ("I don't think you need to worry about that part."). Although Dolphin protests that Lido DAO "does not and cannot control the statements" of "the large and diverse group of people who . . . contribute to Lido," Mot. at 3 n.4, it does not and cannot contend that those statements are *irrelevant* to whether Lido DAO is plausibly alleged to be a business, and they are not irrelevant. Lido DAO's members and employees amply describe it as a business indeed, Trans. at 23:6–7, which it is: Lido DAO pools its customers' assets together, hires service providers to stake those assets, and keeps 5% of the proceeds from staking for itself. AC ¶ 1. That's a business. Dolphin attempts to go well beyond the Complaint by arguing that Lido DAO's employees are actually

1  "volunteer[s]," but even if this could be considered (and it may not), Dolphin concedes that these

2  "volunteers" get paid through "grant[s]" to do things *they* describe as "business development

3  activities." Mot. at 7. Dolphin also says that Lido DAO is no more than a "polling mechanism that

4  queries LDO holders on whether[] an applicant should receive a grant in the form of crypto assets

5  (which are not legal tender)." But any business could be characterized as a "polling mechanism"

6  to determine whether to take actions with valuable assets, legal tender or otherwise. On Dolphin's

7  characterization, Microsoft is not a business because it pays some employees in stock (not legal

8  tender!) based on a poll of its board or shareholders. No court has ever reasoned this way.

9              C.      **Lido DAO is a For-Profit Business**

10         Finally, Plaintiff must show that Lido DAO's business operates as a for-profit business.

11  Cal. Corp. Code § 16202(a). Again, this is obvious: Just ask AH Capital Management, which

12  publicly stated its desire to earn money from the enterprise, AC ¶ 35, or Lido DAO's "treasury

13  committee," which succinctly explained that the goal is to "make lots of money," *id.* ¶ 36. Dolphin

14  contends that it "is untrue" that "the purported general partners all profit from the alleged Lido

15  staking business." Mot. at 9:4–6. But that's straightforwardly disputing the well-pleaded facts,

16  which cannot be done at this stage. Anyway, Dolphin points to no evidence that Lido DAO's

17  general partners cannot profit from the Ethereum staking business. Of course they do: the purpose

18  of Lido DAO is "to make lots of money" and use that money to "provide an economic reward to

19  LDO holders," AC ¶ 36, which all Partner Defendants are.

20  **II.    THIS COURT HAS PERSONAL JURISDICTION OVER LIDO DAO.**

21         Dolphin next disputes personal jurisdiction over Lido DAO. *See* Mot. at 12. That is easily

22  answered. Personal jurisdiction is proper when (1) the defendant "purposefully direct[ed] his

23  activities or consummate[d] some transaction with the forum or resident thereof"; (2) the claim

24  "arises out of or relates to the defendant's forum-related activities"; and (3) the exercise of

25  jurisdiction "comport[s] with fair play and substantial justice." *Schwarzenegger v. Fred Martin*

26  *Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Although the "forum" for this analysis is often the

27  forum state, the Securities Act's nationwide-service-of-process provision authorizes district courts

28  "to exercise [personal] jurisdiction nationwide over any person who has minimum contacts *with*

1    *the United States.*" *SEC v. Ross*, 504 F.3d 1130, 1139 (9th Cir. 2007) (emphasis added); *see* 15

2    U.S.C. § 77v(a). Accordingly, and contrary to Dolphin's narrow focus on California, "the question

3    [is] whether [Lido DAO] has sufficient contacts with the United States, not any particular state."

4    *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985); *see also CFTC v. Ooki*

5    *Dao*, No. 3:22-cv-05416-WHO, 2023 WL 5321527, at *3 (N.D. Cal. June 8, 2023) ("[T]he inquiry

6    to determine 'minimum contacts' is thus 'whether the defendant has acted within any district of

7    the United States or sufficiently caused foreseeable consequences in this country.'").

