UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW SAMUELS,<br><br>                    Plaintiff,<br><br>          v.<br><br>LIDO DAO, et al.,<br><br>                    Defendants. | Case No.  23-cv-06492-VC<br><br>**ORDER RE MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 60, 61, 62, 63, 82 |

Andrew Samuels is an investor who bought cryptocurrency tokens on an exchange. The tokens were originally issued by an entity called Lido DAO. Samuels lost money on his investment, and he has sued to recover his losses. He asserts that the tokens are "securities" within the meaning of federal law, which means that Lido DAO was required to register them with the Securities and Exchange Commission. Samuels contends that because Lido DAO never registered the securities, it is liable for his losses under Section 12(a)(1) of the Securities Act.

Thus far, nobody has seriously disputed that the crypto tokens are, in fact, securities. And everyone agrees that Lido never registered them. So at first glance, this seems like a relatively straightforward case. But it's not. It presents several new and important questions about the ability of people in the crypto world to inoculate themselves from liability by creating novel legal arrangements to profit from exotic financial instruments.

The first question is whether Lido DAO is capable of being sued. The complaint alleges that it was founded by three investors whose whereabouts are either remote or unknown, and who apparently cannot be hauled into court in the United States. "DAO" stands for Decentralized Autonomous Organization—a type of organization that seems designed, at least in part, to avoid legal liability for its activities. As discussed in Section II of this ruling, Samuels has adequately

alleged that Lido DAO is not immune from suit. Specifically, he has alleged that Lido is a general partnership within the meaning of California law.

The second question is whether four large institutional investors in Lido—Paradigm Operations, Andreessen Horowitz, Dragonfly Digital Management, and Robot Ventures—are members of the general partnership. If they are, they can be held liable under California law for the activities of the partnership—including for Lido's failure to register its crypto tokens as securities. As discussed in Section III, Samuels has adequately alleged that all the investors except Robot Ventures are general partners and therefore liable for Lido's conduct.

The third question involves whether Lido (and by extension, the partners) could be liable for the particular losses Samuels incurred. As previously noted, it seems clear that Lido was required to register its crypto tokens as securities. But under Section 12(a)(1), liability for losses incurred from the purchase of unregistered securities only attaches to someone who "offers or sells" those securities. Lido did not actually "sell" the tokens to Samuels; he bought them on the secondary market, on the cryptocurrency exchange Gemini. But the courts have construed the statutory phrase "offers or sells" broadly, to cover someone who "solicits" the purchase of securities. And as discussed in Section IV, Samuels has adequately alleged that Lido indeed solicited the purchase of these tokens on crypto exchanges.

The fourth question is related to the third. The defendants argue that a person can only be liable under Section 12(a)(1) for the sale of an unregistered security if the sale is made in a public offering. And they contend that because Samuels bought his tokens in the secondary market, this means he did not buy them in a public offering. But as explained in Section V, Section 12(a)(1) is not, by its terms, limited to sales made in public offerings. So even if an exchange sale like this one categorically falls outside the scope of the term "public offering," the defendants are wrong to argue that it falls outside the scope of Section 12(a)(1).

The upshot is that the motion to dismiss filed by Robot Ventures is granted, because Samuels has not adequately alleged that Robot Ventures is a member of the Lido general partnership. All other motions to dismiss are denied.

# I.    FACTS AND PROCEDURAL HISTORY

The facts described in this section are based on the allegations in the complaint—which the Court must assume are true for purposes of ruling on the motions to dismiss—and on materials properly subject to judicial notice. Andreessen Horowitz's and Dolphin's requests for judicial notice are granted.

## A.  Crypto Staking and Lido DAO's Origins

Lido DAO's service runs on the Ethereum blockchain. The Ethereum blockchain is, essentially, a digital ledger that people can use to record and execute certain financial transactions without going through a central authority such as a bank. Information in the ledger is stored in "blocks," which are connected to prior and later blocks to form a "chain." Transactions are verified through a process called "proof-of-stake," in which people called validators run computer programs to confirm the validity of new blocks. Validators receive rewards in the form of Ether, a cryptocurrency associated with and traded through the Ethereum blockchain. But to participate in the proof-of-stake process and receive that reward, validators must put up as collateral—"stake"—their own Ether. Validators bid for the opportunity to participate, and are selected and rewarded in proportion to the amount of Ether they stake. In exchange for the rewards, validators run the risk of their stake being forfeited if they dishonestly or incorrectly validate transactions. Because validating can be technologically difficult and requires a minimum per-validator stake of 32 Ether (worth over USD $99,000 as of November 2024, according to Google Finance), some companies began offering staking services in which they would pool users' cryptocurrency, stake it, receive the payout, keep a fee, and pay the rest of the proceeds to the users.

In 2020, Vasiliy Shapovalov, Konstantin Lomashuk, and Jordan Fish created Lido, one such staking service. Shapovalov lives in Cyprus and Lomashuk in the Cocos (Keeling) Islands, an Australian external territory; Fish's whereabouts are apparently unknown. Although these founders incorporated "some legal entities" to operate a website to "facilitate the creation of Lido," these entities apparently do not control Lido itself, as they "vigorously repeat in their

legal documentation." Am. Compl. ¶ 28, ECF No. 54. As a Decentralized Autonomous Organization, Lido has no formal corporate structure or centralized leadership. Rather, holders of a cryptocurrency token issued by Lido, "LDO," have voting power in proportion to their token holdings and can make governance decisions by proposing and voting on governance actions to be taken by Lido.

Most importantly, LDO tokenholders vote to choose who will serve as the actual validators for the Ether that Lido stakes. Once chosen, those validators stake the Ether pooled by Lido and perform the validations. The Ether rewards are sent back to Lido, which keeps 5%, gives 5% to the validator, and gives the remaining 90% back to the users. Lido's staking operation has been successful: according to the complaint, it stakes the equivalent of more than $30 billion at once, meaning that it would be making approximately $50 million a year in staking fees. This money is used to pay operating costs, and Lido DAO has also expressed its intent to upgrade and further develop its technology, hire and pay employees and contractors, and conduct marketing campaigns (in addition to various promotional activities it has already undertaken). And although this hasn't happened yet, the money that Lido DAO keeps could also be distributed to LDO tokenholders as profit.

### B.  Venture Capital Firms' Investments in Lido DAO

When the Lido founders established the DAO in 2020, they generated one billion LDO tokens. They put 36% of these tokens into Lido's treasury and gave the other 64% to themselves and early investors. Over the next few years, various investment firms bought in. In April 2021, Paradigm Operations, a crypto investment firm, bought 10% (or 100 million LDO). About a year later, venture capital firm Andreessen Horowitz bought an unknown but presumably substantial amount of LDO for $70 million, and Dragonfly Digital Management, another venture capital firm, similarly bought an undisclosed amount of LDO for $25 million. Another 30 million LDO were sold, in another transaction, to purchasers including Robot Ventures (an investment vehicle for its two cofounders), although the specifics of that transaction are uncertain. It appears that these entities—all of whom are defendants in this lawsuit—aren't the only institutional investors

in Lido DAO: The complaint notes that "a collection of other venture capitalists" bought 3% of Lido's then-outstanding supply of LDO in April 2021, and refers as well to other "insiders." *See id.* ¶¶ 38, 110. Nevertheless, it's unclear exactly who else might hold a large amount of LDO, how much they might hold, or when or how they might have bought in.