8            Lido DAO has minimum contacts with the United States. Lido DAO collaborated with and

9    sold ownership stakes to multiple U.S.-based companies, including defendants Paradigm, AH

10   Capital Management, Dragonfly, and Robot. AC ¶¶ 6–9, 13, 38. Each of those companies

11   participated in the DAO general partnership from the United States. *Id.* ¶ 6–9, 40–47. Lido DAO

12   purposefully targeted its solicitation activities at the United States, including by collaborating with

13   multiple U.S.-based crypto exchanges to induce secondary-market purchases of LDO tokens by

14   U.S. persons. *Id.* ¶¶ 13, 53–62. For example, the Amended Complaint alleges that Lido DAO

15   "actively collaborated with Gemini," a New York-based crypto exchange, to get the LDO token

16   listed for purchase by U.S. persons, *id.* ¶ 60, and took similar steps with respect to two other U.S.-

17   based exchanges, Coinbase and Kraken, *id.* ¶¶ 58, 62. Lido DAO then actively promoted those

18   U.S.-based-exchange listings to U.S. investors. *Id.* ¶¶ 54, 59, 61, 63. Lido also has "U.S.-based

19   employees and contractors" and has entered into business relationships with several other U.S.-

20   based companies, including "Compound, MetaMask, and many more." *Id.* ¶ 13.

21           Dolphin ignores these allegations and asks the Court to do the same. Instead of addressing

22   the allegations or explaining how they could be insufficient to show minimum contacts, Dolphin

23   wishes them away, stating: "*Aside from the . . . allegations that Defendant listed and promoted its*

24   *illegal securities for trading on California-based exchanges and other U.S. exchanges and to*

25   *California persons*, Plaintiff provides no other facts to show purposeful availment of California or

26   the United States." Mot. at 13 (emphasis added, alterations omitted). But Dolphin never explains

27   why the Court should cast those allegations "[a]side" or why, in light of those allegations, any

28   "other facts" are necessary. *Id.* Dolphin calls the allegations "conclusory" and "baseless," Mot. at

**PLAINTIFF'S RESPONSE TO DOLPHIN CL, LLC'S MOTION TO DISMISS AS TO LIDO DAO**

13, but never explains or justifies either objection. In fact, Plaintiff's allegations are far from conclusory: the Amended Complaint specifically details the extensive steps Lido DAO took to get its token listed on U.S. exchanges and to solicit U.S. persons to purchase them. AC ¶¶ 53–63. Dolphin's assertion that the allegations are "baseless" is false, but in any event irrelevant at this stage, as courts must "take as true all uncontroverted allegations in the complaint and resolve all genuine factual disputes in the plaintiff's favor." *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020).

Plaintiff's claim "arises out of or relates to" Lido DAO's contacts with the United States. *Schwarzenegger*, 374 F.3d at 802. Plaintiff is a U.S. resident who was targeted by Lido DAO's solicitations and purchased his LDO tokens on the U.S.-based Gemini exchange while in the United States. *Id.* ¶ 10. Dolphin disputes this element, Mot. at 13, but once again fails to engage with the relevant allegations, never explaining how Plaintiff's purchase of LDO tokens on Gemini did not arise out of or relate to Lido DAO's efforts to get LDO listed on Gemini and to promote it to U.S. investors. *See* AC ¶¶ 10, 54, 60-61.

Finally on this point, Dolphin argues that "Plaintiff fails to show that this Court's exercise of jurisdiction comports with fair play and substantial justice (*i.e.*, reasonableness)." Mot. at 14. But Dolphin has the burden of proof backwards on this element, as it is the *defendant* who must "'present a compelling case' that the exercise of jurisdiction would be unreasonable and therefore violate due process." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1079 (9th Cir. 2011). Dolphin has not even attempted to meet its burden. In any event, there is nothing unfair or unjust about exercising personal jurisdiction over an entity that issued, promoted, and sold unregistered securities to U.S. investors on U.S.-based exchanges, all after setting itself up as a DAO with the specific goal of evading the U.S. laws that it was so obviously violating.

## III. PLAINTIFF STATED A CLAIM AGAINST LIDO DAO.

Dolphin joins a handful of the arguments on the merits that the Partner Defendants previously made. Mot. at 14–15. None of the arguments is any more persuasive than when originally presented. First, Dolphin joins the argument that Plaintiff failed to plausibly allege that Lido DAO sold unregistered securities. *Id.* at 15. As previously explained, however, "Lido DAO

1   is a statutory seller of LDO tokens because it designed and executed a wildly successful plan to

2   enable and encourage the general public to buy LDO, including by getting it listed on every major

3   crypto exchange and then broadly promoting those listings to the general public." Pltf.'s Resp. to

4   Mot. to Dismiss, ECF 64 at 5; *see id.* at 10-19; *see also* Trans. at 28:7–9 ("I don't think there's any

5   question you've adequately alleged that the Lido DAO was engaged in solicitation.").