Although the complaint doesn't contain every detail about the DAO's operations and interactions with these investment firms, it appears that each of them, with the possible exception of Robot, took an active role in its management or intended to do so. According to a blog post by a separate cryptocurrency investment firm, Paradigm "influenced and even guided the development route of Lido Finance on the key decentralization issue of Lido Finance." *Id.* ¶ 40. And according to a post on Lido's own website, Paradigm was "uniquely positioned to lend its expertise to LidoDAO governance and serve as a liaison to other [decentralized finance] project teams who can help further decentralize LidoDAO's community," and "actively contributes to protocol research, . . . writing code, and, in some cases, auditing codebases." *Id.* ¶ 41.

Andreessen Horowitz planned to be similarly hands-on. When it announced its investment in Lido DAO, it said it "actively contribute[s] to the networks and communities in" its portfolio, and that it would "contribute, as both a staker and governance participant." *Id.* ¶ 43. In one instance, it also expressed an opinion on what Lido's focus should be. More generally, it states that it supports the crypto businesses in which it invests on issues including research, engineering, security, legal and regulatory, and recruiting.

While the complaint provides less detail about Dragonfly's involvement, it also appears to have actively participated in Lido DAO to at least some degree. In July 2022, "[a]fter conversation with the Lido team," it "used its LDO tokens to vote to sell itself even more" tokens, noting that it was "looking forward to being more active in governance." *Id.* ¶¶ 46–47. The corresponding proposal on Lido DAO's site said that Dragonfly, like Paradigm, was "uniquely positioned to lend its expertise to LidoDAO governance and serve as a liaison to other [decentralized finance] project teams who can help further decentralize LidoDAO's community." *Id.* ¶ 78.

The allegations regarding Robot's involvement are much sparser. The complaint notes only that Lido "publicly identified" it as a "key 'strategic partner'"; that one of Robot's founders praised Lido for "securitiz[ing] something prelaunch"; that Lido DAO chose Robot as a partner for "a number of reasons," including its "expertise in the successful development of distributed protocols"; and that it participated—alongside other entities—in a sale of 30 million LDO. *Id.* ¶¶ 9, 34, 45, 96.

### C.  LDO's Listing on Public Exchanges

The founders and early investors weren't the only LDO tokenholders for long. In February 2022, a tokenholder posted on the Lido DAO website a proposal to list LDO on crypto exchanges. (A crypto exchange allows users to trade cryptocurrencies or other crypto assets through a centralized platform, and using a crypto exchange is technologically easier than trading a crypto asset directly through its respective blockchain.) Two Lido DAO representatives responded to the post. One of them worked for both Lido and Paradigm. The other was Jacob Blish, Lido DAO's Business Development Lead, who noted in his response that he was "looking at how we can work with exchanges and would love any insight you might have on the matter." *Id.* ¶ 52. Blish also encouraged the public to ask exchanges to list LDO and fielded inquiries from exchanges that reached out.

These efforts paid off. Over the course of 2022, LDO was added to several major exchanges, including Gemini, Coinbase, Crypto.com, and Kraken. At some point, it was also added to Binance and FTX. Although exact requirements vary, many exchanges require cryptocurrency issuers to actively participate in the listing process, such as by assisting with the exchange's diligence process or otherwise giving the exchange information on the crypto asset to be listed and the technology underlying it.

As LDO was added to new exchanges, Lido DAO—through Blish, its Chief Marketing Officer Kasper Rasmussen, and some of the DAO's other 70-plus employees—promoted the new listings in public posts on Discord (a messaging and social platform) and on Lido's official Twitter account. These posts generally advertised that LDO could be purchased on the relevant

exchange; for example, one post announced: "LDO is coming to Coinbase [beach emoji] Deposits/withdrawals are live, with trading to go live at 9AM PT on 17 November." *Id.* ¶ 59. Lido also posted about increases in LDO's price and about high LDO trading volumes.

Lido's website also promotes LDO holders' ability to participate in Lido DAO's governance (which they can only do by buying LDO tokens) and encourages such participation. It states, for instance, that holding LDO "gives DAO members a vote in the future of Lido, allowing each DAO member to have a personal say in the community" and "in the direction and growth of the Lido DAO." *Id.* ¶ 69. However, according to the complaint, the founders and early institutional investors own the majority of LDO tokens, making their decisions controlling.

### D.  Samuels's Purchases of LDO and this Lawsuit

In April and May 2023, Samuels bought approximately 132 LDO tokens through the crypto exchange Gemini. He sold those tokens for a loss in June 2023. In December 2023, he brought this suit against Lido DAO, alleging that it had violated Section 12(a)(1) of the Securities Act of 1933 by selling LDO, an unregistered security, in interstate commerce. He also sued Paradigm, Andreessen Horowitz, Dragonfly, and Robot (collectively, the investor defendants), alleging that they are members of the Lido DAO general partnership and thus are jointly and severally liable for its misconduct. He seeks to represent a class comprising everyone who purchased or obtained LDO on or after December 16, 2022.

In April 2024, the investor defendants moved to dismiss. Lido DAO did not respond to the complaint or otherwise appear in the lawsuit. Thus, Samuels moved for entry of default against Lido DAO, or otherwise for alternative service. In June, the Court heard oral argument on the investor defendants' motions to dismiss and on Samuels's motions, and granted Samuels's motion for alternative service. After that motion was granted, an entity named Dolphin CL, LLC, appeared in the lawsuit and moved to dismiss as to Lido DAO, purporting to make a limited appearance to prevent entry of default judgment against Lido. As discussed later, it's not clear how Dolphin has standing to appear in court to argue on Lido DAO's behalf. But Samuels did not object to it for purposes of the motion to dismiss, and so the Court agreed to hear Dolphin's

7

motion, deferring ruling on the investor defendants' motions in the meantime. In September, after briefing on Dolphin's motion was completed, the Court heard further oral argument.

## II.    LIDO DAO'S CAPACITY TO BE SUED

Dolphin argues that Lido is not a legal entity, and that therefore it can't be sued at all. The investor defendants argue that whatever Lido is, it is *not* a general partnership, which means that the investors can't be liable as general partners for Lido's conduct.

### A

Dolphin argues that Lido is just autonomous software that runs without human management. Specifically, according to Dolphin, Lido is

> a set of executable software programs . . . stored at and openly accessible on a specific set of public addresses on the Ethereum blockchain. . . . The Lido system identified in the Complaint is not owned or operated by any particular entity or group and is not authoritative or exclusive. The source code for Lido is made up of the 'Lido protocol,' which is available under a free open source license and publicly hosted on GitHub. Anyone can deploy copies of this source code . . . and each such deployment would constitute an instance of Lido similar to the one alleged in the complaint. . . . Although the Complaint alleges a particular Lido deployment is a business run by Lido DAO, the Complaint does not allege who deployed this system, nor that the Lido DAO did such deployment. Lido DAO could not have done this, as Lido DAO is another smart contract system, not a legal entity or natural persons.