6         Second, Dolphin joins the argument that "Plaintiff's Section 12 Claim fails because he does

7   not allege that he purchased securities in a public offering." Mot. at 15. This argument has taken

8   various forms over the course of the parties' briefing, but every version of it is meritless. If

9   Dolphin's argument is that Section 5 is limited to *initial* public offerings and therefore does not

10   reach secondary-market transactions, that argument is foreclosed by circuit precedent: "By its

11   terms, Section 5 of the 1933 Act . . . does not limit liability to initial distribution." *SEC v. Phan*,

12   500 F.3d 895, 902 (9th Cir. 2007); *see also* ECF 81.

13         If Dolphin's argument is that Section 5 is limited to *public* offerings (as opposed to *private*

14   offerings), that is only partially true and in any event does not help Dolphin's case. Section 5 is

15   not itself limited to public offerings—its language is capacious and embraces all sales of

16   unregistered securities, *see infra*—but Section 4 of the Act does exempt from Section 5 liability

17   "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2). This "private

18   offering" exemption, however, does not help Dolphin, for two reasons. First, the defendant bears

19   the burden of proving a Section 4 exemption's applicability, making the issue improper for

20   resolution on a motion to dismiss. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

21   Second, the "private offering" exemption is narrow and not applicable here—it applies only to "a

22   limited distribution to highly sophisticated investors," *SEC v. Platforms Wireless Int'l Corp.*, 617

23   F.3d 1072, 1090-91 (9th Cir. 2010), not, like here, an undifferentiated offering of unregistered

24   securities to the public at large through a widely accessible crypto exchange.

25         If Dolphin's argument is that Section 5 *itself* is limited to public offerings—*i.e.*,

26   independently of a Section 4 exemption—that is both incorrect and irrelevant. It is incorrect

27   because Section 5 contains no such limitation, and in fact has no limitation at all. Courts have

28   uniformly held that, to be legal, "[e]ach sale of a security . . . must either be made pursuant to a

1   registration statement or fall under a [Section 4] registration exception." *Phan*, 500 F.3d at 902;

2   *see also SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998) ("Each sale of a security … must

3   either be made pursuant to a registration statement or fall under a registration exemption."); *Owen*

4   *v. Elastos Found.*, No. 19-cv-5462, 2021 WL 5868171, at *12 (S.D.N.Y. Dec. 9, 2021) (noting

5   that *every* securities transaction is either "registered, exempt [under Section 4], or illegal") (quoting

6   1 Thomas L. Hazen, *Law Sec. Reg.* § 4.2 (May 2024 update)); *Masa Fukuda v. Nethercott*, No.

7   13-cv-917, 2016 U.S. Dist. LEXIS 92462, at *7 (D. Utah July 15, 2016) ("Nor does Section 5 limit

8   liability to 'public offerings.'"); 1 Louis Loss *et al.*, *Securities Regulation* 591 (4th ed. 2006) ("On

9   its face, § 5 is all embracing.")). Dolphin does not cite—and no defendant has cited—a single case

10  holding that Section 5 itself is limited to public offerings or limited in any other way; rather, any

11  defendant seeking to be excused from the Securities Act's registration requirement must "look

12  to Section 4," not Section 5. *Owen*, 2021 WL 5868171, at *14.

        Defendants refuse to "look to Section 4" because, as noted above, Section 4's "private

14  offering" exemption does not apply here and in any event is an affirmative defense rather than a

15  pleading requirement. Defendants' effort to invent a similar limitation directly in Section 5 not

16  only contradicts the cases, it also makes mincemeat of the statutory scheme. Most obviously,

17  reading Section 5 as *itself* limited to public offerings would render Section 4's exemption for

18  "transactions by an issuer not involving any public offering" entirely superfluous. 15 U.S.C.

19  § 77d(a)(2); *see Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against

20  surplusage is strongest when an interpretation would render superfluous another part of the same

21  statutory scheme."). Put another way, if Section 5 were itself limited to public offerings as

22  Defendants insist, Congress would have had no reason to separately provide in Section 4 that

23  Section 5's prohibitions "shall not apply to . . . transactions by an issuer not involving any public

24  offering." 15 U.S.C. § 77d(a)(2). Defendants have no answer for this.