Dolphin's Mot. to Dismiss 3–4, ECF No. 82.

But Lido's alleged actions are not those of an autonomous software program—they are the actions of an entity run by people. According to the complaint, Lido makes decisions through tokenholder votes, maintains a treasury where it keeps its retained percentage of staking rewards, and has hired over 70 employees. Dolphin responds that the votes are just "polls," and somewhat circularly contends that Lido cannot have employees because it isn't a legal entity. But these factual assertions contradict the well-pled allegations in the complaint.

Moreover, even if Dolphin is right that Lido is a "protocol" that can be deployed by anyone, Samuels is not suing that protocol—he is suing the entity that operates the "particular Lido deployment" identified in the complaint and referred to by Dolphin. And Dolphin is

incorrect that the complaint does not allege who deployed this system: it alleges that the Lido founders did so when they created Lido DAO. Dolphin's response that Lido DAO couldn't have deployed any software because it is not a legal entity is, like its argument that Lido can't have employees, both circular and in contradiction to the well-pled allegations in the complaint.

Incidentally, because the complaint adequately alleges that Lido is a legal entity, it's not clear that it's proper for Dolphin to appear on Lido's behalf—or, as Dolphin puts it, "with respect to" Lido. *Id.* at 1. Dolphin claims that its limited appearance is justified because Lido is just software and so can't appear itself. In support of this argument, Dolphin cites to *Banks.com v. Keery*, in which individual defendants moved to dismiss on behalf of domain names also named as defendants. No. C 09-6039, 2010 WL 727973, at *7–8 (N.D. Cal. Mar. 1, 2010). Even if that case is right, it's not clear that it should apply here. For one thing, unlike the plaintiff in *Keery*, Samuels has adequately alleged that Lido is a legal entity (and not just software). For another, the individuals who moved to dismiss the claims against the domain names in *Keery* were alleged to have created or been otherwise connected to those domain names—while here, Dolphin seems to disclaim that it has any connection to Lido, suggesting that it was created by "unaffiliated LDO token holders." Dolphin's Mot. to Dismiss 1 n.2, ECF No. 82. In any event, although Samuels has reserved the right to contest the legitimacy of Dolphin's maneuver and argue that Lido has failed to appear, he responded to Dolphin's motion on the merits (with his lawyer noting at the hearing that he needed to win on the merits anyway to succeed on his theory of joint and several liability). So it is unnecessary to address at this point whether Dolphin's appearance is sufficient to prevent the entry of default against Lido.[1]

---

[1] Dolphin also argues that there is no personal jurisdiction over Lido because Lido is not a legal entity and because Lido does not have minimum contacts with the United States. But for the reasons already discussed, Dolphin is wrong that Lido is not a legal entity. Moreover, Samuels has pled sufficient facts to show that his claim arises out of Lido's minimum contacts with the United States, which is all that is required given that the Securities Act provides for nationwide personal jurisdiction over anyone with such contacts. *SEC v. Ross*, 504 F.3d 1130, 1139 (9th Cir. 2007).

B

Although the investor defendants don't have the audacity to argue that Lido is just software, they do argue (along with Dolphin) that Samuels hasn't adequately alleged that it's a general partnership. California law applies to this question because the law of the state where a federal court is located governs the capacity to be sued of a party that is not an individual or a corporation. Fed. R. Civ. P. 17(b)(3); *see also CFTC v. Ooki Dao*, No. 22-cv-5416, 2022 WL 17822445, at *5–8 (N.D. Cal. Dec. 20, 2022) (applying California law to determine whether a different DAO was an unincorporated association and could be sued). And nobody argues that another state or country's law should apply: Samuels makes arguments under both "California law and the general partnership law of other jurisdictions," Dolphin states that California law applies, Paradigm assumes it does, and the remaining investor defendants all cite cases applying it (while in some cases also citing to the Revised Uniform Partnership Act or observing that Samuels has failed to state what law applies).

Under California law, "the association of two or more persons to carry on as coowners a business for profit forms a partnership, whether or not the persons intend to form a partnership." Cal. Corp. Code § 16202(a). The existence of a partnership is a question of fact. *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1157 (2005). The complaint alleges that Lido DAO's founders formed it to run an Ethereum staking service that keeps a percentage of the staking rewards and that they plan to ultimately distribute this revenue to themselves and other tokenholders—in other words, to carry on, as coowners, a business for profit.

It's not clear at this point who exactly might be a member of the partnership. Samuels's partnership theory is that Lido DAO "is jointly operated by 'large' holders of LDO voting those tokens to cause the DAO to make business decisions," such that "Lido DAO's partners are those that have the capacity to meaningfully participate in Lido DAO's business." Pl.'s Opp'n to Dolphin's Mot. to Dismiss 6, ECF No. 97. In other words, Samuels alleges that only those entities with the capacity for meaningful participation in management of the DAO were admitted as partners by the founders (and, for later-joining partners, by any other then-existing partners)

and are jointly carrying on the Lido DAO's staking service for profit. As additional facts are uncovered by discovery, it may become clear that the Lido DAO general partnership is narrower (for instance, including only the founders) or broader (for instance, including everyone who has voted on a governance proposal or who holds any LDO).[2]

But at the pleading stage, it is enough for Samuels to adequately allege that some general partnership exists. He has done so. The complaint alleges that some number of people got together and agreed to create and operate an Ethereum staking service because they thought they could make money doing that. Samuels has therefore pled sufficient facts to allow the reasonable inference that a Lido DAO general partnership was formed. *Cf. Houghton v. Leshner*, No. 22-cv-7781, 2023 WL 6826814, at *3 (N.D. Cal. Sep. 20, 2023) ("The exact contours of liability . . . [are] more appropriately tested on a full evidentiary record at summary judgment or trial.").[3]

Because this is all that is required at this stage, the argument advanced in various forms by the investor defendants that Samuels "does not plead any coherent theory of partnership, including when it formed, how it formed, or why Defendants are the only 'partners' in it" fails. Paradigm's Mot. to Dismiss 1, 8–9, ECF No. 60. Fairly read, the complaint does not allege that the investor defendants are the only members of the Lido general partnership. Instead, it alleges that the founders got together and formed the Lido partnership. Later on, the investor defendants "joined [that] general partnership" and began to jointly carry on the business with the preexisting partners. *See* Am. Compl. at 34, ECF No. 54. Other entities may also have joined at various points. But every LDO holder, on the other hand, hasn't automatically joined the partnership

---

[2] Samuels does not contend that the partnership comprises every single person who holds even a single LDO token, or—given the allegations in the complaint that people who hold LDO through certain exchanges cannot vote on Lido DAO governance proposals—every single person who has the capacity to use their LDO to vote or who has actually voted. In this regard, his partnership allegations are different from those accepted in *Sarcuni v. bZx DAO*, which held that the plaintiff had adequately alleged a partnership comprising every holder of the defendant DAO's token. 664 F. Supp. 3d 1100, 1115 (S.D. Cal. 2023).