        Defendants try to draw support from the Supreme Court's decision in *Gustafson v. Alloyd*

26  *Co., Inc.*, 513 U.S. 561 (1995), but they draw the wrong lesson from that case. In *Gustafson*, the

27  Supreme Court read the word "prospectus" in Section 12(a)(2) narrowly in part because Section

28  4's exemptions *do not apply to Section 12(a)(2)*, meaning that a narrow reading of Section 12(a)(2)

**PLAINTIFF'S RESPONSE TO DOLPHIN CL, LLC'S MOTION TO DISMISS AS TO LIDO DAO**

would not pose the superfluity problems noted above. *Id.* at 573. Here, in contrast, the Section 4 exemptions do apply to Section 5, distinguishing *Gustafson* and compelling courts' uniformly broad reading of Section 5. *See, e.g.*, *Owen*, 2021 WL 5868171, at *13 ("[N]othing in *Gustafson* limits claims under [Section 5].")"; *Zakinov v. Ripple Labs, Inc.*, No. 18-cv-06753, 2020 WL 922815, at *12 (N.D. Cal. Feb. 26, 2020) ("[D]efendants' reliance upon *Gustafson* is misplaced."). Furthermore, *Gustafson* interpreted only the word "prospectus" in Section 12(a)(2); in contrast, Section 5 prohibits selling unregistered securities "through the use or medium of any prospectus *or otherwise*," 15 U.S.C. § 77e(a)(1)—plainly broader language than addressed in *Gustafson*. *See, e.g.*, *Zakinov*, 2020 WL 922815, at *12 (holding that Section 5 "provides a broader basis for assigning liability" than Section 12(a)(2)").

In any event, even if Defendants' counter-textual reading were correct, Defendants do not and cannot explain why limiting Section 5 to "public offerings" would provide them any more refuge than Section 4's exemption for non-public offerings—*i.e.*, no refuge. As noted above, an offering is "private" rather than "public" only if it is "a limited distribution to highly sophisticated investors." *Platforms Wireless*, 617 F.3d at 1090-91; *see Ralston Purina*, 346 U.S. at 125 (holding that only "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering'"). Plaintiff purchased his LDO tokens in undifferentiated offering the public at large through a widely accessible crypto exchange, not a limited distribution that would qualify as "private" under *Ralston Purina*. And because Lido DAO was a "seller" under *Pinter* in that public offering of unregistered securities, *see supra*, it is liable in rescission under the Securities Act.

Finally, Dolphin joins Dragonfly's and Robot's argument "that the *in pari delicto* doctrine bars Plaintiff's . . . claims." Mot. at 15. As previously explained, however, that defense is available only when "the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress," and "the comparative fault here is not even close to equal." Pltf.'s Resp. to Mot. to Dismiss, ECF 64 at 22-23.

### CONCLUSION

For the foregoing reasons, Dolphin CL, LLC's motion to dismiss should be denied.

1

2

3    Respectfully submitted,

4                                    */s/ Jason Harrow*
                                     Jason Harrow
5                                    (Cal. Bar No. 308560)
                                     GERSTEIN HARROW LLP
6                                    12100 Wilshire Blvd. Ste. 800
7                                    Los Angeles, CA 90025
                                     jason@gerstein-harrow.com
8                                    (323) 744-5293

9                                    */s/ Charles Gerstein*
10                                   Charles Gerstein
                                     (*pro hac vice*)
11                                   Emily Gerrick
                                     (*pro hac vice*)
12                                   GERSTEIN HARROW LLP
13                                   810 7th Street NE, Suite 301
                                     Washington, DC 20002
14                                   charlie@gerstein-harrow.com
                                     (202) 670-4809
15
16                                   */s/ James Crooks*
                                     James Crooks
17                                   (*pro hac vice*)
                                     Michael Lieberman
18                                   (*pro hac vice*)
                                     FAIRMARK PARTNERS, LLP
19                                   1825 7th Street NW, #821
20                                   Washington, DC 20001
                                     jamie@fairmarklaw.com
21                                   michael@fairmarklaw.com
                                     (619) 507-4182
22
23                                   *Attorneys for Plaintiff*

24

25

26

27

28

**PLAINTIFF'S RESPONSE TO DOLPHIN CL, LLC'S MOTION TO DISMISS AS TO LIDO DAO**