[3] Similarly, it may be that any defendant ultimately found to be a general partner of Lido DAO nevertheless cannot be liable for acts that predate their entry into the partnership. *See* Cal. Corp. Code § 16306(b). The extent to which individual partners' liability must be reduced on this basis is also better determined at a later stage in the case. *See Houghton*, 2023 WL 6826814, at *6.

because they don't all necessarily have the ability to meaningfully participate in DAO governance and thus haven't all necessarily begun to jointly carry on the DAO's business. No defendant cites any authority holding that a plaintiff must identify when a defendant allegedly joined a partnership, or that a plaintiff seeking to hold members of a partnership liable for a claim against the partnership must name every single partner as a defendant. To the extent that there are other Lido general partners, they would also be jointly and severally liable for any judgment against it, and the investor defendants are free to implead them—or, if any of the investor defendants are ultimately forced to pay a judgment against the DAO, to later seek contribution from them. But the fact that Samuels has not comprehensively identified every single Lido partner and when they joined—and named every partner as a defendant—does not mean that he has not sufficiently alleged a partnership.[4]

The defendants also argue that Lido cannot be a partnership because its structure and operations are inconsistent with various aspects of partnerships under California law. For instance, they note that anyone can buy LDO tokens and thus participate in the management of Lido's business, while California law provides that a "person may become a partner only with the consent of all of the partners." Cal. Corp. Code § 16401(i). Similarly, anyone can sell their tokens on an open exchange, while under California law, a partnership must repurchase a dissociating partner's interest. *Id.* § 16701(a).

But these are only default rules that can be displaced by a partnership agreement. *Id.* § 16103(a). And that partnership agreement can be oral or implied. *Id.* § 16101(a)(10). Lido is

---

[4] The argument advanced by some of the defendants that Samuels's claim is barred by the doctrine of *in pari delicto* ("in equal fault") fails for similar reasons. This doctrine provides a defense where a plaintiff who is an "active, voluntary participant in the unlawful activity that is the subject of" a securities action "bears at least substantially equal responsibility for the underlying illegality." *Pinter v. Dahl*, 486 U.S. 622, 635–36 (1988). The defendants argue that this doctrine applies to Samuels because he became a Lido DAO partner by purchasing LDO, so he is equally responsible for the partnership's wrongdoing. But the complaint includes no allegation that indicates that Samuels jointly carried on the Lido business, so as discussed, there's no reason he should be considered a partner at this point. Moreover, there is no indication whatsoever that he "is at least equally responsible for the actions that render[ed] the sale of the unregistered securities illegal." *Pinter*, 486 U.S. at 636.

structured such that anyone who holds LDO can participate in the DAO's governance. It can only work this way because its founders (possibly in concert with other early collaborators) set it up to work this way. Therefore, it is reasonable to infer that, at some point, the DAO's founders or early partners made an agreement (whether written, oral, or implied) to modify these default rules and allow for people to become partners by purchasing LDO and for dissociating partners to be able to sell their "interest" to anyone in the form of LDO.

The same is true if the partnership is construed more narrowly, in line with Samuels's theory, as only including those who can meaningfully participate in Lido governance because they hold a large number of tokens (as opposed to including every LDO holder who votes or has the capacity to vote). In that case, it's reasonable to infer that at some point, the founders— possibly in conjunction with other early partners—agreed to structure the DAO to allow for new partners to join by purchasing enough LDO tokens. Or, conceivably, the founders might have decided to sell large quantities of LDO to certain hand-picked entities, ensuring that the founders and these selected entities would hold enough tokens to control votes themselves. Again, it's not clear at this point what the founders might have agreed to, and the exact contours of the Lido general partnership are better determined "on a full evidentiary record at summary judgment or trial." *Houghton*, 2023 WL 6826814, at *6. But Samuels has made sufficient allegations to draw the reasonable inference that the Lido founders (and possibly other early investors) agreed to displace California's default partnership rules governing partners' entrance into and exit from the partnership.

Dolphin, Dragonfly, and Robot next argue that Lido cannot be a general partnership because the plaintiffs do not allege an explicit agreement for the sharing of profits and losses. But under California law, profit sharing is "evidence of a partnership, rather than a required element of the definition of a partnership." *Holmes v. Lerner*, 74 Cal. App. 4th 442, 453–54 (1999). Although Dragonfly cites *Simmons v. Ware* for the proposition that "[a]greement to share in the profits and losses of the enterprise is . . . essential to a joint venture," that language concerned a joint venture. 213 Cal. App. 4th 1035, 1054 (2013). While partnerships and joint

ventures may be similar, to the "extent a difference exists, it pertains to the significance of profit sharing. In particular, profit sharing is a requisite element of joint ventures, whereas, with respect to partnerships," it is evidence of a partnership but not a necessary element of one. *Beautiful Slides, Inc. v. Allen*, No. 17-cv-1091, 2017 WL 11829657, at *1 (N.D. Cal. Dec. 4, 2017) (cleaned up) (discussing *Holmes* and *Simmons*). Rather, the "essential requirement for a partnership" is "association with the intent to carry on a business for profit." *Holmes*, 74 Cal. App. 4th at 454. That members of a certain partnership may not have made an explicit agreement regarding profit sharing does not mean that their goal in running a business together was not to make money. Here, as discussed above, Samuels has adequately alleged an association to carry on a business for profit.

Finally, both Dolphin and Paradigm make arguments based on the principle that the affirmative choice of another corporate form weighs against the existence of a partnership. *See, e.g.*, *Eng v. Brown*, 21 Cal. App. 5th 675, 694–95 (2018). Dolphin notes that separate entities were "formed for the purposes of facilitating the Lido DAO software." Dolphin's Mot. to Dismiss 11, ECF No. 82. But the complaint alleges that those separate entities were only formed to operate a website and do not control Lido itself—and in fact that these entities' "legal documentation" disclaims any control over the DAO. Am. Compl. ¶ 28, ECF No. 54. Paradigm argues that the fact that the investor defendants themselves chose other corporate forms means that they are not members of a partnership. But California law expressly provides that corporations and other corporate entities can be members of general partnerships. Cal. Corp. Code § 16101(a)(13). And the investor defendants' individual businesses are different from the business they allegedly jointly carry on as Lido.[5]

---

[5] Even if Lido DAO is not a general partnership, it might still be capable of being sued under some other theory—for instance, as an unincorporated association or to enforce a substantive federal right. *See, e.g.*, *CFTC v. Ooki DAO*, No. 22-cv-5416, 2022 WL 17822445, at *4–8, *8 n.10 (N.D. Cal. Dec. 20, 2022) (holding that the plaintiff had adequately alleged that a different DAO was an unincorporated association under California law—and noting that, even if the plaintiff hadn't done so, the defendant could be sued under Rule 17 because the plaintiff was seeking to enforce federal law and the defendant met the federal law definition of an unincorporated association).

III.    **SAMUELS'S CLAIMS AGAINST THE INVESTOR DEFENDANTS**

Samuels concedes that the investor defendants did not directly violate the Securities Act. Rather, he seeks to hold them liable as members of the Lido general partnership. Under California law, general partners "are liable jointly and severally for all obligations of the partnership unless otherwise agreed." Cal. Corp. Code § 16306(a). So the investors are proper defendants only to the extent Samuels has adequately alleged that they are Lido general partners.

The complaint easily alleges that Paradigm and Andreessen Horowitz are partners. It says that Paradigm has helped "influence[]" and "guide[]" the development of Lido and that the DAO's website heralded Paradigm's ability to "lend its expertise to LidoDAO governance." Am. Compl. ¶¶ 40–41. Andreessen Horowitz, for its part, announced itself that it would contribute to Lido DAO as a "governance participant," and in at least one instance did express a view on DAO governance. *Id.* ¶ 43. Considering also the allegation that it purchased $70 million worth of LDO, it is reasonable to infer that it was capable of meaningfully participating in the DAO's governance. Because the complaint alleges that Paradigm and Andreessen Horowitz participated in Lido DAO governance, it plausibly alleges that they (possibly alongside others) jointly carried on the DAO's business for profit.

Although it's a closer call, the complaint also includes sufficient allegations to support an inference of partnership on the part of Dragonfly. After an initial purchase of $25 million worth of LDO, Dragonfly purchased even more tokens, noting that it was "looking forward to being more active in governance" and that it was "uniquely positioned to lend its expertise to LidoDAO governance." *Id.* ¶¶ 46, 78. And it was able to purchase these tokens because it voted for them to be sold to it. So, drawing reasonable inferences in Samuels's favor, it is plausible that Dragonfly, too, has meaningfully participated in Lido DAO governance and thus carried on its business for profit.

On the other hand, the complaint does not contain sufficient allegations to infer that Robot meaningfully participated in Lido DAO governance. It notes only that one of Robot's partners praised Lido DAO, that Robot was chosen to get involved with the DAO because it

could add its "expertise in the successful development of distributed protocols" to the DAO, and that it participated in a sale in which it—along with other entities—purchased 30 million LDO. *Id.* ¶ 45. It does not allege that Robot participated in Lido DAO governance or made any statements about doing so. Samuels argues that it is reasonable to infer that Robot, having been brought in for similar reasons as the other investor defendants, would have a similar role and similar active participation in governance. But while it might be true that Robot did or intended to have such a role, the complaint doesn't actually allege that Robot did or said anything other than purchase some unknown quantity of LDO. So, at this juncture, Samuels has not pled that Robot is a member of the Lido DAO partnership; should discovery reveal that Robot was actually an active participant in governance, Samuels is free to seek leave to add it back as a defendant.

Notwithstanding the complaint's allegations of the investor defendants' involvement with Lido DAO, Dragonfly and Robot argue that the investor defendants cannot be partners because partners are those who "*each* have the power of ultimate control" over a business, but the complaint does not allege that the investors completely control Lido DAO or "consistently vote in unison." Dragonfly's Mot. to Dismiss 6, 8, ECF No. 63; Robot's Mot. to Dismiss 7–8, ECF No. 63 (emphasis added). They note that the Revised Uniform Partnership Act, on which California's partnership law is based, imposes this requirement.

But the defendants do not cite to any place where the requirement that "each" partner have the "power of ultimate control" can be found in California law. And partners obviously do not need to always agree on everything to be partners. To the contrary, as Dragonfly itself notes, California law requires that each party have the "right of joint *participation* in the management and control of the business." *Bank of California v. Connolly*, 36 Cal. App. 3d 350, 364 (1973) (emphasis added). It is the partnership as a whole that must ultimately control the business, as Samuels has alleged the Lido DAO partnership does. So whether Samuels has plausibly alleged that the investor defendants are members of that partnership hinges not on whether he has alleged that they each control Lido, but on whether he has made sufficient allegations that each

of them has agreed to jointly participate in its management alongside other partners.

Paradigm and Andreessen Horowitz argue that, even if they are members of the Lido general partnership, they are not properly defendants in this case for other reasons. First, both argue that partners cannot be derivatively liable for a partnership's violations of Section 12—the section of the Securities Act under which this lawsuit is brought. In support of this argument, they note that Section 12 only creates liability for "any person" who "offers or sells a security." 15 U.S.C. § 77*l*(a). Section 11 of the Act, meanwhile, also extends liability to "every person who was" a "partner in the issuer" of a false registration statement. 15 U.S.C. § 77k(a)(2). According to the defendants, the fact that partners were expressly included in Section 11 but not in Section 12 indicates that Section 12 precludes partnership liability.

It's true that a partner cannot be directly liable for a violation of Section 12 simply by virtue of their being a partner in an entity that violates that provision (as they could be for a violation of Section 11). But the Act clearly defines "person" to include "a partnership." 15 U.S.C. § 77b(a)(2). And under California law, general partners are jointly and severally liable for the obligations of the partnership. Cal. Corp. Code § 16306(a). So even though a partner cannot be directly liable for a partnership's violation of Section 12, the partnership can still be a co-obligor, under state law, for the partnership's liability.

This is not a meaningless distinction: partners may structure their partnerships so as not to create joint and several liability (whether through the partnership agreement or by forming limited or limited liability partnerships) and thereby avoid liability under state partnership law. If, on the other hand, Section 12 provided for partner liability the way Section 11 does, partners could presumably be subject to Section 12 suits regardless of how their partnerships were structured under state law.

Nor does *Schneider v. Traweek*, cited by the defendants, change this conclusion. No. CV 88-0905, 1990 WL 169856 (C.D. Cal. Sep. 5, 1990). In that case, the court held that the alleged status of one defendant, Fainsbert, as a "secondary general partner" did not make him a statutory seller subject to liability under Section 12. *Id.* at *17. The court thus dismissed the Section 12

claim against him. *Id.* What claims were brought against whom is somewhat unclear; the opinion notes, for instance, that the defendant "Bell Firm is not named as a Defendant in the Plaintiff's [Section 12(a)(2)] and RICO claims," but also that the court had "previously ruled that the Plaintiffs have sufficiently stated a [Section 12(a)(2)] claim against the Defendant Bell Firm." *Compare id.* at *3, *with id.* at *16. Nevertheless, it appears that the plaintiffs did not actually bring a Section 12 suit against the entity of which Fainsbert was a general partner: the opinion discusses a Section 12 claim only against Fainsbert, and discusses only Section 10(b), Rule 10b-5, and RICO claims against the partnership. *See id.* at *2–3, *16–17. *Schneider* therefore does not stand for the proposition that a defendant cannot be held jointly and severally liable, under state partnership law, for a partnership's alleged violation of Section 12; it does not even address this point or discuss partnership liability under California law.

Andreessen Horowitz also argues that it is not a proper defendant because joint and several liability merely "relates to the apportionment of damages once a party has been found liable." Andreessen Horowitz's Reply 5, ECF No. 67 (quoting *Staefa Control-System Inc. v. St. Paul Fire & Marine Insurance Co.*, 847 F. Supp. 1460, 1471 (N.D. Cal. 1994)). It's true that Andreessen Horowitz will only be liable if Lido is. But under Federal Rule of Civil Procedure 20(a)(2), multiple parties can be joined as defendants if "any right to relief is asserted against them jointly [or] severally." *See also Sarcuni v. bZx DAO*, 664 F. Supp. 3d 1100, 1125 (S.D. Cal. 2023) (allowing claims against defendants that were allegedly members of DAO general partnership to proceed on grounds that those defendants could be jointly and severally liable for DAO's negligence). Andreessen Horowitz can be joined as a defendant because Samuels has adequately alleged that it is a Lido general partner jointly and severally liable for any judgment against the DAO.

## IV.    LIDO DAO AS A STATUTORY SELLER

Section 12(a)(1) provides that any person who "offers or sells a security in violation of" Section 5 of the Act "shall be liable" to "the person purchasing such security from him, who may sue" to "recover the consideration paid for such security." 15 U.S.C. § 77*l*(a). Section 5 provides

that it "shall be unlawful for any person" to sell a security in interstate commerce unless "a registration statement is in effect as to" that security. 15 U.S.C. § 77e(a); *see also Pinter v. Dahl*, 486 U.S. 622, 627 n.4 (1988). Therefore, Section 12(a)(1) and Section 5(a)(1) together allow someone who purchases an unregistered security to bring a suit for rescission against that security's seller.

Paradigm, Andreessen Horowitz, and Dolphin argue that Samuels has failed to plead that Lido DAO is a statutory seller (that is, one who "offers or sells a security" under Section 12). But the case law gives a broad definition to this statutory phrase. A defendant may be liable as a seller under Section 12 "where they either pass title or other interest in the security directly to the buyer, or where they 'successfully solicit' someone else to buy a security motivated in part by a desire to serve their own or the security owner's financial interests." *Houghton v. Leshner*, No. 22-cv-7781, 2023 WL 6826814, at *2 (N.D. Cal. Sep. 20, 2023) (quoting *Pinter*, 486 U.S. at 646). Samuels does not allege that Lido passed him title to the LDO tokens he purchased; he argues only that Lido DAO is a statutory seller because it solicited his and others' purchases of LDO.

A person "solicits" the purchase of a security "where she petitions, entices, lures, or urges another to purchase a security." *In re Genius Brands International, Inc. Securities Litigation*, 97 F.4th 1171, 1182 (9th Cir. 2024) (cleaned up). "Solicitation is broadly construed in the Ninth Circuit," *Houghton*, 2023 WL 6826814, at *3, and can include "various mechanisms used to 'urge or persuade another to buy a particular security,'" *Genius Brands*, 97 F.4th at 1182 (quoting *Pino v. Cardone Capital LLC*, 55 F.4th 1253, 1258 (9th. Cir. 2022)).

Most relevant here, courts in this district have held that a plaintiff has adequately pled solicitation where they have stated that the defendant has been "comprehensive[ly] involve[d] with the design, operation and monetization of a cryptocurrency enterprise." *Houghton*, 2023 WL 6826814, at *3 (citing *In re Tezos Securities Litigation*, No. 17-CV-6779, 2018 WL 4293341, at *9 (N.D. Cal. Aug. 7, 2018)). In *Tezos*, for instance, Chief Judge Seeborg held that allegations of a defendant's "creation of the [relevant] technology, establishment of a legal entity

to monetize [that defendant's] interest in that technology, development of a platform to facilitate said monetization, and minute-to-minute oversight of the monetization process itself" made that defendant more than a "collateral participant" in the sale of the crypto assets at issue and thus potentially liable as a statutory seller. 2018 WL 4293341, at *9. Similarly, in *Houghton*, Judge Orrick held that the plaintiffs' "numerous allegations regarding the Partner Defendants' roles with [a DAO and that DAO's founder], including their design and governance decisions, their efforts to successfully monetize [that DAO's token] and bring it to secondary markets, and their public comments, plausibly [pled] solicitation." 2023 WL 6826814, at *3.

Here, Samuels has likewise pled solicitation because he has alleged that Lido DAO was comprehensively involved in the creation and issuance of LDO and in efforts to get people to purchase it. He alleges that Lido worked to get crypto exchanges to list LDO; that Lido promoted the listings and increases in LDO's price through posts on social media; and that Lido encouraged people to participate in Lido governance, which requires them to purchase LDO. The alleged statements about LDO's price and availability on exchanges and about participation in DAO governance are plausibly encouragements to purchase LDO. These allegations are nearly identical to those held sufficient for solicitation in *Houghton*, where the plaintiff alleged that the defendants "were involved in creating, designing, and then opening the market for [the DAO's business, analogous to Lido's staking service], including efforts to persuade exchanges to offer [the DAO's token], paying exchanges to carry promotional videos, and encouraging investors to purchase [the token] and play a role in governance." *Id.* at *5.

The defendants argue that Lido DAO could not have solicited Samuels's purchase because he does not specifically allege that he saw any of Lido DAO's promotional social media posts. But the Ninth Circuit has held that solicitation does not need to be "direct or personal to a particular purchaser," or akin to "contractual privity." *Pino*, 55 F.4th at 1259–60. Moreover, a plaintiff does not need to plead either reliance or causation to state a Section 12 claim. *See id.* at 1260; *In re Daou Systems, Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011)); *Houghton*, 2023 WL

6826814, at *4 n.5. Given that reliance is not required, that a solicitation must be "successful" is better understood as requiring that "a sale has taken place." *Pinter*, 486 U.S. at 644. So if solicitation can be achieved through mass communications, and individual plaintiffs do not need to have relied on or had their purchases caused by these communications, it is unclear why a plaintiff would need to have seen them. *See also Tezos*, 2018 WL 4293341, at *3, *9–10 (holding that a plaintiff adequately alleged solicitation as to certain defendants even where the plaintiff did not allege that he had any "awareness of any of the defendant-specific promotional or procedural activity").[6]

Andreessen Horowitz and Paradigm next argue that Lido DAO was not motivated by a desire to serve its financial interests. But Lido would benefit financially from sales of LDO— even sales in which it did not literally pass title—because the LDO tokens owned by it and its partners and investors are only valuable if there is a liquid market on which to sell them, and because the tokens can be sold for more if LDO's market price is driven higher by high demand. Andreessen Horowitz argues that Supreme Court precedent limits the sorts of financial interests that suffice for solicitation, contending that a defendant must specifically receive a financial benefit from the sale to the plaintiff (such as a commission) to qualify. Andreessen Horowitz's Mot. to Dismiss 5, ECF No. 61 (citing *Pinter v. Dahl*, 486 U.S. 622, 654–55 (1988)). In its view, Samuels's purchase fails because Lido's financial interest is in the token price generally rather than in his transaction specifically. But while the Supreme Court may have used commissions and profit-sharing arrangements as examples of financial interests a soliciting seller might have in a sale, it did not say that these were the only sufficient interests. *See Pinter*, 486 U.S. at 654. Although these might be the only interests that would make sense for certain brokers to have, that doesn't mean they are the only interests that make sense for an issuer accused of solicitation

---

[6] Dolphin cites *Hollifield v. Resolute Capital Partners Ltd.*, in which a district court held that the plaintiffs had not pled solicitation because they did not allege that they attended any of the seminars or dinners, or listened to any of the radio shows, through which some of the defendants allegedly engaged in solicitation. No. 22-cv-7885, 2023 WL 4291524, at *6 (C.D. Cal. May 12, 2023). But *Hollifield* did not discuss or distinguish *Pino* in reaching this conclusion, so this Court declines to follow it.

to have in the sale of its own security. And while Lido's financial interest might not manifest on a sale-by-sale basis the way a commission would, it still has a financial interest in every transaction because every purchase contributes to demand—creating, in the aggregate, a market for LDO and raising its price.

Paradigm similarly cites *Risley v. Universal Navigation Inc.* for the proposition that an interest in seeing the price of a security increase does not count for solicitation. 690 F. Supp. 3d 195 (S.D.N.Y. 2023). But that is not what *Risley* said. In *Risley*, the defendants operated a cryptocurrency exchange that could be used to trade cryptocurrency without going through an intermediary. *Id.* at 200, 205. Like Lido DAO, the exchange had a "governance token." That token could be purchased on the exchange and its holders could make governance decisions for the exchange. *Id.* at 208–09. The plaintiffs lost money on "scam tokens" that they bought on the exchange. *Id.* at 200. Unable to identify the issuers of the scam tokens, they instead sued developers of and investors in the exchange. *Id.* The court held that the plaintiffs had failed to allege that the defendants had solicited their purchases of the scam tokens. *Id.* at 221–23. In addition to holding that the defendants had not actually solicited buyers to purchase the scam tokens, the court held that the plaintiffs had not adequately alleged that the defendants were motivated by the prospect of financial gain. *Id.* The plaintiffs had argued that the defendants "ultimately profited themselves by, at the least, increasing the value" of the governance token. *Id.* at 223. The court held that this wasn't enough, saying that "Plaintiffs' citation to SEC Chair Gensler's conclusory statement that '[t]here's some incentive structure for those promoters and sponsors in the middle of' the decentralized software, cannot support a claim that Defendants had a financial interest in the particular transactions at issue here. . . . Instead, Plaintiff's allegations that [defendants] either directly solicited the transactions or did so as a means of obtaining a profit are entirely conclusory and devoid of factual support." *Id.* (internal citations omitted).

*Risley* is thus distinguishable in two ways. First, the court didn't hold that increasing the value of a security could never be enough to constitute a financial interest sufficient for

solicitation. It held more narrowly that the plaintiffs hadn't explained in a non-conclusory way how the defendants in that case would actually benefit from the plaintiffs' purchases. Unlike in *Risley*, Samuels explains clearly enough how Lido would benefit from sales of LDO, and does not rely on conclusory statements about cryptocurrency exchanges generally. Second, and more importantly, the security whose value the *Risley* defendants had allegedly sought to increase—the exchange's governance token—was a different security than the ones the plaintiffs had purchased. The tokens the plaintiffs had actually purchased, meanwhile, were not issued by the defendant exchange. Therefore, as the court noted, the plaintiffs' suit was akin to suing the New York Stock Exchange after losing money "due to an issuer's fraudulent schemes." *Id.* at 222. Here, by contrast, the alleged security that Samuels purchased is the same one whose price he argues Lido has a financial interest in: LDO. And he is suing LDO's issuer, not the exchange on which he purchased it.

## V.    SECONDARY MARKET TRANSACTIONS

The defendants contend that even if Lido has "solicited" the purchase of the tokens by Samuels, its conduct falls outside the scope of the Securities Act for a different reason. To recall, Section 12(a)(1) of the Act imposes liability on a person who "offers or sells" a security in violation of Section 5. 15 U.S.C. § 77*l*(a)(1). As relevant here, Section 5(a)(1) makes it unlawful to sell a security unless it is registered. *Id.* § 77e(a)(1). And the prohibition on the sale of unregistered securities applies to sales that are made "through the use or medium of any prospectus or otherwise." *Id.* The defendants attach significance to the word "prospectus" in Section 5. They say that the use of a prospectus connotes an initial public offering, and that Congress, by using the phrase "prospectus or otherwise," was referring only to a prospectus or other types of communications one would make in connection with an initial public offering. The defendants further contend that Samuels did not buy his tokens in a public offering, and so Lido's conduct falls outside the scope of Section 12(a)(1) and Section 5(a)(1).

But as a textual matter, the phrase "prospectus or otherwise" seems designed to ensure that the sale of *any* unregistered security is covered by Section 5(a)(1): no matter what medium

you're using to sell the security, you can only sell it if it's been registered. This is bolstered by a review of Section 4 of the Act, which exempts certain sales from Section 5. This includes exemptions for "transactions by any person other than an issuer, underwriter, or dealer," and "transactions by an issuer not involving any public offering." *Id.* § 77d(a)(1)–(2). If Section 5(a)(1) were limited to sales of securities in public offerings, there would presumably be no reason to include these exemptions. But the defendants don't argue, at least at this stage, that their conduct falls within one or more of Section 4's exemptions. They argue instead that Section 5(a)(1)—and by extension, Section 12(a)(1)—applies only to public offerings in the first place.[7]

In support of their position, the defendants invoke *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995). In *Gustafson*, the Supreme Court considered the scope of the provision that immediately follows Section 12(a)(1), which creates liability for people who sell a security "by means of a prospectus or oral communication" that includes a material misstatement or omission. 15 U.S.C. § 77*l*(a)(2). The Court held that this provision—Section 12(a)(2)—is limited to statements made in public offerings. A "prospectus," the Court explained, is "confined to documents related to public offerings by an issuer or its controlling shareholders." *Gustafson*, 513 U.S. at 569. And the phrase "or oral communication" should be understood, in context, as referring to a communication that's not a prospectus but that's made in connection with a public offering. Therefore, because secondary market transactions do not occur by means of documents relating to public offerings, the Court held that they are not sales done "by means of a prospectus or oral communication," and cannot give rise to liability under Section 12(a)(2). *Id.* at 567–73, 576–78, 584.

It's not clear whether the approach to statutory interpretation employed by the majority roughly thirty years ago in *Gustafson* is consistent with the Court's current approach. In any

---

[7] It is a defendant's burden to prove that a Section 4 exemption applies; a plaintiff does not need to plead that none does. *See, e.g.*, *Western Federal Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir. 1984). Samuels appears prepared to argue, in response to the assertion of any Section 4 defense, that his purchase of the tokens *was* in a public offering. But in response to the motion to dismiss, he simply argues (correctly) that Sections 12(a)(1) and 5(a)(1) are not limited to sales made in public offerings.

event, it does not follow from *Gustafson* that Sections 12(a)(1) and 5(a)(1) apply only to sales made in public offerings. First, in terms of plain text, Sections 12(a)(1) and 5(a)(1) contemplate a broader scope than does Section 12(a)(2). Section 12(a)(2) covers sales "by means of a prospectus or oral communication." 15 U.S.C. § 77*l*(a)(2). Sections 12(a)(1) and 5(a)(1) cover sales "through the use or medium of any prospectus *or otherwise*." (emphasis added). *Id.* §§ 77*l*(a)(1), 77e(a)(1). Second, in terms of structure, Section 4 exempts many secondary market transactions—including transactions by entities other than issuers, underwriters, and dealers, and transactions by issuers "not involving any public offering"—from Section 5 and thus Section 12(a)(1) liability. But Section 4 does not exempt these transactions from Section 12(a)(2) liability.

Therefore, as Justice Thomas noted in his dissent in *Gustafson*, reading Section 12(a)(1) and Section 5(a)(1) as limited to public offerings "would render § 4 superfluous": if Section 12(a)(1) and Section 5(a)(1) were limited to public offerings by their own language, "this would have precluded any need to include § 4 at all." *Gustafson*, 513 U.S. at 591 (Thomas, J., dissenting). Justice Thomas would have applied this concept to Section 12(a)(2) as well. But the majority reasoned that reading Section 12(a)(2) as limited to public offerings did not create the same superfluity because Section 4 does not apply to Section 12(a)(2). *Id.* at 573 (majority opinion). Given this exchange, there is no reason to believe that any member of the Court in *Gustafson*—whether in the majority or the dissent—thought that Section 12(a)(1) and Section 5(a)(1) are limited to public offerings by their own terms. Reading these provisions to apply to secondary market transactions (to the extent those transactions are not exempted by Section 4) ensures that Section 4 serves a purpose and gives meaning to Section 5(a)(1)'s use of "or otherwise"; the defendants' reading, on the other hand, treats Section 4 as surplusage and largely reads "or otherwise" out of the statute. So even if the defendants are ultimately correct that Samuels's secondary market transaction was not part of a public offering (or, in the language of Section 4(a)(2), was a transaction "not involving any public offering"), they "should look to Section 4, not *Gustafson*," to dispose of his claim on that basis. *Owen v. Elastos Foundation*, No.

19-cv-5462, 2021 WL 5868171, at *14 (S.D.N.Y. Dec. 9, 2021).

  The defendants insist that, under their reading, Section 4 is not surplusage but rather part of a "belt and suspenders" burden-shifting approach. Under their theory, a plaintiff bringing a Section 12(a)(1) claim has the initial burden (under Section 12(a)(1) and Section 5(a)(1)) to plead that they purchased the unregistered security in a public offering, and then the burden shifts to the defendant to show that the transaction did not involve a public offering (under Section 4). The defendants are correct that the Section 4 exemptions are affirmative defenses that a defendant bears the burden of establishing. But then it seems even less plausible that the purchase of a security in a public offering is an element of a Section 12(a)(1) claim: if purchase in a public offering were an element of the claim, there would be no need to establish a similar requirement as a separate affirmative defense. To make something both an element and an affirmative defense is not "belt and suspenders." It's irrational, and there's no reason to ascribe such irrationality to the Securities Act.

  Relatedly, the defendants argue that "or otherwise," as used in Section 5(a)(1), must be read narrowly and in light of "prospectus," which precedes it. It's true as a general matter that "otherwise" must be interpreted in light of the words preceding it. *See, e.g.*, *Fischer v. United States*, 144 S. Ct. 2176, 2182–86 (2024). But the statute's definition of "prospectus" already includes "any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale." 15 U.S.C. § 77b(a)(10). So if all Congress wanted to do was cover "prospectus-like documents" in situations where a formal prospectus hasn't been filed, there would have been no need to add "or otherwise." It could have just referred, as it did in Section 12(a)(2), to a "prospectus or oral communication." This would have covered any "notice," "advertisement," or "oral communication" that offered a security for sale in connection with a public offering. That Section 5(a)(1) instead refers to sales by "prospectus or otherwise" indicates that it is intended to apply more broadly than just to things included in the definition of a "prospectus"—in other words, more broadly than something that "describes a public offering of securities," as prospectus was defined in *Gustafson*, 513 U.S. at 584—and thus

more broadly than Section 12(a)(2).

The defendants cite *Kainos Laboratories, Inc. v. Beacon Diagnostics, Inc.*, in which the court held that Section 12(a)(1) is limited to public offerings. No. C-97-4618, 1998 WL 2016634, at *6–7 (N.D. Cal. Sep. 14, 1998). For one thing, at least two other district courts have since held that Section 12(a)(1) and Section 5(a)(1) cover secondary market transactions. *See, e.g.*, *Zakinov v. Ripple Labs, Inc.*, No. 18-cv-06753, 2020 WL 922815, at *11–12 (N.D. Cal. Feb. 26, 2020); *Owen*, 2021 WL 5868171, at *12–14. More importantly, *Kainos* reached its conclusion based on a footnote in Justice Ginsburg's *Gustafson* dissent, which stated that there "is no dispute that" Section 12(a)(1) applies "only to public offerings—or, to be precise, to transactions subject to registration." *Kainos*, 1998 WL 2016634, at *6–7 (citing *Gustafson*, 513 U.S. at 600 n.4 (Ginsburg, J., dissenting)). But Justice Ginsburg also joined Justice Thomas's dissent, which stressed that Section 5 (and thus Section 12(a)(1)) is only limited to initial offerings by Section 4 and noted that "Congress left the job of exempting certain classes of transactions to §§ 3 and 4." *Gustafson*, 513 U.S. at 586 (Thomas, J., dissenting). So in context, it's clear that Justice Ginsburg meant that Section 12(a)(1) and Section 5(a)(1) are limited by Section 4. *Kainos* is also undercut by the Ninth Circuit's statement, made in a different context, that "[b]y its terms, Section 5 . . . creates liability for *any* securities sale for which 'a registration statement is [not] in effect;' it does not limit liability to initial distribution"—in other words, that any limitations on Section 5 (and thus Section 12(a)(1)) must come from Section 4. *SEC v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007) (third alteration in original).

## VI.    CONCLUSION

For the foregoing reasons, Robot's motion to dismiss is granted. The motions to dismiss by Dolphin, Paradigm, Andreessen Horowitz, and Dragonfly are denied. Discovery against the remaining defendants can proceed immediately. A case management conference is set for 10am on December 6, 2024, to set a schedule for the rest of the case. Because of the Thanksgiving holiday, the parties need not file their joint case management statement until December 3.

**IT IS SO ORDERED.**

Dated: November 18, 2024

_____
VINCE CHHABRIA
United States District Judge